UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.

| | |
|---|---|
| CHRISTINA CORDA, | ) |
|   Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| SUFFOLK COUNTY DISTRICT | ) |
| ATTORNEY'S OFFICE, | ) |
|   Defendant | ) |

**COMPLAINT & JURY DEMAND**

Plaintiff Christina Corda brings claims for sex discrimination and retaliation, pursuant to Mass. Gen. Laws ch. 151B and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. Plaintiff also brings claims under the Massachusetts and federal equal pay acts.

**Jurisdiction**

1. The court has original jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

2. The court has supplemental jurisdiction over the state claims in this action pursuant to 28 U.S.C. § 1367(a).

**Parties**

3. Plaintiff Christina Corda is an adult resident of Suffolk County, Massachusetts.

4. Defendant Suffolk County District Attorney's Office ("DA's Office") is a political subdivision of the Commonwealth of Massachusetts. At all times relevant to this complaint, the Suffolk County District Attorney was Daniel Conley.

**Facts**

5. Ms. Corda began working for the DA's Office as an Assistant District Attorney ("ADA") in September 2007. She continued working there until her termination on or about September 22, 2014.

6. During the course of her employment, she was promoted on several occasions, most recently to the Gang Unit in or around August 2012.

7. Prior to her termination, Ms. Corda had never been subject to any disciplinary action. On the contrary, she had been praised repeatedly for her prosecution work, including by the District Attorney himself. For example, in the past year, she was praised for her work on two significant trials.

8. In May 2014, she obtained guilty verdicts in a major gang case. On Thursday, May 22, 2014, the District Attorney sent a group email saying:

> Tom, I apologize for not responding sooner to your email of May 16th, though I read it when it came in. This was truly a remarkable verdict given the state of the evidence and the adherence of the victim to the 'code of the street.' Great police work by Detectives Carroll and Charbonnier, and the other officers who assisted them. As well, I couldn't be more pleased by the preparation, skill and persuasive arguments of ADA Christina Corda in convincing the jury to credit our understanding of the facts and take a very dangerous man off the streets of our city. Thanks for taking the time to pass along your thoughts. I really appreciate it. All the best, Dan C.

9. Thereafter, Ms. Corda saw the District Attorney in front of the office, and he shook her hand and congratulated her on the case. On his Facebook page, he posted a paragraph about the case and a link to a press release on the Suffolk County District Attorney's Office website stating,

> Whether because he didn't see the assailant's face or adhered to a misguided code of conduct, the victim in this case didn't identify the man who shot at him – but that didn't stop ADA Christina Corda of our Gang Unit from building an ironclad case against the defendant. Congratulations to her and the trial team for their remarkable work on this challenging case.

10. On Thursday, May 30, 2014, the District Attorney wrote a letter to Boston Police Commissioner William Evans, citing Ms. Corda's trial along with another and saying about her, "Make no mistake: the prosecutor assigned this case had a tough job with a recalcitrant victim and not one eyewitness who could identify the defendant, but she carried the day with the help of that lab work."

11. In August 2014, Ms. Corda obtained guilty verdicts in another major gang case. On August 26, 2014, her supervisor sent an email saying,

> Verdicts just came in. Enrry Garcia was found guilty of both Aggravated ABDW (2 cts) and A&B for the stabbing and beating of Israel Munguia- Padilla with, among other things, a screwdriver, on August 12, 2012. Co-D Argenis Felipe was found NG. Case was tried before Conners, J. John Moss & Paul Anthony for the defendants. A third co-d and the principal aggressor, Juan Ortiz pled out prior to trial and is serving a 6-7 year sentence. Defendants are associated with the Chelsea Bloods/Los Chollos. Israel was an unaffiliated innocent victim. Another huge effort for Corda on a very difficult case.

First Assistant District Attorney Patrick Haggan replied to the email by saying, "Christina, Great job on this case! Congratulations. You are really on quite a roll! Pat."

12. Beginning in March 2014, and continuing while these trials were going on, Ms. Corda complained about the relatively low salaries of a black colleague and herself. When she ultimately attributed those disparate salaries to race and sex discrimination, she was terminated, as discussed in more detail below.

3

13.     On March 10, 2014, Ms. Corda met with Mr. Haggan about her salary. In the course of their meeting, she noted that a number of male ADA's that were hired with or after her, or had less time in service, were making more money than she. In addition, she noted that one of her colleagues who is black, R.A., also had a lower salary. (Salaries are public information that is available on the Commonwealth of Massachusetts website.) Mr. Haggan noted that another ADA made less than Ms. Corda and R.A.. That ADA is a Hispanic woman who left the office shortly thereafter. Mr. Haggan reassured Ms. Corda that there were no concerns about her work or the work of R.A., and that they were performing well. Mr. Haggan said he would talk to Chief of Staff John Towle and the District Attorney and get back to her.

