## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

*Civil Action No. 15-10628-RWZ*

CHRISTINA CORDA,        )
  Plaintiff             )
                        )
v.                     )
                        )
SUFFOLK COUNTY DISTRICT   )
ATTORNEY'S OFFICE,       )
  Defendant           )

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Christina Corda opposes the defendant's motion to dismiss. In short, the defendant's contention that Ms. Corda willfully withheld any information is wrong. As discussed below, Ms. Corda made a diligent, good faith effort to comply with this Court's order and with all of her discovery obligations. There is no basis for imposing any sanction, much less the extreme step of dismissing Ms. Corda's discrimination and retaliation claims. As a result, the defendant's motion should be denied.

1.      **Because this Court is being asked to exercise its discretion, it is important to consider the overall circumstances of this case, and those circumstances include what material facts are and are not in dispute.**

In terms of liability, the principal question in dispute is whether Mr. Conley terminated Ms. Corda based on her complaint of discrimination. The core facts underlying that question are not in dispute. There is no dispute that Ms. Corda complained of discrimination to Mr. Conley's chief of staff, John Towle, at an office party on the night of Friday, September 19, 2014. (Deposition of Daniel Conley, Exh. 1,

at 72:5-11; Position Statement, Exh. 2, at 5).[1]  There is no dispute that she – presumably

like everybody else at the party, including Mr. Towle (the party was at a bar) – was

drinking, and she readily admits that she had a number of drinks.  (Interrogatory

Answers, Exh. 3, at 5).  There is no dispute that she was sent an email the very next day,

ordering her to report to Mr. Conley's office on Monday morning.  (Email, Exh. 4).  And

there is no dispute that when she reported to Mr. Conley's office that morning, she was

terminated in a brief meeting, with the DA telling her, among other things, that what she

said to Mr. Towle was "untrue" and "offensive."  (Position Statement, Exh. 2, at 7).

In its position statement to the Massachusetts Commission Against

Discrimination, which was signed under oath by Mr. Conley, the DA's Office admitted

that it was "deeply troubled" by Ms. Corda's allegations of discrimination and that she

was terminated, at least in part, based on those allegations.  (Id. at 7, 19) ("The DA's

Office was deeply troubled by the Complainant's allegations of sexism, racism, and

political favoritism.  In addition, the DA's Office believed that the Complainant's use of

profanity, her hostility, and her refusal to adhere to requests from Mr. Towle and Mr.

Zanini to wait until an appropriate forum to discuss her grievance amounted to

unacceptable conduct and insubordination.  The totality of the Complainant's conduct on

September 19, 2014 warranted termination, despite her strong trial work.  …It is clear

that the Complainant's abusive and profane language *and accusations of sexism, racism,*

*and political favoritism, while in an intoxicated state, are the basis for her termination*.")

(emphasis added).  Mr. Conley's deposition testimony further established that he

---

[1] Because the defendant has designated Mr. Conley's entire deposition transcript as confidential, Ms. Corda is moving to file it under seal.

terminated Ms. Corda based on his belief that Ms. Corda was making allegations that he

deemed untrue, and that she would not have been terminated for alleged intoxication and

profanity if she had said she loved working at the DA's Office instead of registering her

complaints.  (Conley Depo., Exh. 1, at 124:3 – 125:8; 137:6-15).

     As a result of this evidence, there is no material dispute about the facts (1) that

Ms. Corda was drinking at the party, (2) that she complained about discrimination, (3)

that the DA's Office was "deeply troubled" by her complaint, and (4) that her complaint

played a part in her termination.

