UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

CHRISTINA CORDA,                          )
      Plaintiff                        )
                      )
                      )     Civil Action No.: 1:15-CV-10628-RWZ
v.                                         )
                      )
SUFFOLK COUNTY DISTRICT            )
ATTORNEY'S OFFICE,                    )
      Defendant                      )
_____)

---

**THE DEFENDANT'S, SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE,
MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

     The Defendant, Suffolk County District Attorney ("DA's Office"), submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment to dismiss Counts I (gender discrimination—Title VII), II (gender discrimination—G.L. c. 151B), III (retaliation—Title VII), and IV (retaliation—G.L. c. 151B) of the Plaintiff's Complaint.

**I.      INTRODUCTION**

     The Plaintiff, Christina Corda ("Plaintiff"), brings this action against her former employer, the DA's Office, for alleged gender discrimination, retaliation, and violations of the Equal Pay Act under both state and federal law.  Plaintiff was terminated on September 22, 2014 after an incident that occurred on September 19, 2014 where she verbally confronted the DA's Office's Chief of Staff, John Towle, in a hostile and demeaning manner about her grievances related to her alleged pay deficiencies while intoxicated at a bar.  At the close of discovery, the undisputed facts demonstrate that Plaintiff's claims for gender discrimination (Counts I and II) and retaliation (Counts III and IV) fail as a matter of law, and the DA's Office is therefore entitled to summary judgment on those counts.

## II.     FACTS

For purposes of this Motion only, the DA's Office assumes the following facts are true.

The DA's Office employs approximately 150 assistant district attorneys, with roughly half of them handling criminal cases in Suffolk County Superior Court and half of them handling cases in Suffolk County's district courts.  *See* Local Rule 56.1 Statement of Material Facts ("SMF") ¶ 7. Dan Conley has served as the District Attorney of Suffolk County since 2002.  *See* SMF ¶ 5. Also since 2002, John Towle has served as the DA's Office's Chief of Staff, where he is responsible for overseeing all business operations of the office.  *See* SMF ¶ 6.

Assistant district attorneys at the Superior Court level are assigned to various units that specialize in the type of criminal cases they prosecute.  The DA's Office values each Superior Court unit individually, and an assistant district attorney's compensation is based, in part, upon his or her placement.  *See* SMF ¶ 10.  Some units are generally afforded greater compensation because they require particularized and unique skill-sets for assistant district attorneys, including the Homicide Unit, Senior Trial Unit, Special Prosecutions Unit, and the Appeals Unit.  *See* SMF ¶ 11.  The Narcotics Unit, for example, typically requires extensive legal research and writing experience because of the pervasiveness of motions to suppress and also handles complex and challenging cases with wiretapping.  *See* SMF ¶ 12.  Placement in the Gang Unit does not require an assistant district attorney the same skills as assistant district attorneys in other units and is usually based on interest in the unit's work.  *See* SMF ¶ 13.

There are several factors that go into an assistant district attorney's compensation. Among many factors, the DA's Office will consider an assistant district attorney's seniority and experience, background and education, and overall job performance.  *See* SMF ¶ 8.  The assistant district attorney's job performance is determined, in large part, based upon the year-end review

and rankings of assistant district attorneys that unit supervisors complete. *See* SMF ¶ 9. The District Attorney set the salaries of assistant district attorneys based upon recommendations that supervisors and other senior staff provide to him and budget considerations constrained by the annual amount allocated to the Office by the Massachusetts Legislature. *See* G.L. c. 12, § 16.

Plaintiff graduated from Suffolk University Law School in May 2007, and she commenced working as an assistant district attorney with the DA's Office in September 2007. *See* SMF ¶¶ 2-3. For approximately two years, Plaintiff worked at Roxbury District Court, before being assigned to Dorchester District Court to serve as a safe neighborhood initiative prosecutor. *See* SMF ¶¶ 14-15. During the Fiscal Year 2012[1], Plaintiff's annual salary was increased from $40,000.00 to $46,500.00. *See* SMF ¶ 17. Two male colleagues, Rilwan Adeduntan and Brendan Cox, started at the same time as Plaintiff, worked at the Dorchester District Court and each received an identical raise simultaneous to Plaintiff. *See* SMF ¶¶ 16, 18. In October 2011, Plaintiff and ADA Adeduntan were promoted from Dorchester District Court to Superior Court and were assigned to the Major Felony Unit. *See* SMF ¶¶ 19, 22. Plaintiff received a raise to $47,500.00 annual salary to coincide with her promotion. *See* SMF ¶ 21. ADA Cox was promoted to Superior Court approximately one month after Plaintiff and ADA Adeduntan. *See* SMF ¶ 20.

In August 2012, Plaintiff and ADA Adeduntan were simultaneously promoted from the Major Felony Unit to the Gang Unit. *See* SMF ¶ 22. Plaintiff's annual salary was increased from $47,500.00 to $52,000.00 around this time, and ADA Adeduntan earned an identical raise. *See* SMF ¶¶ 23-24. Plaintiff and ADA Adeduntan were also part of a group of assistant district attorneys who received a one-time $2,500.00 retention stipend in May 2013. *See* SMF ¶ 25.

