COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

|  |  |
|---|---|
| CHRISTINA CORDA,<br>    Complainant,<br><br>v.<br><br>SUFFOLK COUNTY DISTRICT<br>ATTORNEY'S OFFICE,<br>    Respondent. | )<br>)<br>)<br>)<br>)  MCAD DOCKET NUMBER: 14BEM03011<br>)<br>)<br>)<br>)<br>) |

## POSITION STATEMENT OF THE RESPONDENT,
## SUFFOLK COUNTY DISTRICT ATTORNEY

The Respondent, Suffolk County District Attorney (hereinafter referred to as DA's Office"),

through its counsel, Boyle, Shaughnessy & Campo, P.C., hereby submits this Position Statement in

response to the Charge of Discrimination of its former employee, the Complainant, Christina Corda

("Complainant"). The DA's Office categorically denies any allegations of gender discrimination or

retaliation in violation of G.L. c. 151B and Title VII of the Civil Rights Act.

The Complainant was reasonably compensated at a level based on her experience and

qualifications, job responsibilities, and job performance throughout her employ with the DA's

Office. She was not subject to retaliation, as she was commended by superiors repeatedly after she

brought complaints about her pay rate in relation to other assistant district attorneys. The DA's

Office terminated the Complaint as a result of an incident of insubordination on September 19, 2014

where the Complainant accosted the DA's Office's Chief of Staff at a commercial establishment

making profane and hostile statements about her pay rate, alleged discrimination, and political

favoritism.

## I.    FACTS

The DA's Office presents the following facts that provide information regarding the Complainant's employment with the DA's office and her compensation, the subject incident that led to the Complainant's termination, and the compensation of male assistant district attorneys listed in the Charge of Discrimination.

### A.    The Complainant's Employment with The DA's Office

The Complainant commenced work as an assistant district attorney ("ADA") with the DA's Office on September 24, 2007.  She was assigned to the Dorchester District Court.  The Complainant is a 2007 graduate of Suffolk University Law School.  At the time of hiring, she received the starting salary of $28,000.00 annually, which would increase to $37,500.00 annually when she passed the bar exam.  This salary structure was uniform for all entry level assistant district attorneys, male and female.  The pay raise took effect on December 17, 2007 after she successfully passed the bar.  Subsequently, she received a pay raise in April 2008 to $40,000.00 annually.  She received a pay raise to $46,500.00 on September 1, 2011.  On October 24, 2011, the Complainant was promoted to the Superior Court's Major Felony Bureau, and her annual salary was raised to $47,500.00.

In September 2012, the Complainant was transferred to the Gang Unit and received a raise to $52,000.00.  At that time, the DA's Office took action to raise the salaries of all assistant district attorneys promoted to the Superior Court level to $50,000.00.  The Complainant received a further raise to $53,550.00 on January 27, 2014.

On March 5, 2014, the Complainant asked for a meeting with First Assistant District Attorney Patrick Haggan.  A meeting occurred on March 10, 2014, between the Complainant, fellow ADA, Rilwan Adeduntan, and Mr. Haggan.  At the meeting the Complainant advised Mr.

Haggan that she perceived her salary as low in comparison to other assistant district attorneys. During the meeting the Complainant specifically named a female assistant district attorney working in the narcotics unit who earned nearly the same salary as her, but had less experience working as an ADA.[1] Mr. Haggan advised the Complainant and Mr. Adeduntan that they were performing her job well and indicated that he would speak with the DA's Office's Chief of Staff, John Towle, and the Suffolk County District Attorney, Daniel Conley ("District Attorney"), regarding her concerns.

The Complainant sent an email to Mr. Haggan on April 7, 2014 requesting an update regarding their prior meeting. Mr. Haggan responded on April 9, 2014 that he had made a salary recommendation to the District Attorney, but that he did not have an answer yet. Mr. Haggan told the Complainant that she could speak to him if she wanted any further explanations. The Complainant sent a follow up email on April 27, 2014 seeking an update.