14.     Thereafter, Ms. Corda repeatedly followed up with Mr. Haggan, either in person or via email, but her salary was not increased. At the very least, those communications included the following:

      a. On Monday, April 7, 2014, Ms. Corda sent an email to Mr. Haggan saying, "Hi Pat, Hope you are doing well. I am emailing to follow up on our conversation from March 10 and wanted to see if there had been an update in regards to salary status. Thanks!"

      b. On Wednesday, April 9, 2014, Ms. Corda received an email from Mr. Haggan saying, "Christina, Sorry for the delay in responding. My recommendation on salary issues is with the DA now but I do not yet have an answer. I will let you know as soon as a decision is made. Feel free to come speak with me if you would like any additional explanation. Thanks. Pat."

c. On Sunday, April 27, 2014, Ms. Corda sent an email to Mr. Haggan saying, "Hi Pat, Hope you had a nice weekend. Wanted to check in again on the salary issues to see if the DA had responded since our least [sic] email a few weeks ago. Thanks!"

d. On Wednesday, May 7, 2014, Ms. Corda received an email from Mr. Haggan saying, "Christina, Please come see me when you have a moment so I can update you on the salary discussion. Thanks. Pat."

e. On Thursday, May 8, 2014, Ms. Corda sent an email to Mr. Haggan saying, "Hi Pat, Thank you for your email. I am empaneling a jury today but will try to stop by later in the afternoon or tomorrow. Thanks. –Christina."

f. In the latter half of May 2014, Ms. Corda had a second meeting with Mr. Haggan regarding salary issues. Mr. Haggan said he had good news and bad news. The bad news was that he spoke to the District Attorney, who said he could not give a raise now because then 20 other people would be asking for one, but he was happy with Ms. Corda's and R.A.'s work, adding that the District Attorney specifically passed along his congratulations and was happy about Ms. Corda's last trial. The good news was that the office was getting a budget increase, and as of July 1, 2014, the number one priority of the District Attorney and Mr. Haggan was getting Ms. Corda and R.A. a raise. He said he would ask that it be

retroactive to September 2013. Ms. Corda asked if she and R.A. could follow up if they did not hear and he said hopefully he'd be calling them as of July 1, 2014, but if not she could contact him.

g. As of Monday, July 7, 2014, Ms. Corda had not heard anything about a raise, so she sent an email to Mr. Haggan (copying R.A.) saying, "Hi Pat, Hope you had a nice holiday weekend. I know you had told me to give you a reminder aka bug you if [R.A.] and I had not heard from you after the new fiscal year, so I wanted to shoot you an email to check in on the status. Thanks!"

h. On Friday, July 11, 2014 Mr. Haggan sent an email to Ms. Corda and R.A. saying, "Christina and [R.A.], Thank you for the email to follow-up as I instructed you to do. I apologize for the delayed response, but I was on a work-related trip this week and just got back last night. Unfortunately, over the past two weeks, the DA and I have not had mutual availability to meet to discuss the salary issue in the new fiscal year. I do expect, however, to speak to him next week about this and other related personnel issues. I hope to have an update for you by the end of next week. Thank you for your continued hard work and patience. Pat."

i. On Tuesday, July 22, 2014, Ms. Corda sent an email to Mr. Haggan (again copying R.A.) saying, "Hi Pat. Hope you had a nice weekend. Just checking in how your meeting went with Dan last week. Thanks!" She never received a response to this email.

    j.  On Monday, September 8, 2014, Ms. Corda sent another email to Mr. Haggan (again copying R.A.) saying, "Hi Pat, Hope you had a nice weekend.  Wanted to check in again about our salary status and the meeting you had with the DA in July.  Thanks!"

    k.  On Wednesday, September 10, 2014, Mr. Haggan sent an email to Ms. Corda and R.A. saying, "Sorry for the delayed response. The DA decided that all raises will be calculated as part of our current review process (new evaluation forms/reviews/etc.) that we hope to have completed by the end of October.  Feel free to come see me if you have any questions or concerns.  Thanks.  Pat."

    l.  On Thursday, September 11, 2014, Ms. Corda sent an email to Mr. Haggan (copying R.A.) saying, "Hi Pat.  Thank you for your email.  I would like to come see you to discuss this whenever you are free.  Thanks!"  She never received a response to this email.

15.    On Friday, September 19, 2014, Ms. Corda attended a going-away party for a colleague, Christine Walsh.  At the party, she saw Mr. Towle.  They had a conversation, during which she said that she did not make enough money.  She said that the reason R.A. and she weren't making the money they should is because she is a woman and he is black.  Mr. Towle asked if she really believed that, and she said she did.  He then walked away without saying anything more.

16.    On Saturday, September 20, 2014, Ms. Corda received an email from Karen DiLoreto, secretary to the District Attorney, saying, "Hi Christina, The District

Attorney would like to meet with you on Monday at 8:30 a.m. in the 7th floor conference room. Thank you, Karen DiLoreto."

17.     On Monday, September 22, 2014, prior to 8:30 a.m., Ms. Corda received a voicemail from Ms. DiLoreto on her work phone saying she was not sure if she had received the email over the weekend but that the District Attorney wanted to meet with her at 8:30 a.m.