**2.     The defendant's proposed inference that Ms. Corda willfully withheld information is illogical and unwarranted.**

     The defendant asserts – as a fact – that Ms. Corda willfully failed to comply with her

discovery obligations, but that is not a fact, it is an allegation.  As set forth in her accompanying

affidavit, Ms. Corda did not willfully fail to comply with her discovery obligations.  (Affidavit of

Christine Corda, Exh. 5).  In reality, the defendant is asking the Court to *infer* that Ms. Corda

*intentionally* withheld documents based on the fact that the defendant found several text

messages (out of a universe of well over 10,000 messages, as discussed below) that Ms. Corda

did not find and produce as part of the hundreds of messages that she did find and produce.  The

inference that the defendant asks this Court to make is illogical and unwarranted for multiple

reasons.

     As a threshold matter, it is important to put into context how difficult it is to locate

specific messages.  For the Court's reference, the text messages that Ms. Corda produced are

attached as Exh. 6.[2]  Finding responsive text messages is time consuming and difficult.  (Corda

---

[2] Given the highly personal nature of many of these messages, Ms. Corda is moving to file this exhibit under seal, as well.

Aff. ¶ 3).  Ms. Corda uses text messages extensively to communicate with a large number of friends and business acquaintances.  (Id.).  In fact, she relies much more heavily on text messages than she does on email.  (Id)  She currently has more than 590 "conversations" in her text messages.  (Id.).  A "conversation" includes messages with a specific person or group of people.  (Id.).  Many of those conversations have dozens – and in some cases hundreds – of individual messages.  (Id.).  As a result, although she has not counted a specific number (and is not aware of any easy way to do so) she estimates that she has well over 10,000 individual text messages on her phone.  (Id.)  To the best of her knowledge, the only way to review all messages is to continually scroll through, download, and read older messages within each of her hundreds of conversations, which is a very time consuming process.  (Id. ¶ 4).  She is not aware of any easy way to print text messages.  (Id. ¶ 5).  As a result, to print out a string of messages, she has to take a screen shot from her phone, then scroll down to take another picture, and so on, and then those pictures have to be put in order, which is also a time consuming process.  (Id.).  In addition to spending many hours searching to the best of her ability for text messages responsive to the Defendant's Second Request, she also spent hours in her attorney's office to organize and compile all of the screen shots she took.  (Id. ¶ 6).  Throughout this process, she made a good faith and diligent effort to find all responsive text messages, and she never attempted to withhold any responsive documents for any reason.  (Id. ¶ 7).

As a further threshold matter, it is important to identify the specific individual messages upon which the DA's Office relies in support of its motion, because the subject of those messages bears on the defendant's inference that Ms. Corda intentionally withheld information.[3]

---

[3] According to the information accompanying its motion, the defendant had these additional text messages as of October 9, 2015.  (Affidavit of Aaron White, Esq. ¶¶ 4-5).  Although they fell

The messages include ones that said (1) "Pretty sure I said me and Rilwan not making as much bc woman and black…Wow…Can't even remember it all.  This said that he said you this that? I said yes and he got pissed and left," (2) "Eff…Can't believe said. Can't remember his started…How…Too much [drink emoji]", (3) "You think I should talk to him?...I'm going to be anxious all weekend," (4) "I hope I didn't say worse ugh ha," (5) "And maybe day will cool him off," and (6) "Tons of pple came, all higher ups there, speeches, booze, black out, told off towle…I went home by 1130 so not sure."  (Motion, pp.6-7).

Based on this information, the defendant's inference that Ms. Corda willfully withheld information is wholly unwarranted.  First, the defendant grossly misrepresents Ms. Corda's deposition testimony to support its contention that she was shielding information from discovery. In its motion, the defendant argues, apparently with a straight face, that the messages at issue are "fatal to her claims" and "wildly inconsistent" with her pleadings.  (Motion, p.12).  It does not identify any actual inconsistencies with her "pleadings," much less wild ones.  Likewise, the messages are not inconsistent with her deposition testimony.  The defendant, for example, points to her deposition testimony allegedly denying that she used profanity.  (Motion, p.2).  In the first place, and most significantly, *none* of the new text messages indicate that Ms. Corda used profanity when talking to Mr. Towle, so there is no inconsistency.  In the second place, the defendant's characterization of her deposition testimony is inaccurate.  She said that she did not