---

[1] Fiscal Year 2012 commenced on July 1, 2011.

At the conclusion of 2013, the supervisors of the Gang Unit prepared a year-end report that summarized the achievements of the Gang Unit and its assistant district attorneys.  *See* SMF ¶ 26; Exhibit K.  The supervisors of the Gang Unit ranked three attorneys, Ed Curley, Christine Walsh, and Matt Feeney, as the Unit's top performers.  *See* SMF ¶ 26.  Plaintiff and ADA Adeduntan were ranked as second-tier performers at No. 4 and 5.  *See id.*  Plaintiff admits that ADA Adeduntan was the sole prosecutor in the Gang Unit who started at the same time as her. *See* SMF ¶ 31.  The District Attorney and executive staff relied upon these rankings in determining salary raises for the prosecutors, and the process for Fiscal Year 2014 raises was completed in February 2014.  *See* SMF ¶ 27.  That month, Plaintiff's annual salary was increased to $53,550.00, and ADA Adeduntan received an identical raise.  *See* SMF ¶¶ 28-29.  The assistant district attorneys in the Gang Unit received raises that ranged from 2% to 3.3%, with ADA Walsh receiving the sole raise that exceeded 2.8%.  *See* SMF ¶ 30; Exhibit L.  The DA's Office set Plaintiff's salary at that amount because of her placement in the Gang Unit and its determination that she was a reasonably good, mid-level Superior Court prosecutor.  *See* SMF ¶¶ 34.  Office-wide budget constraints prevented Plaintiff from receiving a higher salary.  *See id.*

Plaintiff was dissatisfied with the raise that she received in February 2014.  She claims that she told her supervisor in the Gang Unit, Joe Janezic, that she believed her salary was unfairly low due to gender bias in the DA's Office.  *See* SMF ¶ 35.  On March 10, 2014, Plaintiff and ADA Adeduntan met with First Assistant District Attorney Patrick Haggan, where they discussed grievances about the recent raises they had received in comparison to assistant district attorneys, both female and male, in other units.  *See* SMF ¶ 36.  Plaintiff alleges that her gender discrimination claim is based upon "the lack of any lawful or non-pretextual reason to explain why I was paid less than similarly-situated men."  *See* Exhibit F ¶ 3.

4

On Friday, September 19, 2014, Plaintiff and others in the DA's Office attended a going-away party for ADA Walsh at The Fours. *See* SMF ¶ 37. Plaintiff arrived at The Fours between 5:30 and 6:30 p.m. that evening. *See* SMF ¶ 38. Over the course of the next several hours, Plaintiff consumed at least six alcoholic beverages, consisting of two pumpkin beers, three vodka and soda mixed drinks, and a shot of liquor. *See* SMF ¶ 39.

Between 9:30 and 10:00 p.m., Plaintiff was introduced to Chief of Staff Towle. Immediately prior to the introduction, Plaintiff knocked over a glass on the bar, which caught the attention of Chief of Staff Towle and Chief of the Appellate Unit, Jack Zanini[2]. *See* SMF ¶ 40. At that point, Chief of Staff Towle told Plaintiff that he heard that she was a good attorney. *See* SMF ¶ 41. Subsequently, Plaintiff told Chief of Staff Towle that she was not paid fairly and that Darcy Kofol, an assistant district attorney in the Narcotics Unit, was earning a high salary despite having three years' less experience than Plaintiff. *See* SMF ¶ 42. At the time, ADA Kofol was earning $53,000.00 annually, $550.00 less than Plaintiff. *See* SMF ¶ 43; Exhibit L. Plaintiff stated that ADA Kofol received a raise because she had campaigned for the District Attorney. *See* SMF ¶ 42. Plaintiff next stated that she and ADA Adeduntan were paid unfairly because she is a woman and he is black. *See* SMF ¶ 44. Chief of Staff Towle asked Plaintiff if she believed this, and he left the bar after she said, "yes I do." *See* SMF ¶ 45. ADA Zanini, who was present for this altercation, believed that Plaintiff was intoxicated. *See* SMF ¶ 51.

Plaintiff admits that she may have been intoxicated and used profanity during this interaction while speaking to ADA Zanini (as opposed to directly to Chief of Staff Towle), including the words "fuck" and "bullshit." *See* SMF ¶¶ 46-48, 50. She also admits that she may have called somebody a "fucker" at some point. *See* SMF ¶ 47. During the course of this interaction, ADA Zanini told Plaintiff to stop and that she should speak to Chief of Staff Towle

---

[2] ADA Zanini also serves as Legal Counsel to the District Attorney.

at a later time.  *See* SMF ¶ 49.  ADA Zanini perceived Plaintiff to be aggressive and using a hostile tone laced with profanity during this interaction.  *See* SMF ¶ 51.  Plaintiff began to cry after Chief of Staff Towle left.  *See* SMF ¶ 53.