On June 3, 2014, Mr. Haggan and the Complainant met again. Mr. Haggan advised the Complainant that the DA's Office could not make any adjustment to her salary in the current fiscal year and that he was optimistic that there would be a budget increase for our office in the next fiscal year, starting on July 1, 2014. Mr. Haggan indicated that any adjustment to her salary would have to be in the next fiscal year after July 1, 2014. Mr. Haggan advised the Complainant and Mr. Adeduntan that they should feel free to check in with him for an update after July 1st. On July 7, 2014, the Complainant sent Mr. Haggan an email, copied to Mr. Adeduntan to "check on the status" of a potential salary adjustment/raise. Mr. Haggan responded in an email dated July 11, 2014, advising that the DA's Office had not had the opportunity to further discuss salary adjustments in the new fiscal year but that he hoped to do so the following week. The

---

[1] The salaries of employees of the DA's Office, as public employees, are available online.

Complainant sent Mr. Haggan another email on July 22, 2014, "checking in" on the status of his conversations with the DA.

The next communication between the Complainant and Mr. Haggan occurred on September 8, 2014, when the Complainant sent Mr. Haggan and email which states "to check in again about our salary status and the meeting you had with the DA…" Mr. Haggan responded to the September 8th email on September 10, 2014 relating to her renewed requests for an update regarding her salary status. Mr. Haggan noted in the email, that the DA decided that all raises will be calculated as part of our current review process (new evaluation forms/reviews/etc.), which the DA's office hopes to complete by the end of October. Mr. Haggan also invited the Complainant to feel free to come see me if you have any questions or concerns."

The DA's office attaches hereto as "Exhibit A" copies of all emails in its possession, custody, and control, which are referenced in the above paragraph.

Contemporaneous with her complaints regarding her salary, the Complainant received repeated commendations from superiors, including the District Attorney, regarding her trial work. As alleged in the Charge of Discrimination, the District Attorney sent an email on May 22, 2014 congratulating the Complainant for her work in securing a conviction in a difficult trial. Internal emails sent to the Complainant from her direct supervisor in the Gang Unit and Mr. Haggan in May 2014 also commended her for her trial work. In August 2014, the Complainant received further commendations for a second guilty verdict she obtained. Mr. Haggan wrote to her an email that said, "Christina, Great job on this case! Congratulations. You are really on quite a roll!"

On September 19, 2014, the Complainant completed a self-evaluation form, like all other ADA's. The purpose of the self-evaluation form was for use by supervisors in connection with their performance reviews and ultimately for decisions relating to performance-based raises.

**B.      September 19, 2014 Incident**

On the evening of Friday, September 19, 2014, there was a going away gathering for a departing assistant district attorney from the Gang Unit at The Fours in Boston.  At approximately 9:30 p.m., the DA's Office's Chief of Staff, John Towle, and Chief of Appeals and Legal Counsel, Jack Zanini, were standing at the corner of the bar area and conversing.  They heard a banging sound, which was caused when the Complainant knocked over a beverage on the bar next to them. Deputy Chief of the Homicide Unit, Mark Lee, was standing near to Mr. Towle and Mr. Zanini at the time.

The Complainant subsequently said hello to Mr. Zanini and introduced herself to Mr. Towle.  Mr. Towle told the Complainant that she was the best attorney in the office he had not previously met or had a conversation with, and that he had heard only good things about her.  Mr. Towle and Mr. Zanini continued conversing.  The Complainant then moved herself to a position between Mr. Towle and Mr. Zanini.  Appearing intoxicated, the Complainant told them, with the use of profanity, that she was unhappy with her salary and her most recent raise.  She told them that a female assistant district attorney in the Narcotics Unit, who was making $500.00 less annually than her, had significantly less trial experience than the Complainant, yet their salaries were comparable.