18.     At 8:30 a.m., Ms. Corda reported to the 7th floor (Executive Floor) with paperwork that included a list of eight males who started her year or after her, or had fewer years in than she, and the salary amounts they made, together with the emails between Mr. Haggan and her, and other materials. Ms. DiLoreto asked her to come back at 9 a.m. She returned at 9:00 a.m. and reported to the 7th floor. She was instructed to go sit in the conference room for the District Attorney. The District Attorney, Mr. Haggan, and Chief Trial Counsel John Pappas entered the conference room. The District Attorney began by saying words to the effect of, "This is not a good way to start my week," or "This is a bad way to start my week." He then said, in words and substance, that what Ms. Corda said to Mr. Towle the prior Friday was untrue and offensive, and he criticized her integrity and honesty. He ended by saying that she was terminated effective immediately, that she would be escorted to her office, and that she was to turn in her phone, pass, and credentials.

19.     On or about October 28, 2014, Ms. Corda filed timely charges of discrimination with the Massachusetts Commission Against Discrimination and the U.S. Equal Employment Opportunity Commission ("EEOC").

20. In response to her charge, the DA's Office stated, among other things, that Ms. Corda was terminated because she "accosted the DA's Office's Chief of Staff at a commercial establishment making profane and hostile statements about her pay rate, alleged discrimination, and political favoritism." As a result, the DA's Office all but admits that Ms. Corda was terminated as a result of her complaints of discrimination, but it seeks to avoid liability by suggesting that Ms. Corda failed to conform to some unspecified code of genteel behavior. In fact, the evidence will show that the environment at the DA's Office often was not genteel, and Ms. Corda's alleged conduct was not unusual. Among other things, the use of profanity, work events at which employees drank, and heated discussions were part of the culture of the DA's Office. Indeed, on information and belief, neither the use of profanity nor heated discussions ordinarily led to disciplinary actions. As a result, it was not Ms. Corda's language or demeanor that led to her termination; it was the fact that she accused the DA's Office of discrimination, an allegation that District Attorney Conley admits that he found "offensive."

21. Ms. Corda has received a right to sue from the EEOC.

## COUNT I
### Sex Discrimination (42 U.S.C. §§ 2000e *et seq.*)

22. Ms. Corda incorporates the above paragraphs. The DA's Office discriminated against Ms. Corda on the basis of sex by paying her less than men who were equally or less qualified than she. As a result, Ms. Corda suffered harm, including lower wages and emotional distress.

## COUNT II
### Sex Discrimination (Mass. Gen. Laws ch. 151B)

23. Ms. Corda incorporates the above paragraphs. The DA's Office discriminated against Ms. Corda on the basis of sex by paying her less than men who were equally or less qualified than she. As a result, Ms. Corda suffered harm, including lower wages and emotional distress.

## COUNT III
### Retaliation (42 U.S.C. §§ 2000e *et seq.*)

24. Ms. Corda incorporates the above paragraphs. The DA's Office retaliated against Ms. Corda based on her complaints of discrimination. As a result, Ms. Corda suffered harm, including lost wages and emotional distress.

## COUNT IV
### Retaliation (Mass. Gen. Laws ch. 151B)

25. Ms. Corda incorporates the above paragraphs. The DA's Office retaliated against Ms. Corda based on her complaints of discrimination. As a result, Ms. Corda suffered harm, including lost wages and emotional distress.

## COUNT V
### Equal Pay Act (29 U.S.C. § 206(d))

26. Ms. Corda incorporates the above paragraphs. The DA's Office violated the federal Equal Pay Act by paying Ms. Corda less than men for equal work on jobs the performance of which required equal skill, effort, and responsibility, and which were performed under similar working conditions. Ms. Corda's lower pay was not made pursuant to (a) a seniority system; (b) a merit system; (c) a system which measures earnings by quantity or quality of production; or (d) a differential based on any other factor other than sex. As a result, Ms. Corda suffered harm.

## COUNT VI
## Massachusetts Equal Pay Act (Mass. Gen. Laws ch. 149, § 105A)

27. Ms. Corda incorporates the above paragraphs. The DA's Office violated the Massachusetts Equal Pay Act by paying Ms. Corda less than men for jobs that were comparable in substantive content. Moreover, the job that Ms. Corda performed and the jobs performed by her higher-paid male co-workers entailed comparable skill, effort, responsibility, and working conditions. Ms. Corda's lower pay was not based upon differences in seniority. As a result, Ms. Corda suffered harm.

## PRAYERS FOR RELIEF

WHEREFORE, Ms. Corda respectfully asks this Court to enter the following relief:

a. An award of damages for all lost wages and benefits;

b. An award of damages for emotional distress;

c. Liquidated damages;

d. Punitive damages;

e. An award of attorneys' fees, costs, and pre- and post-judgment interest; and

f. Such other legal and equitable relief as the Court deems just and proper.

## **JURY DEMAND**

Ms. Corda demands a trial by jury for all claims so triable.

                                CHRISTINA CORDA,

                                By her attorney,

                                /s/ *Stephen Churchill*

                                _____
                                Stephen Churchill, BBO # 564158
                                FAIR WORK, P.C.
                                192 South Street, Suite 450
                                Boston, MA 02111
                                (617) 607-3260
                                steve@fairworklaw.com

Dated:  March 3, 2015