---

squarely within the plaintiff's document request, they were not produced to Ms. Corda until one month later, on the same day that the defendant filed its motion to dismiss, November 5, 2015. No doubt to justify its non-production, the defendant claimed, inexplicably, that the additional text messages were "work product."  Letter from Aaron White, Exh. 8.  The defendant knew that Ms. Corda's further production originally was due on October 23, 2015.  Because Ms. Corda's counsel was on trial, Ms. Corda moved (over the defendant's objection) to have an additional week to produce further texts.  The Court allowed the motion, and she produced further texts on October 30, 2015.  During this entire time, the defendant had the texts at issue but did not produce them, plainly hoping that Ms. Corda would miss one of the texts so it could file its motion.

use profanity when talking to Mr. Towle (given that they are not friends), but she acknowledged using profanity when talking to Jack Zanini (who was nearby and present for some of the conversation) because "[t]hat's how we talk." (Corda Depo. at 378:1 – 379:8).

The defendant also points to her alleged testimony that she was "lucid" during the conversation and that she "repeatedly denied that she was intoxicated" at the time of the incident. (Motion, pp.2-3). That is a false characterization of her testimony. She was first asked, "When this discussion was proceeding, you were lucid and not intoxicated?," and she answered, "Yes. I had alcohol in my system, but I was saying what I would have said and I have said." (Corda Depo. at 400:18-22). That question is not even proper, because there was no foundation that Ms. Corda was qualified to render an opinion on her level of lucidity or intoxication (whatever those terms mean in this context). But in any event, her answer plainly does not mean that she was claiming to be "lucid and not intoxicated." On the contrary, she acknowledged that she had alcohol in her system but testified that her statement was not made as a result of having been drinking. Even more significantly, she was later asked, "Well, were you intoxicated when you talked to John Towle?," and she answered, "Like I said to you. I had the drinks that we already went over. *So I guess that's up to anyone else, whether I'm intoxicated or not.* I never said to Rilwan, 'I wasn't intoxicated.' That's not how I speak." (Corda Depo. at 433:2-9) (emphasis added). According to the defendant, this is one of the two times she "repeatedly" denied that she was intoxicated (Motion, p.3), which is obviously an inaccurate characterization of her testimony.

Finally, the defendant asserts that Ms. Corda denied that her conversation with Mr. Towle was "aggressive." (Motion, p.3). When being asked about what she said to her parents, she was asked, "Did you tell them that your conversation was aggressive?," she answered, "No, because

it wasn't." (Corda Depo. at 445:10-12).  None of the text messages at issue indicate that Ms.

Corda thought her conversation with Mr. Towle was "aggressive."  One message has three words

that say, "told off towle."  That does not mean she was "aggressive," because telling someone off

does not require aggression.  Indeed, the Cambridge Dictionary of American Idioms defines "tell

off somebody" as "to tell someone that their behavior is not acceptable," giving the example, "*I*

*was told off by my best friend, and it was a long time before I could forgive her. He's always*

*been obnoxious and it's about time someone told him off.*"  Cambridge Dictionary of American

Idioms (Cambridge University Press 2003).  That is precisely what Ms. Corda did: she told Mr.

Towle that the DA's Office was acting in an unacceptable (and unlawful) manner.

     <u>Second, the inference that Ms. Corda willfully withheld text messages to protect herself is</u>

<u>illogical given that she produced documents that said largely the same things as the handful of</u>

<u>messages at issue.</u>  For example, in discovery she produced talking points that she had prepared

for her meeting with Mr. Conley on the morning of September 22, 2015, which included the

following:

> 4. Apologize how I said it, that I said it – was done incorrectly and was wrong to
> bring up how did at social event and now did it was rude to do then etc and when
> did and I apologize for that when/where/how.