On the morning of September 20, 2014, Plaintiff made several representations via text message regarding the altercation that occurred on September 19, 2014.  Plaintiff stated that she "[c]an't even remember it all," "[c]an't believe said. Can't remember [how] started" and that she had "told off towle."  *See* Exhibit 1.  Plaintiff also indicated that she had <span style="border:1px solid #888; padding:1px 3px; background:#eee;">Too much</span> when referencing the altercation that occurred with Chief of Staff Towle.  *See id*.

The DA's Office has an Office Policy and Procedures Manual, which states, in part:

> Staff are reminded that they are public employees and as such are subject to scrutiny and standards that may not be applicable to employees in the private sector.  You represent the office and the District Attorney at all times. Behavior not expressly forbidden in this manual may still be the basis for disciplinary action, including termination, if it is deemed contrary to the best interest of the office.

*See* Exhibit M at § 5.2.  The DA's Office found that Plaintiff's conduct on the evening of September 19, 2014 was offensive, outrageous, and showed a lack of judgment, professionalism, and self-control.  *See* SMF ¶ 59.  Plaintiff was terminated by the District Attorney on the morning of September 22, 2014.  *See* SMF ¶ 60.

## III.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), the Court must allow summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "In considering whether or not a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the opposing party.  Only if a reasonable jury, drawing favorable inferences, could resolve the motion in favor of the nonmoving party is the dispute genuine."  *LaPierre v. City of Lawrence*, 95 F.Supp.3d 88, 89-90 (D. Mass. 2015).

## IV.     ARGUMENT

Plaintiff has no reasonable expectation of proving her claims brought under Title VII and G.L. c. 151B for gender discrimination or retaliation as a matter of law, and the DA's Office is therefore entitled to judgment on those counts.  First, under the burden-shifting standard articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Plaintiff has the obligation of presenting evidence that the DA's Office's proffered legitimate, non-discriminatory reasons for her salary are pretext to mask discriminatory animus.  She lacks admissible evidence of pretext and therefore Counts I and II must be dismissed.[3]   Similarly, the undisputed facts demonstrate that Plaintiff was not engaged in protected activity when she verbally accosted an executive member of the DA's Office while intoxicated about her perceived pay inequities and made a reference to gender and race bias.  Accordingly, the retaliation claims under Title VII and G.L. c. 151B also fail.  Finally, Plaintiff is not an "employee" under Title VII as an appointee of an elected official, and Counts I and III must be dismissed for this alternative reason.

### A.     <u>Plaintiff Is Unable To Show Disparate Treatment From Similarly Situated Males Or Evidence Of Pretext That Are Essential Elements To Her Gender Discrimination Claims.</u>

Plaintiff's gender discrimination claims under Title VII and G.L. c. 151B arise from her perception of alleged pay disparities between her and alleged male comparators.  The undisputed facts, however, demonstrate that Plaintiff was paid at the identical rate as the sole male individual who was similarly situated to her in *all relevant respects* based on placement within the DA's Office's Gang Unit, seniority, experience, and work performance.  Moreover, Plaintiff is unable to

---

[3] Although the Equal Pay Act claims are predicated upon the same allegations of pay disparities on the basis of gender as the gender discrimination counts, the Equal Pay Act claims, unlike Title VII and G.L. c. 151, do not require "purposeful discrimination."  *See Jancey v. School Cte. Of Everett*, 421 Mass. 482, 494 (1995); *see also Mullenix v. Forsyth Dental Infirmary for Children*, 965 F. Supp. 120, 139 (D. Mass. 1996) (Saris, J.) ("In contrast to the required elements in a Title VII claim, the plaintiff does not have to prove that the employer intentionally discriminated against her on the basis of sex in order to prevail under the EPA.").  In other words, unlike in Equal Pay Act claims, "a Title VII plaintiff must prove the intent to discriminate, specifically the actual desire to pay women less than men because they are women."  *Cullen v. Ind. Univ. Bd. Of Tr.*, 338 F.3d 693, 703 (7th Cir. 2003).

rebut the DA's Office's legitimate, non-discriminatory reason for Plaintiff's salary as pretext masking discriminatory animus.  The DA's Office meets its burden and has demonstrated that Plaintiff's salary was based upon several factors, including seniority, experience, background and qualifications, placement in the Gang Unit, and strong (not exemplary) evaluations given by her supervisors.  In the absence of evidence of pretext, Plaintiff's gender discrimination claims under Title VII and G.L. c. 151B fail as a matter of law.

Where there is no direct evidence of an employer's discriminatory animus, the court applies the three-step framework set forth in the Supreme Court's 1973 *McDonnell Douglas* decision.[4]  *See, e.g.*, *Espinal v. Nat. Grid NE Holdings 2, LLC*, 693 F.3d 31 (2012) (analysis of Title VII); *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 498 (2001) (analysis of G.L. c. 151B).  In the first stage, Plaintiff "must establish a prima facie case of discrimination."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  She must demonstrate that she is a member of a protected class and "produce sufficient evidence that [the DA's Office's] actions, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 45 (2005).  As discussed below, Plaintiff has not demonstrated that she was treated disparately in her pay than any similarly situated male.