Mr. Towle and Mr. Zanini both tried to defuse the Complainant's anger and aggression, by urging her on at least four occasions to wait until the following Monday when they could hold a formal meeting to discuss her concerns in a more appropriate environment.  The Complainant then became progressively more hostile and stated to Mr. Towle and Mr. Zanini that she and an African-American male ADA in the Gang Unit were the two lowest paid members of her class because of her gender and his race.  Mr. Towle expressed his surprise at the allegation and asked the

Complainant, "Are you alleging racism and sexism?" The Complainant replied that she could prove that she did more work than the female ADA in the Narcotics Unit she had previously mentioned, and that this ADA's salary was comparable to hers only because she had worked on the District Attorney's recent political campaign. Mr. Towle responded, "So now you're charging political favoritism?" The Complainant confirmed this statement, and then continued to rant about her salary. Next, Mr. Towle said "goodnight" and left The Fours.

Both Mr. Towle and Mr. Zanini observed the Complainant to be significantly intoxicated during this discussion. Mr. Lee also observed the Complainant to be significantly intoxicated during his social interactions with her prior to the discussion with Mr. Towle. Mr. Lee was not present for the conversation between the Complainant, Mr. Towle, and Mr. Zanini. Immediately following the incident, the Complainant spoke with fellow ADA and friend, Caitlin Grasso. Grasso observed the Complainant to be intoxicated and using profanity when discussing the incident with Mr. Towle and Mr. Zanini.

### C.   Office Policy and Procedures

The DA's Office promulgated an "Office Policy and Procedures Manual," effective November 2013. *See* Excerpts from Office Policy and Procedures Manual, attached as Exhibit B. § 5.1 STANDARD OF CONDUCT provides, in relevant part, "All staff shall conduct themselves in a professional manner that promotes public confidence in the integrity and independence of the District Attorney's Office." § 5.2 UNACCEPTABLE CONDUCT provides, in relevant part:

> Staff are reminded that they are public employees and as such are subject to scrutiny and standards that may not be applicable to employees in the private sector. You represent the office and the District Attorney at all times. Behavior not expressly forbidden in this manual may still be the basis for disciplinary action, including termination, if it is deemed contrary to the best interest of the office. Behavior that is unacceptable and subject to disciplinary action,

including termination, shall include, but not be limited to, the following:

e.    Refusing to accept of follow directions from a proper authority, or any other form of willful insubordination

m.    Exhibiting hostile, demeaning, disrespectful, mean-spirited behavior or engage in any form of hazing or bullying toward colleagues or other persons

§ 5.21 provides for a grievance procedure when staff members are dissatisfied with job-related performance issues. Where a staff member feels that he/she has been treated unfairly:

Staff should promptly discuss problems or complaints with his/her immediate supervisor. Staff may continue to seek resolution of the problem through the Chief Trial Counsel, Chief of District Courts and Community Prosecutions, Director of Human Resources, or Chief of Victim Witness Assistance Program. Staff who continue to feel dissatisfied may schedule a meeting with the First Assistant District Attorney or the Chief of Staff. . . . Each reported grievance will be addressed promptly.

**D.    Termination**

Mr. Towle reported the incident to the District Attorney, Mr. Haggan, and Chief Trial Counsel, John Pappas. The DA's Office was deeply troubled by the Complainant's allegations of sexism, racism, and political favoritism. In addition, the DA's Office believed that the Complainant's use of profanity, her hostility, and her refusal to adhere to requests from Mr. Towle and Mr. Zanini to wait until an appropriate forum to discuss her grievance amounted to unacceptable conduct and insubordination. The totality of the Complainant's conduct on September 19, 2014 warranted termination, despite her strong trial work. On September 22, 2014, the District Attorney, Mr. Haggan, and Mr. Pappas met with the Complainant. The District Attorney advised the Complainant that her conduct was unacceptable, her allegations were untrue and offensive, and that she was terminated, effective immediately.

### E.  Male Assistant District Attorneys Referenced By The Complainant

In the Charge of Discrimination, the Complainant listed six male assistant district attorneys who she contends earned more money than her in March 2014. In order to respect the privacy of each of these six male assistant district attorneys, they will be referred to as Employees 'A,' 'B,' 'C,' 'D,' 'E,' and 'F.' Below is information regarding their background and experience level, job performance, and their salary.