(Document, Exh. 7).  Likewise, among the hundreds of text messages that she found and

produced, there were a number that are not materially different from the text messages upon

which the defendant now relies, including (just as illustrative examples) the following: (1) "App

jack thought I wasn't drunk…Not sure how ha" (Exh. 6 at CC955), (2) "Oh also btw I app said

Darcy got $/prom etc afer doing campaign work…Should I call towle and just say sorry

shouldn't have brought up at that party" (CC1021), (3) "Ugh I'm freaking out now bc think they

are going to fire me" (CC1034), (4) "Thx! Ugh nervous…Feel like they'll try to fire me"

(CC925), (5) "Doubt it bc said campaign thing too" (CC927), (6) "I mean I think all said was those things" (CC931), (7) "Yeah but said bad stuff to towle" [then, in response to "Are you serious??? No way"] "Oh yes" (CC538), and (8) "Going to be anxious" (CC540).  If Ms. Corda were attempting to withhold harmful information, why would she have produced all of these documents?

Third, the text messages at issue have no significant bearing on the central issues in this case.  As a result, Ms. Corda had no incentive to willfully withhold any of the messages.  The defendant contends that the messages show that she "contemporaneously admitted being heavily intoxicated (she uses the term 'black out'), that she 'told off' the DA's Office's Chief of Staff, and that she lacks a memory of statements she made leading to her termination."  (Motion, p.1). But there is *no dispute* that she had a number of drinks and confronted the chief of staff, so she had no reason to withhold evidence on those topics.  And her contemporaneous statement that she can't remember "it all" has little bearing in the circumstances of this case, given the undisputed facts, upon which both she and the DA's Office agree, that she had drinks, confronted the chief of staff, and complained about discrimination.  Her memory about any other facts is immaterial, because none of the other facts are significant.  Indeed, the defendant has not identified any other facts of consequence.  As a result, production of the messages would have no meaningful bearing on her case, so she had no reason to withhold them.

In short, the defendant's highly charged allegation that Ms. Corda willfully withheld relevant documents makes no sense in the overall circumstances of this case.  As a result, the entire premise of its motion fails, and the motion should be denied.

3.      **Given the overall circumstances of this case, dismissal is plainly unwarranted.**

There is no dispute that courts have broad discretion to address discovery issues, including allegations that a party has not complied with its discovery obligations.  But dismissal is a severe sanction that should be reserved for the most extreme situations.

The First Circuit has recognized that dismissal with prejudice is "the harshest sanction, other than contempt, which may be visited on a party." *Benitez-Garcia v. Gonzalez-Vega*, 468 F.3d 1, 4 (2006).  As a result, the sanction is reserved for cases of "extremely protracted inaction (measured in years), disobedience of court orders, ignorance of warnings, contumacious conduct, or some other aggravating circumstance." *Id*. (internal quotation marks and citation omitted).  It has long been the rule that "a case should not be dismissed with prejudice except 'when a plaintiff's misconduct is particularly egregious or extreme.'" *Id.* at 5*, quoting Benjamin v. Aroostook Med. Ctr., Inc*., 57 F.3d 101, 107 (1st Cir. 1995) (other citations omitted).  And because fairness concerns "encompass both the law's preference that cases be disposed of on the merits…*and* procedural aspects such as notice and an opportunity to be heard," dismissals are reviewed based both on "the substance" and "the procedure by which the sanction was imposed." *Id*. (emphasis added).