Once a plaintiff provides evidence of a prima facie case of discrimination, the burden shifts to the employer "to present a legitimate, non-discriminatory reason, sufficient to raise a genuine issue of material fact as to whether it discriminated against the employee, for the employment decision."  *Quinones v. Buick*, 436 F.3d 284, 289 (2006).  "The employer's burden is one of production only and it need not persuade the factfinder that the reason underlying its action was sound or prudent."  *Beasley v. Aramark Uniform and Career Apparel, Inc.*, 430 F.Supp.2d 8, 12

---

[4] The three-stage framework applies equally to claims both under Title VII and G.L. c. 151B.  *See, e.g.*, *Quinones v. Buick*, 436 F.3d 284, 289 n.1 (2006).

(D. Mass. 2006)[5].   The plaintiff then must introduce sufficient evidence that demonstrates "(1) that the employer's articulated reason . . . is a pretext, and (2) that the true reason is discriminatory."   *Espinal*, 693 F.3d at 35.   "Despite these shifting burdens of production, the plaintiff throughout retains the burden of persuasion."   *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir. 1999).

### 1.   Plaintiff's Salary Was The Same As The Only Similarly Situated Male.

Plaintiff bears the burden to demonstrate that she has been subject to disparate treatment on the basis of gender.   Specifically, she must prove that her salary was different (and lower) than a similarly situated male.   The First Circuit has held that a plaintiff claiming disparate treatment "bears the burden of proving that she was subjected to different treatment than persons '*similarly situated in all relevant aspects*.'"   *Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir. 1995) (quoting *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994)) (emphasis in original).   In order to demonstrate disparate treatment, there must be "a suitable provenence for the evidence by showing that others similarly situated to [her] in all relevant respects were treated differently by the employer."   *Conward*, 171 F.3d at 20.   Plaintiff must show "that she was similarly situated to those men in terms of performance, qualifications and conduct, without such differentiating or mitigating circumstances that would distinguish their situations."   *Stratus Computer*, 40 F.3d at 17.   At the close of fact discovery, it is clear as a matter of law that the individual identified as R.A. in Plaintiff's Complaint is the sole similarly situated male to Plaintiff, and his salary was identical to Plaintiff at all material times.   As a result, Plaintiff lacks evidence to make out a prima facie case.

The First Circuit in *Byrd* recognized the difficulties in comparing male and female attorneys within one law firm for purposes of gender bias and equal pay analyses.   There, the plaintiff alleged

---

[5] *See also Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 128 (1997) ("The reasons given for a decision may be unsound or even absurd, and the action may appear or arbitrary or unwise, nonetheless the [employer] has fulfilled its obligation.") (citations omitted).

that she was discriminated against, among other reasons, because a male attorney with a similar or lesser experience level was hired at a rate higher than hers.[6]  The male attorney had "five years' specialization in bankruptcy practice, bringing with him clients from whom the firm generated fees approximating $200,000 in a single year." *Byrd*, 61 F.3d at 1029.  In assessing the plaintiff's claim under the Equal Pay Act that she and this male attorney were fair comparators, the First Circuit rejected such an argument, finding that the evidence demonstrated that the male attorney had greater bankruptcy experience than the plaintiff, did not perform "parallel functions" within the law firm, and the male attorney generated "substantially greater revenues . . . for the firm" and, accordingly, they were not fair comparators.  *Id*. at 1033-34.  Accordingly, it affirmed the lower court's allowance of summary judgment to the defendant employer.

*Byrd* illustrates that comparators must be similarly situated in *all* material respects and that Plaintiff fails to demonstrate that any such male assistant district attorneys were paid more than her. The undisputed facts demonstrate that Plaintiff was an assistant district attorney within the DA's Office's Gang Unit from August 2012 until her termination in September 2014.  The Gang Unit was evaluated independently of other Superior Court units by the DA's Office, as other units had different responsibilities and required different skill-sets.  For example, the Appellate Unit was for valued legal research and writing because of the nature of criminal appellate work.  Likewise, the Special Prosecutions Unit typically prosecuted white-collar criminals and required an ability to handle complex and costly litigation.  In this way, Plaintiff is unable to compare herself to those individuals within other units.  Moreover, as part of annual reviews, the DA's Office would analyze each unit's statistics individually and would allocate raises to units based upon the unit's annual

---

[6] The *Byrd* plaintiff's gender discrimination claim was based upon her termination for poor work performance, and the First Circuit affirmed the lower court's determination that she could not make out a prima facie case of discrimination because her work performance was, in fact, poor and further that there was no evidence of pretext masking discriminatory animus.  *See id*. at 1030-33.