#### 1.  Employee 'A'

Employee 'A' joined the DA's Office in September 2007, and he is a 2002 graduate of Harvard Law School. Prior to joining the DA's Office, he spent two years as a law clerk to a federal judge and had worked at a prestigious private firm. Employee 'A' is in the Special Prosecutions Unit, where he is tasked with investigating and prosecuting public corruption and white collar crime. The Special Prosecution Unit is unique because its cases are legally and factually complex and usually involve facing highly qualified, resourced, and specialized private defense counsel. Employee 'A' recently left the DA's Office to serve as Deputy Legal Counsel to Governor Baker. Employee 'A' earned $70,000.00 during the 2014 fiscal year.

#### 2.  Employee 'B'

Employee 'B' joined the DA's Office in September 2007, and he is a 2007 graduate of Suffolk University Law School. For several years, Employee 'B' worked in the DA's Office's Appellate Division. The Appellate Division cultivates a unique and highly-coveted skill set among its assistant district attorneys, as they handle the DA's Office appeals and require substantial legal research and writing skills and argue cases to the Massachusetts Appeals Court and Supreme Judicial Court. Employee 'B' currently works in the Narcotics Unit. Narcotics-related cases typically involve substantial motion practice, and the assistant district attorneys working in the Unit

are required to have strong research and writing skills. Employee 'B' is responsible for all arson-related investigations, which is in addition to his responsibilities in the Narcotics Unit. Employee 'B' earned $58,000.00 during the 2014 fiscal year.

### 3. Employee 'C'

Employee 'C' joined the DA's Office in September 2008, and he graduated from Boston College Law School in 2007. Employee 'C' served as a law clerk to the Massachusetts Superior Court justices in 2007-2008. From 2011-2013, Employee 'C' served as supervising assistant district attorney for Chelsea District Court. He was responsible for supervising the work of the other assistant district attorney performing work at Chelsea District Court and earned a raise for these additional responsibilities. Employee 'C' has been in the Narcotics Unit since February 2013. Employee 'C' earned $56,000.00 during the 2014 fiscal year.

### 4. Employee 'D'

Employee 'D' joined the DA's Office in September 2008. Employee 'D' served as supervisor of the Priority Gun Prosecution Unit for nearly two years, where he was responsible for overseeing the work of all assistant district attorneys in the unit. He received a salary raise for the supervisor position. He is currently in the Narcotics Unit. Employee 'D' earned $55,000.00 during the 2014 fiscal year.

### 5. Employee 'E'

Employee 'E' joined the DA's Office in April 2006, and he graduated from New England School of Law in 2006. Employee 'E' was called to active duty by the United States Army in September 2008, and he served for approximately five years in Afghanistan. Immediately, prior to his departure, Employee E was notified of his promotion to the Major Felony Bureau. His responsibilities in Afghanistan included working with the Afghan government to establish an

independent and functioning legal justice system, and he also conducted intelligence gathering and analysis. Employee 'E' was recruited back to the DA's Office in July 2013 to serve in the Major Felony Bureau, with a starting salary of $55,000.00. The salary earned by Employee 'E' reflected his prior experience within the office and the additional experience he had earned as an officer and attorney with the United States Army Command in Afghanistan. He earned $56,100.00 during the 2014 fiscal year."

### 6.   Employee 'F'

Employee 'F' joined the DA's Office in September 2006, and he is a graduate of the University of Virginia School of Law. Prior to joining the DA's Office, Employee 'F' served as a law clerk for the United States Court of Appeals, Eleventh Circuit for one year. Employee 'F' left the DA's Office in July 2011 to teach for 18 months. At the time of his departure, Employee 'F' worked as an ADA in the Major Felony Bureau at the DA's office. The DA's office recruited back Employee 'F' in March 2013 for the Major Felony Bureau at a salary of $52,000.00 based on his prior experience working in the Major Felony Bureau. In addition, Employee 'F' handled the prosecution of elevated cases, including motor vehicle homicide cases, before his departure and upon his return. Employee 'F' earned $57,500.00 in the 2014 fiscal year.