Substantive considerations include "the severity of the violation, the legitimacy of the party's excuse, repetition of violations, the deliberateness vel non of the misconduct, mitigating excuses, prejudice to the other side and to the operations of the court, and the adequacy of lesser sanctions." *Id., quoting Robson v. Hallenbeck*, 81 F.3d 1, 2-3 (1st Cir. 1996).  It is abundantly clear that these considerations do not warrant dismissal here.  In terms of severity, it is significant that there is no "pattern of…repeatedly flouting court orders." *Id*.  In reversing a district court's dismissal for violation of a single discovery order, the First Circuit observed that "we have been

unable to find [] a case from this circuit sustaining a dismissal with prejudice imposed solely for a single allegation of noncompliance with a single (albeit multi-part) discovery order." *Id.*

Equally significant here is the lack of any evidence that the defendant suffered any prejudice as a result of obtaining the texts at issue from another employee instead of from Ms. Corda. *See id.* (noting lack of prejudice when reversing dismissal for failure to comply with discovery order). The defendant has the messages. It is ironic here that the *defendant* delayed producing the texts to Ms. Corda in a transparent attempt to then argue that it was prejudiced. The defendant's belief that there might be additional messages that Ms. Corda did not produce is purely speculative, and that belief is insufficient to warrant the extreme sanction of dismissal. Indeed, if that type of belief were sufficient to move for judgment, then Ms. Corda would move for judgment against the defendant, because it appears that the defendant has text messages between its senior staff (about Ms. Corda) that is has failed to produce.[4] But dismissal is not a bludgeon to be used in discovery, and Ms. Corda does not seek to use it that way.

It is telling that the defendant fails to identify a single case remotely similar to this one in which a complaint was dismissed with prejudice. In two of the cases the defendant cites, the First Circuit reversed dismissals, ruling them to have been an abuse of discretion. *Benitez-Garcia,* 468 F.3d at 7; *Robson,* 81 F.3d at 5. In *Malloy v. WM Specialty Mortg., LLC,* 512 F.3d 23, 27 (1st Cir. 2008), the First Circuit upheld a dismissal, but the plaintiffs in that case had discovery responses that were more than seven months overdue under the applicable rules, had failed for more than five months to produce discovery pursuant to an order compelling

---

[4] After repeated requests from Ms. Corda, the defendant produced text messages from *one* senior staff member to two other senior staff members (Mr. Towle and John Pappas). (Messages, Exh. 9). Those messages have been marked as confidential, so Ms. Corda is moving to file them under seal. The messages were about Ms. Corda and were sent during the critical period of Friday, September 19, 2014 and Monday, September 22, 2014. The defendant has failed to produce any messages from the phones of Mr. Towle or Mr. Pappas.

production, had provided their initial disclosures three weeks late (and only after being

reminded), had failed to respond to another defendant's discovery requests until ordered to do so,

was subject to a pending motion to compel overdue responses from a third defendant, had been

warned by the court that dismissal was imminent, filed no opposition to the motion to dismiss,

and proffered no legitimate excuses for their delay.  *Id.* at 27-28.  In *Plasse v. Tyco Electronics*

*Corp.*, 448 F. Supp. 2d 302 (D.Mass. 2006), another case upon which the defendant relies, the

district court found clear and convincing evidence that the plaintiff engaged in fraud on the court,

including the intentional and systematic deletion of relevant documents known to be relevant

(after the defendant had already sought their protection and the court had permitted discovery of

them) and repeatedly lied at his deposition.  *Id* at 309-11.

The defendant's remedy in this case is the same remedy that parties use in virtually every

case: if it believes that it can effectively attack Ms. Corda's credibility based on her deposition

testimony or discovery responses, then it can seek to do so by cross examining her at trial.

Indeed, if the Court were inclined to provide a sanction, the appropriate course would be to

permit the defendant to ask her at trial about her production of texts, a line of questioning which

otherwise may be unwarranted.

**Conclusion**

For these reasons, Ms. Corda respectfully requests that the Court deny the defendant's

motion to dismiss.

CHRISTINA CORDA
By her attorney,


/s/ Stephen Churchill
Stephen Churchill, BBO # 564158
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3260
steve@fairworklaw.com

Dated:  November 19, 2015

**CERTIFICATE OF SERVICE**

I certify that I served, by the ECF system, a copy of the foregoing document on all counsel of record.

Dated:  November 19, 2015                    /s/ Stephen Churchill
                                             Stephen Churchill