Case 1:15-cv-10628-RWZ   Document 50   Filed 02/29/16   Page 11 of 21

performance and the performance of individuals within the unit. Therefore, assistant district attorneys across different units are not similarly situated *in all relevant aspects* where an assistant district attorney's pay is based, in part, on the unit where they are located, the nature of cases that are handled, including their complexity, and the skills required of the individual assistant district attorneys within each unit.

The evidence also demonstrates that the DA's Office compensated its assistant district attorneys based upon performance reviews of unit supervisors. Plaintiff can therefore only compare herself to male assistant district attorneys who received similar performance reviews. For the 2012-2013 year-end evaluation of the Gang Unit, the co-chiefs of the Gang Unit ranked ADAs Curley, Walsh, and Feeney as first-tier performers.[7] Plaintiff, along with ADA Adeduntan, was ranked in the second-tier (No. 4 and 5) for her performance from the time they joined the Gang Unit until the end of 2013. It is undisputed that the annual performance reviews were used by the DA's Office in preparing raises for the assistant district attorneys. It is also undisputed that, based upon the annual performance reviews, Plaintiff and ADA Adeduntan were provided identical raises. In sum, as set forth in *Byrd* and *Stratus Computer*, all other males who Plaintiff has attempted to compare herself to were not similarly situated based upon all pertinent factors, both in differentiation and mitigation. The sole true male comparator to her is ADA Adeduntan, who was paid identical to her, so Plaintiff is unable to demonstrate that she was disparately treated in her salary.[8] The First Circuit has held that "the cases [of disparate treatment] must be fair congeners. In other words, apples should be compared to apples." *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989),

---

[7] The males ranked (Curley and Feeney) in the first tier did not start at the same time as Plaintiff. *See* SMF ¶ 31.

[8] To the extent that Plaintiff claims that ADA Adeduntan's salary was due to racial bias, such an assertion is inadmissible and cannot be considered by the Court. The DA's Office categorically rejects any allegation of racial bias, just like it disputes allegations of gender bias. More specifically, at the conclusion of discovery, there is no admissible evidence in the record that supports racial bias in the DA's Office. Plaintiff cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation" to create material factual disputes. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

*overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez*, 889 F.2d 13, 19 (1st Cir. 2004).  The only fair congener in this action is ADA Adeduntan, and since he was paid at the same level of her, Plaintiff cannot make out a prima facie case of gender discrimination.

### 2.   Plaintiff Lacks Evidence That The DA's Office's Proffered Reasons For Her Salary Are Pretext To Mask Discriminatory Animus.

Plaintiff's gender discrimination claims likewise fail because the record lacks any evidence of pretext.  The DA's Office has articulated legitimate, non-discriminatory reasons for Plaintiff's salary at all relevant times, so the burden returns to Plaintiff to demonstrate that these reasons are a pretext to cover up discriminatory animus.  Specifically, the DA's Office has offered testimony that Plaintiff's salary was based upon a number of factors, including her experience level, her work performance, her position in the Gang Unit, and her rankings when compared to peers in the Gang Unit.  The burden therefore shifts back to Plaintiff to show that "the [DA's Office's] discriminatory animus was the determinative cause" of her salary.  *Lipchitz*, 434 Mass. at 504.

The evidence in the record reinforces that contrary to being pretextual, the DA's Office has consistently maintained and demonstrated that decisions relating to salaries are gender neutral and based on several factors.  There are several manners that Plaintiff could show pretext, and none of them are applicable here.  The DA's Office's proffered explanations lack any "weaknesses, implausibilities, inconsistencies, incoherencies, or contractions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and . . . infer that the employer did not act for the asserted non-discriminatory reasons." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998) (citations omitted).  Far from being inconsistent or implausible, the DA's Office's proffered explanations for Plaintiff's salary are reasonable, logical, and fully supported in the record.  The DA's Office has demonstrated that it has a detailed, meticulous method for determining annual raises of Superior Court-level

assistant district attorneys.   Plaintiff conducted the depositions of four members of the DA's Office's executive staff, and each reinforced that pay decisions for individual assistant district attorneys are based upon several factors including experience, performance, and placement within the DA's Office.   Plaintiff's unhappiness with her salary and her position as a member of a protected class does not support that her salary was motivated by discriminatory intent.   There is no evidence of pretext, which renders her gender discrimination claims futile.

Courts have recognized other examples of pretext that show discriminatory animus through workplace comments from a male superior that reduce "a woman to her physical attributes" and demonstrates "an inability or unwillingness to see her as a professional peer."   *Scott v. Sulzer Carbomedics, Inc.*, 141 F.Supp.2d 154, 172 (D. Mass. 2001).   Here, there is no evidence in the record to support a claim that the DA's Office was permeated by gender bias through stereotypes or insensitivities to females in the workplace that would be evidence of pretext.   Based on her Answers to Interrogatories, Plaintiff apparently relies on certain unsubstantiated hearsay and innuendo regarding gender bias in the DA's Office.   Any such evidence would be inadmissible as hearsay and not based upon personal knowledge or experience, and it therefore cannot be used to show pretext. *See*, *e.g.*, *Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 71 (1st Cir. 2011) (plaintiff in race discrimination case cannot use out-of-court statements of co-workers to defeat summary judgment). There is no evidence that gender bias permeated the DA's Office's personnel decisions.