## II.   DISCRIMINATION/RETALIATION LEGAL ANALYSIS

The Complainant alleges that she has been subjected to gender discrimination through disparate pay and retaliation through her termination in violation of G.L. c. 151B and Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq*. As will be discussed below, the Complainant was not subjected to gender discrimination. Her salary was based on her background and experience, qualifications, status in the Gang Unit, and job performance. The DA's Office did not retaliate against her, as it routinely commended her for her job performance after she began

complaining about her pay.  She was terminated for an incident of insubordination where she was highly intoxicated and used profanity in addressing a supervisor six months after the original complaints commenced.

### A.    Gender Discrimination

G.L. c. 151B, § 4(1) prohibits an employer "because of the . . . sex . . . of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification."  The Complainant contends that she was paid less than similarly situated males.  "A plaintiff who brings her claim under the disparate treatment theory must demonstrate that her employer intentionally treated her less favorably than others because of her . . . gender."  *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 38 n.10 (2005).

### 1.    The Complainant Cannot Make Out A Prima Facie Case Because The Male Employees Listed Are Not Fair Congeners To Her.

The Complainant cannot make out a prima facie case for gender discrimination.  At the outset, she must demonstrate that "(1) she is a member of a protected class; (2) met her employer's legitimate job expectations; and (3) suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination."  *Lavalley v. Quebecor World Book Services LLC*, 315 F.Supp.2d 136, 144 (D. Mass. 2004) (citing *School Comm. Of Braintree v. MCAD*, 377 Mass. 424, 430 (1979)).  In an analysis of disparate treatment, the Complainant has the burden to show "in the first stage that, inter alia, she was treated differently from another person, known as a comparator, who was not a member of her protected class, but who otherwise was similarly situated."  *Trustees of Health and Hosp. of City of Boston, Inc. v. Massachusetts Commission Against Discrimination*, 449 Mass. 675, 682 (2007) (citation

11

omitted).   Courts employ an objective test to determine if others are "similarly situated" to ensure that they are "fair congeners" and that "apples should be compared to apples."   *Id.* (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989).

The male employees listed by the Complainant in her Charge of Discrimination are not similarly situated.   There are several reasons why the Complainant earned less than the male ADAs listed in the Charge of Discrimination.   The DA's Office has a pay scale that is based in part on seniority and length of service in the DA's Office.   ADAs in different units of the DA's Office develop varied skill sets that are not of equal value to the DA's Office.   An ADA in a supervisory role will be tasked with added responsibilities to his or her caseload that warrants greater pay.   Once the ADA is promoted from the supervisory role at a lower unit to a Superior Court unit, the ADA's pay will naturally be higher than other like ADA without the experience as a supervisor.   These factors warrant disparate salaries among the ADA.

The male ADAs identified by the Complainant are not "fair congeners" with the Complainant and are not similarly situated.   The Complainant commenced employment with the DA's Office in September 2007 as a recent law school graduate.   She was promoted to the Major Felony Unit and earned a salary of $47,500.00.   She was subsequently promoted to the Gang Unit in 2012, and earned an annual salary of $52,000.00.   In 2012, the DA developed a pay scale that included a $50,000.00 floor for all ADAs promoted to the Superior Court level.   Having been promoted to the Superior Court prior to the development of the new pay scale, the Complainant's salary was raised to $52,000.00 because she had some experience working in the Major Felony Bureau.   The Complainant never held any supervisory positions while with the DA's Office, did not come to the DA's Office with relevant prior legal experience, and did not

take on additional responsibilities beyond her role in the Gang Unit that would justify a greater salary.