Plaintiff is unable to create a dispute of material fact "simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus."   *Coyne v. City of Somerville*, 972 F.2d 440, 444 (1st Cir. 1992).   The First Circuit has repeatedly held that "[i]t is not [the court's] role to 'sit as super personnel departments, assessing the merits—or even the rationality of employers' nondiscriminatory business decisions.'"

*Goncalves v. Plymouth County Sheriff's Dep't*, 659 F.3d 101, 107 (1st Cir. 2011) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991).   Rather, the Court must determine if there is evidence that the proffered legitimate, non-discriminatory reason is pretext that masks discriminatory animus.  Since Plaintiff fails to present any admissible evidence of pretext, her gender discrimination claims under Title VII and G.L. c. 151B fail.

### B.   Plaintiff Was Not Engaged In Protected Activity On September 19, 2014 As A Matter Of Law.

Counts III and IV of the Complaint, alleging retaliation under Title VII and G.L. c. 151B, must be dismissed because Plaintiff fails to show that her conduct on September 19, 2014 was protected activity as a matter of law.[9]  It is undisputed that Plaintiff, while under the influence of alcohol, accosted a senior member of the executive staff of the DA's Office at a bar and complained about her pay while using profanity, ignoring requests to stop and discuss the issue at a more appropriate time and place, and disparaging a female colleague.  It was patently inappropriate based on the time, place, and manner of her conduct and reflected a lack of judgment, professionalism, and self-control that her position as a public representative of an elected official required.  Courts in numerous circuits have recognized that certain employee conduct is so disruptive that it is not protected merely because the employee makes reference to alleged discrimination.  Because the undisputed facts demonstrate that Plaintiff's conduct falls within this realm of case law, the Court must find that Plaintiff was not engaged in protected activity as a matter of law.

In order to prevail on a retaliation claim, Plaintiff must first present evidence "that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were

---

[9] Title VII prohibits an employer "to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3.  Under G.L. c. 151B, § 4(4), it is unlawful for an employer ""to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under [G.L. c. 151B, § 5]."

causally linked." *Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005)[10]; *Mole v. Univ. of Mass.*, 442 Mass. 582, 591-92 (2004) (analyzing prima facie factors under G.L. c. 151B).   She must also show that "she reasonably and in good faith believed that the [DA's Office] was engaged in wrongful discrimination, that she acted reasonably in response to her belief, and that the [DA's Office's] desire to retaliate against her was a determinative factor in its decision to terminate her employment." *Tate v. Dep't of Mental Health*, 419 Mass. 356, 365 (1995) (internal citations and quotations omitted).   Although informal complaints may be protected activity, "the way informal complaints are raised can effect whether they are considered protected," and complaints that are "accusatory, confrontational and insubordinate are not protected." *Buchanan v. Hilton Garden Inn Westbury*, 2008 WL 858986, *12 (E.D.N.Y. Mar. 31, 2008).

In 1976, the First Circuit Court of Appeals recognized that Title VII remedies were not available to a disgruntled employee to remediate adverse employment action for "militant self-help activity" and that opposition activities must be undertaken in a reasonable manner. *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 230-31 (1st Cir. 1976).   There, a female scientist believed that her pay was lower than male scientists, and she engaged in a protracted campaign of complaining about her salary that included providing confidential salary information to a reporter, disparaging the company to a client, and engaging in "bitter personal exchanges with her supervisors." *Id*. at 228-30.   The First Circuit affirmed an allowance of summary judgment and held that "militant self-help" so "generally inimical to her employer's interests" is not protected activity. *Id*. at 230.   The First Circuit recognized that by passing Title VII, Congress did not intend "to immunize hostile and disruptive employee activity." *Id*. at 230.   As such, the First Circuit crafted a balancing test "to protect persons engaging reasonably in activities

---

[10] The Supreme Court recently held that Title VII "requires proof that the desire to retaliate was the but-for cause of the challenged employment action." *University of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2518, 2528 (2013).

opposing sexual discrimination, against Congress' equally manifest desire not to tie the hands of

employers in the objective selection and control of personnel." *Id.* at 231.  Among other factors,

*Hochstadt* found that courts must consider "the vociferousness, expressions of hostility to an

employer" and "the setting in which the activity arises and the interests and motivations of both

employer and employee" to determine whether the conduct is protected activity.[11]  *Id*. at 231-32.