Employee 'A' is a 2002 law school graduate who joined the DA's Office with several years of experience as a law clerk and practicing attorney. He also was promoted to an elite unit of the DA's Office, the Special Prosecutions Unit, which handles legally and factually complex public corruption and white collar criminal prosecutions. Employee 'A's' pay is in line with other assistant district attorneys in the Special Prosecutions Unit, both male and female. He had several years of experience that the Complainant did not have at the time that he was hired away from a prestigious law firm. He also worked in an elite and specialized unit that justified a higher salary than the Complainant's salary. It is clear that he is not a "fair congener"

Likewise, Employee 'B' has a higher salary than the Complainant based on his several years experience as an assistant district attorney in the DA's Office's Appellate Division. The Appellate Division requires extensive legal research and writing abilities, which is a unique skill set among its assistant district attorneys. As such, the DA's Office provides a gender-neutral policy that the minimum starting salary for the Appellate Division is $42,000.00 annually, while the minimum starting salary is $40,000.00 annually for all other assistant district attorneys. Employee 'B' is currently in the Narcotics Unit, where the nature of cases differs from the Gang Unit that the Complainant worked. The Narcotics Unit requires its attorneys to work on substantial pre-trial motions to suppress evidence and sophisticated issues of surveillance and evidence gathering. Employee 'B' is also not a "fair congener."

Employees 'C' and 'D' are not "fair congeners" with the Complainant because they each held supervisory experience for multiple years prior to being promoted to the Narcotics Unit. They earned salary raises based on the additional obligations they undertook as supervisors and

the leadership skills their roles created.  As mentioned above, the Narcotics Unit is a specialized unit that has a focus on motion practice and legal research and writing that is not seen in the Gang Unit where the Complainant worked.

Employee 'E' began working with the DA's Office the year prior to when the Complainant began working as an ADA.  Immediately after receiving notice of promotion to the Major Felony Bureau, Employee 'E' was called to serve in Afghanistan with the United States Army, where he cultivated very unique and specialized skills based on his work with the Afghan government to develop a legal system.  The DA's Office re-hired Employee 'E' in 2013 at an annual salary of $55,000.00, recognizing his invaluable experience, and prior experience working as an ADA.  At the time the DA's Office rehired Employee 'E' the starting salary for ADAs new to the Major Felony Bureau was $50,000.00.

Similarly, Employee 'F' joined the DA's Office one year prior to the Complainant.  At that time, he already had one year of experience as a law clerk in a federal appeals court.  When Employee 'F' was recruited back to the DA's office in March 2013 for the Major Felony Bureau, he received an annual salary of $52,000.00.  This is identical to the Complainant's starting salary when she was promoted to the same unit in July 2012.  The salary of Employee 'F' was increased to $57,500.00 in 2014.  Due to his several years of experience working as an ADA in the Major Felony Bureau, Employee 'F' handled elevated cases, including motor vehicle homicide cases.  At the time that ADA salaries were established for the 2014 fiscal year, the Complaint did not have the same years of service at the Superior Court level, or experience handling similarly escalated cases.

None of the male assistant district attorneys listed in the Charge of Discrimination are "fair congeners" that permit the Complainant to meet her prima facie burden.  The one "similarly

situated" male assistant district attorney earned an identical salary of $53,550.00 to the Complainant for the 2014 fiscal year. This male assistant district attorney was hired in September 2007, worked in Dorchester District Court for several years, and was promoted to the Major Felony Bureau in October 2011 before being moved and given a raise to $47,500.00. In September 2012, he was promoted to the Gang Unit and given a raise to $52,000.00 annual salary. The striking similarities between the male individual and the Complainant further show that the Complainant is unable to meet her prima facie burden.

It is also noteworthy that when she confronted Mr. Towle about her pay rate, the Complainant referenced the salary of a female assistant district attorney in another unit that she believed was unfairly only $500.00 less than her annual salary. This demonstrates that the Complainant believed that her gender was not the motivating factor for her pay rate, but rather that she was being treated unfairly as an individual when compared to other assistant district attorneys, both male and female. The Complainant cannot sustain a claim for disparate treatment if it is based on her perception of unfair treatment she received as an individual as opposed to membership in a protected class.