Hochstadt found as "a helpful point of comparison" the National Labor Relations Act's use

"concerted activity" and rulings by the National Labor Relations Board ("NLRB") as to whether

employee statements were protected as "concerted activity" or whether "the means chosen by the

employees [were] excessive." *Id*. at 232.  Three years after *Hochstadt*, the NLRB articulated a four-

prong standard for determining whether employee statements were protected as "concerted

activity."  *See Atlantic Steel Co. v. Chastain*, 245 N.L.R.B. 814, 1979 WL 10011 (Sept. 28, 1979).

The NLRB indicated that balancing factors for whether the employee conduct was protected as

"concerted activity" depended upon "(1) the place of the discussion; (2) the subject matter of the

discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way,

provoked by an employer's unfair labor practice."  *Id*. at *5.  In 2009, for example, the Fourth

Circuit held that an employee's comment to a supervisor that the company's vice president was a "f-

--ing idiot" was not protected activity under the *Atlantic Steel* factors.  *See Media General*

*Operations, Inc. N.L.R.B.*, 560 F.3d 181 (4th Cir. 2009).  The employee was discussing unionizing

activities because he spoke in response to a letter from the company vice president relating to an

---

[11] Following the balancing test adopted by the First Circuit in *Hochstadt*, "several circuits have held that otherwise protected conduct may be so disruptive or inappropriate as to fall outside [Title VII's] protection]."  *Robbins v. Jefferson County School Dist. R-1* 186 F.3d 1253, 1259 (10th Cir. 1999); *see also Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) ("way in which an employee presses complaints of discrimination can be so disruptive or insubordinate that it strips away protection against discrimination"); *Wrighten v. Metropolitan Hosp., Inc.*, 726 F.2d 1346 (9th Cir. 1984) (adopting *Hochstadt* balancing factors).  The Eleventh Circuit crafted a similar balancing test that weighs "the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment."  *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 401 (11th Cir. 1989); *see also Laughlin v. Metropolitan Washington Airports Auth.*, 149 F.3d 253 (4th Cir. 1998).

ongoing labor dispute.  *See id*. at 183-84.  Nevertheless, the Fourth Circuit noted that the statement was part of "an ad hominem attack" that the employee initiated and therefore the *Atlantic Steel* factors compelled a finding that the solitary statement was not protected activity.  *See id*. at 187-89

Plaintiff's conduct on the evening of September 19, 2014 does not constitute protected activity as a matter of law.  *Hochstadt* and its progeny in a majority of the federal circuits have made common sense determinations that an employee must act reasonably in her opposition activities for them to be protected.[12]  The undisputed facts demonstrate that Plaintiff was intoxicated when she accosted the DA's Office's Chief of Staff, somebody with whom she had no prior relationship (as demonstrated by the fact that they were introduced to each other) at a bar within earshot of colleagues.  She used profanity and disparaged a female colleague and ignored requests to stop her outburst and discuss her concerns at a more appropriate time and place.  At the conclusion of her outburst, she began to cry, recognizing the seriousness of the incident, and the next morning, Plaintiff told individuals that she "told off towle" as a manner to characterize the altercation.  *See* Exhibit 1.  As an assistant district attorney, Plaintiff knew that she was held to a high standard of conduct at all times and served at the District Attorney's "pleasure."  G.L. c. 12 § 16.  Accordingly, Plaintiff's outburst demonstrated a lack of professionalism, judgment, and self-control that was unbecoming of a public representative of an elected official and could lawfully subject her to discipline.  *Cf. Hertz v. Luzenac America, Inc.*, 370 F.3d 1014 (8th Cir. 2004) (plaintiff engaged in protected activity where he angrily reacted to supervisor's comment he perceived as anti-Semitic during workday).  The *Atlantic Steel* factors also compel this conclusion, as the outburst was unprompted and initiated by Plaintiff in a clearly inappropriate venue.

---

[12] Although this analysis was done under Title VII, G.L. c. 151B also requires that the opposition activities are "reasonable" to be treated as protected activity for a prima facie retaliation claim.  *Tate*, 419 Mass. at 365.

Simply because Plaintiff referenced alleged gender and race discrimination as part of her multi-faceted alleged grievances does not mean that she was immune from adverse employment action.  "While Title VII protects certain rights, an employee may not use it as a sword to verbally attack her employer and similarly use it as a shield demanding immunity from disciplinary action resulting from such inappropriate conduct toward her employer."  *Rizzo-Puccio v. College Auxiliary Servs., Inc.*, 71 F.Supp.2d 47, 64 (N.D.N.Y. 1999); *see also Matima*, 228 F.3d at 79 ("An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conductive to the work of the enterprise.").   Plaintiff's insubordination, disparagement of a colleague, use of profanity, and patent lack of judgment evidenced by the time, place, and manner of raising these grievances all place the conduct outside the protections of G.L. c. 151B and Title VII.  Accordingly, the Court must dismiss Counts III and IV.

### C.     Plaintiff Is Not An Employee Under Title VII.

Plaintiff's claims under Title VII fail as a matter of law because she falls under Title VII's exceptions to its definition of "employee."  Under Title VII, an "employee" is defined as follows:

> The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.  The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision.