2.  **Even Assuming That The Complainant Has Stated A Prima Facie Case, The DA's Office Has Articulated Legitimate, Non-Discriminatory Reasons For The Complainant's Salary And The Complainant Is Unable To Show Pretext.**

To the extent that the Complainant has stated a prima facie case, the DA's Office has articulated legitimate, non-discriminatory reasons for her salary. The DA's office "may satisfy its burden by articulating a lawful reason or reasons for its employment decision and producing credible evidence that demonstrates that the reason or reasons advanced were the real reasons." *Sullivan*, 444 Mass. at 50. The DA's office has a burden of production and not persuasion, meaning that it must only present some evidence and need not prove its case. *See id.* As

discussed above, the Complainant's salary was set for legitimate reasons including her background and experience, her qualifications, her position, and her job performance.

As the DA's Office has met its burden in the second prong, the burden returns to the Complainant to demonstrate that the DA's Office's reasons are pretext. *See, e.g.*, *Ramsdell v. Western Mass. Bus Lines, Inc.*, 415 Mass. 673, 679 (1993). The Complainant must demonstrate that the DA's Office's articulated reasons for alleged pay discrepancies was a "pretext for the underlying and decisive unlawful bias." *Finney v. Madico, Inc.*, 42 Mass. App. Ct. 46, 49 (1997). There is no evidence supporting any pretext. Accordingly, the Complainant's claim for gender discrimination fails.

### B.   Retaliation

G.L. c. 151B, § 4(4) makes it unlawful for an employer "to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under [G.L. c. 151B, § 5]." The Complainant's prima facie case for retaliation requires her to demonstrate that (1) she engaged in protected conduct; (2) subsequently suffered an adverse employment action; and (3) that there is a causal connection between the protected conduct and the adverse employment action. *See, e.g.*, *Mole v. Univ. of Mass.*, 442 Mass. 582, 591-92 (2004). She must also show that "she reasonably and in good faith believed that the [DA's Office] was engaged in wrongful discrimination, that she acted reasonably in response to her belief, and that the [DA's office's] desire to retaliate against her was a determinative factor in its decision to terminate her employment." *Tate v. Dep't of Mental Health*, 419 Mass. 356, 365 (1995) (internal citations and quotations omitted).

The Complainant's retaliation claim against the DA's Office fails for two independent reasons.  First, the Complainant's approaching Mr. Towle on September 19, 2014 was not protected activity protected by G.L. c. 151B.  Second, there is no evidence that the Complainant was terminated due to retaliatory animus.

### 1.     The September 19, 2014 Incident Is Not Protected Activity.

The Complainant, while intoxicated, confronted Mr. Towle on September 19, 2014 and used profane and hostile language while arguing that the DA's Office was sexist, racist, and promoted those involved in political campaigns.  This conduct is not protected under G.L. c. 151B.  Under *Tate*, 419 Mass. 365, the person who engages in alleged petitioning activity must act reasonably in doing so.  The Complainant demonstrated insubordination and a complete lack of judgment unbecoming of an assistant district attorney.  The Complainant's conduct is clearly unreasonable and cannot be tolerated by an employer.

Several factors lead to the undeniable conclusion that the Complainant's conduct on September 19, 2014 is not protected activity under G.L. c. 151B.  First, the timing and place of her complaints was not appropriate.  This was an after-work going away party for a departing colleague.  The incident occurred at approximately 9:30 p.m. on a Friday night after the Complainant had been consuming alcohol at the bar for several hours.  The Complainant approached Mr. Towle in public, and within ear shot of numerous other employees of the DA's Office and possibly members of the public to discuss a private matter involving her salary and her unsubstantiated allegations of sexism, racism, and political favoritism.  Second, the Complainant was highly intoxicated.  This was not a reasonable context for her to express her frustration with pay and her perception that her gender was the basis for pay disparities.  Third, the Complainant used profane and abusive language to the Chief of Staff, a superior of hers in

the DA's Office.  Fourth, the Complainant departed from the DA's Office's grievance procedure when she confronted the Chief of Staff.  All of these factors together demonstrate unreasonable conduct, and a lack of judgment, that cannot form the basis for protected activity.