42 U.S.C. § 2000e(f).  The Fifth Circuit and Ninth Circuit have each held that an aggrieved assistant district attorney is not an "employee" under Title VII and therefore cannot state a claim

under it.[13]  *See Teneyuca v. Bexar County.*, 767 F.2d 148 (5th Cir. 1985); *Ramirez v. San Mateo County. Dist. Attorney's Office*, 639 F.2d 509 (9th Cir. 1989)[14]. These holdings are applicable here, where Plaintiff was at all relevant times an assistant district attorney who served at the pleasure of the Suffolk County District Attorney.

        In reaching their decisions, the Fifth Circuit and Ninth Circuit relied heavily on state statutory schemes that are similar to Massachusetts' and accord to district attorneys broad powers to appoint and terminate assistant district attorneys serving in their office.  In *Teneyuca*, the plaintiff filed suit after being passed over for an assistant district attorney position in favor of men who were less qualified than her.  *See* 767 F.2d at 149.  The Fifth Circuit agreed with the lower court that the assistant district attorney position fell within the "personal staff" exception of § 2000e(f) and could not state a claim under Title VII.  It first noted that as set forth by state law, the county district attorney was an elected official, and the assistant district attorneys were exempt from civil service protection.  *See id*. at 150-51.  Relying on prior case law interpreting whether aggrieved individuals were "employees" under Title VII, the Court noted:

>        These factors include (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

---

[13] The Age Discrimination in Employment Act (29 U.S.C. § 621 *et seq*) contains a nearly identical definition for "employee" as Title VII.  *See* 29 U.S.C. § 630(f).  Federal courts have held that attorneys working underneath an elected official are not "employees" under the Age Discrimination in Employment Act.  *See Monce v. City of San Diego*, 895 F.2d 560 (1990) (deputy city attorney could not bring age discrimination claim); *Rutland v. Office of the Atty. Gen. State of Miss.*, 851 F. Supp. 793 (S. D. Miss. 1994) (special assistant attorney general was "personal staff" of attorney general).

[14] *See also Jackson v. Watkins*, 2009 WL 1437824 (N. D. Tex. May 21, 2009) (holding that white male assistant district attorney who was terminated was not an employee under Title VII); *Bibbs v. Newman*, 997 F. Supp. 1174 (S. D. Ind. 1998); *Wall v. Coleman*, 393 F. Supp. 826 (S. D. Ga. 1975) (female denied employment as assistant district attorney could not state a claim under Title VII).

*Id*. at 151.  Based upon the aforementioned state laws governing the county's district attorney and assistant district attorneys, the Fifth Circuit held that the lower court properly entered summary judgment for the county district attorney's office, as the statutory scheme demonstrated that the plaintiff was not an "employee" under Title VII as a matter of law.

Here, the Massachusetts statutory scheme governing the DA's Office and its assistant district attorneys is identical to that contemplated in cases like *Teneyuca* and *Ramirez*.  Under G.L. c. c. 12, § 16, "[e]ach district attorney shall . . . appoint and may, at his pleasure, remove such assistant district attorneys as are necessary to the functioning of the office of the district attorney."  It also provides that assistant district attorneys are not subject to Massachusetts civil service protections and mandates that assistant district attorneys "shall devote their full time during ordinary business hours to their duties."  *Id*.  As federal courts in numerous jurisdictions have repeatedly held, the statutory scheme demonstrates that Plaintiff is not an "employee" under Title VII.  Congress carved out an exception under Title VII to those individuals such as Plaintiff who serve at the pleasure of county district attorneys.  The Ninth Circuit held in *Ramirez* that the plaintiff was not an "employee" under Title VII where the district attorney "has plenary power of appointment and removal" and the position is unlike other county positions because "deputies are not subject to the normal protections of the county civil service system."  Under identical circumstances, the Court should hold that Plaintiff is excepted from Title VII's definition of employee (§ 2000e(f)) and cannot bring a Title VII claim, so Counts I and III must be dismissed.

## V.      CONCLUSION

For the foregoing reasons, the Defendant, Suffolk County District Attorney's Office, requests that this Court ALLOW its Motion for Partial Summary Judgment and Dismiss with Prejudice Counts I, II, III, and IV of the Plaintiff's Complaint.

THE DEFENDANT,
SUFFOLK COUNTY DISTRICT
ATTORNEY'S OFFICE,
BY ITS ATTORNEYS,


DATE: _____ 2/29/16                    */s/ Aaron R. White*_____
                                          Anthony M. Campo, BBO#552093
                                          acampo@BSCtrialattorneys.com
                                          Aaron R. White, BBO# 650918
                                          awhite@BSCtrialattorneys.com
                                          Boyle, Shaughnessy & Campo, P.C.
                                          695 Atlantic Avenue, 11th Floor
                                          Boston, MA 02111
                                          (617) 451-2000
                                          Fax: (617) 451-5775

## CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2016, I filed the foregoing document filed through the ECF system which will send notice electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.


/s/        *Aaron R. White*_____