> **2.      There Is No Evidence That The Complainant's Alleged Protected Activity Caused Her Termination.**

The Complainant has the burden to show that she was terminated as a result of her protected activity and that retaliatory animus governed the adverse action by the DA's Office.  A causal relationship can be found "where adverse employment actions follow close on the heels of protected activity."  *Pardo v. General Hosp. Corp.*, 446 Mass. 1, 19-20 (2006) (quoting *Mole*, 442 Mass. at 592).  "The mere fact that one event followed another is not sufficient to make out a causal link.  That an employer knows of a discrimination claim and thereafter takes some adverse action against the complaining employee does not, by itself, establish causation."  *Mole*, 442 Mass. at 592.

Here, the Complainant first complained about her salary in March 2014.  It was not until six months later, immediately following the September 19, 2014 incident, that she was terminated.  There is certainly no direct evidence that the Complainant's alleged protected activity was the cause of her termination.  More importantly, there is no indirect evidence that would permit an inference that the DA's Office was motivated by retaliatory animus in terminating her.  In between her first meeting regarding her salary with Mr. Haggan on March 10, 2014 and her termination on September 22, 2014, the Complainant was repeatedly commended by her superiors and the District Attorney for her trial work.  The Complainant herself concedes that she was repeatedly commended in her Charge of Discrimination.  She was praised in correspondence in May 2014 and August 2014 in connection with her trial work.  Additionally, superiors including Mr. Haggan repeatedly sent her positive and encouraging

emails regarding her job performance. Mr. Haggan advised the Complainant that the DA's Office would address her salary concerns during the upcoming review process that began in September 2014.

The DA's Office did not take any adverse employment actions against the Complainant until immediately after her highly inappropriate conduct on September 19, 2014. For six months after she originally complained about her salary, the Complainant was not subject to any adverse employment action. In fact, she completed a self-evaluation form on September 19, 2014 that would be used for her formal job performance evaluation and a subsequent raise. Had she not engaged in such inappropriate behavior, the Complainant would have likely received a salary increase in the following months that may have alleviated her frustrations with her pay rate.

It is clear that the Complainant's abusive and profane language and accusations of sexism, racism, and political favoritism, while in an intoxicated state, are the basis for her termination. The District Attorney notified her of his decision to terminate her in the morning of the next work day and told her that her conduct was inappropriate, offensive, and unbecoming of an assistant district attorney. No reasonable dispute can exist that the September 19, 2014 incident was the basis for her termination, and that this is not retaliation. If the Commission were to hold otherwise, this would severely undermine an employer's legitimate expectations of respect and decorum from its employees when dissatisfied with the terms and conditions of employment. The DA's Office was fully within its rights to terminate the Complainant for her conduct on September 19, 2014, and it did not violate G.L. c. 151B in doing so. Accordingly, the DA's Office is not liable for retaliation as a result of the termination of the Complainant.

III.   CONCLUSION

The Complainant's Charge of Discrimination fails to state a claim for gender discrimination or retaliation under G.L. c. 151B or Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.* and therefore must be dismissed without a finding of probable cause.

Executed this the fifteenth day of January, 2015, under the pains and penalties of perjury.

Daniel F. Conley
Suffolk County District Attorney
The Suffolk County District Attorneys Office

PREPARED BY ITS ATTORNEYS,

DATE: 1/15/2015

Anthony M. Campo, BBO#552093
acampo@BSCtrialattorneys.com
Aaron R. White, BBO# 650918
awhite@BSCtrialattorneys.com
Boyle, Shaughnessy & Campo, P.C.
695 Atlantic Avenue, 11th Floor
Boston, MA 02111
(617) 451-2000
Fax: (617) 451-5775