UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS


CHRISTINA CORDA,                    )
                                    )
     Plaintiff,                     )
                                    )
                                    )     Civil Action
vs.                                 )     No. 15-10628-RWZ
                                    )
SUFFOLK COUNTY DISTRICT             )
ATTORNEY'S OFFICE,                  )
                                    )
     Defendant.                     )


**JURY TRIAL**
**DAY TWO**


BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE


UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
May 24, 2016
9:00 a.m.


*   *   *   *


CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
(617) 261-0555

APPEARANCES:

2

3    For the Plaintiff:

4
     FAIR WORK, P.C.
5    By:  Stephen S. Churchill, Esq., and
          Hillary A. Schwab, Esq.
6         192 South Street
          Suite 450
7         Boston, MA 02111

8

9    For the Defendant:

10   BOYLE, SHAUGHNESSY & CAMPO, P.C.
     By:  Aaron R. White, Esq., and
11        Dawn M. Piccirilli, Esq.
          695 Atlantic Avenue
12        11th Floor
          Boston, MA 02111
13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS


Christina Corda, Recalled

    By Mr. Churchill:        7
    By Ms. Piccirilli:                50

```
 1                  P R O C E E D I N G S

 2           (The following proceedings were held in open court

 3   before the Honorable Rya W. Zobel, United States District Judge,

 4   United States District Court, District of Massachusetts, at the

 5   John J. Moakley United States Courthouse, 1 Courthouse Way,

 6   Boston, Massachusetts, on May 24, 2016.)

 7     THE FOLLOWING TAKES PLACE OUTSIDE THE PRESENCE OF THE JURY:

 8           THE COURT:  May I see counsel quickly.

 9   AT SIDEBAR:

10           THE COURT:  On the issue of drinking and the bars,

11   the plaintiff -- as I understand it, the plaintiff wants to

12   show that there was a habit of having (A) parties at bars, (B)

13   that people got drunk, and (C) that they used certain

14   language.

15           It is relevant to the extent that, as I understand

16   it, she was fired for her conduct at this party.  If her

17   conduct is not out of the norm, which is certainly what the

18   plaintiff is trying to show, then they're entitled to put in

19   some evidence about ordinary conduct to show that her conduct

20   was not unusual.  Is that, in essence, what you're --

21           MR. CHURCHILL:  Yes, your Honor.  I'm not --

22           THE COURT:  Okay.  Now, we know already that there

23   were bars, that people had parties in bars.  We know that

24   there's such parties.  You can have a couple of questions

25   about how people behave at these parties, and that's it.
```

1          MR. CHURCHILL:  That's all I said I intended.

2          MS. PICCIRILLI:  Your Honor, if I may respond to

3     that.  There's absolutely no evidence of anyone ever coming up

4     to an executive staff member while drunk using --

5          THE COURT:  Well, you can bring that out.

6          MS. PICCIRILLI:  -- using profanities at a bar.  This

7     other testimony is about --

8          THE COURT:  It's evidence.  That doesn't mean they

9     can't put in whatever they need to put in to show that she was

10    -- what the totality of the circumstances were, which is her

11    dealing with -- her conduct.  What they're trying to show is

12    no different from what the totality of circumstances in other

13    parties were.  You can show that it was different because she

14    went up to an executive, but they're entitled to show that she

15    behaved in a certain way which was inconsonance with the way

16    these things normally went, and you can show it was in

17    dissonance.  That's it.  Okay?

18          MR. WHITE:  She has one question.

19          MS. PICCIRILLI:  There's another issue here, your

20    Honor, that I asked to speak with you about.  It's the race

21    issue.

22          THE COURT:  The what?

23          MS. PICCIRILLI:  The race discrimination.

24          THE COURT:  Why do we need to talk about that right

25    now?

1          MS. PICCIRILLI:  Because there was a motion in limine

2     that was allowed and there will be no discussion of any sort

3     of race discrimination.

4          THE COURT:  No, it is not that there's no discussion

5     of race.  The fact is that the plaintiff gave up on race

6     discrimination, as I understand it.  Their papers say we're

7     not claiming race discrimination.

8          MS. PICCIRILLI:  There was no race discrimination.

9          THE COURT:  They're not claiming it.

10          MS. PICCIRILLI:  This is my only point.  There

11     weren't questions that were raised about plaintiff's counsel

12     about race discrimination.  It was interjected in plaintiff's

13     testimony.  She would frequently refer to people's race, such

14     as this person being black and being paid less than he should

15     be or this person --

16          THE COURT:  Tell her she can't do that anymore.  Stop

17     her and make sure that you don't question her in such a way

18     that she can do that.

19          (End of sidebar conference.)

20          (Jury enters courtroom.)

21          THE COURT:  Ms. Corda, understand that you are still

22     under oath, even though we will not again swear you today.

23          THE WITNESS:  Yes, your Honor.

24          CHRISTINA CORDA, PREVIOUSLY SWORN.

25          THE COURT:  Members of the jury, I apologize for

1    doing this.  I try to avoid what we call these sidebar

2    conferences, but counsel had a question and I had failed to

3    deal with it before I took the bench.  So, it was my fault.

4    You may proceed.

5            MR. CHURCHILL:  Thank you, your Honor.

6                   CONTINUED DIRECT EXAMINATION

7     BY MR. CHURCHILL:

8    Q.   Ms. Corda, good morning.

9    A.   Good morning.

10   Q.   Let me show you --

11           THE COURT:  Before you go, how much more time do you

12   have?

13           MR. CHURCHILL:  Maybe --

14           THE COURT:  By my calculus, no more than half an

15   hour.

16           MR. CHURCHILL:  If I could have 30 minutes to an

17   hour, but I'll move as quickly as I can, your Honor.

18   Q.   Ms. Corda, let me show you what has been marked as

19   Exhibit 54 and Page 2 from that exhibit.  Do you recognize

20   this document?

21   A.   Yes.

22   Q.   And what is it?

23   A.   My résumé.

24   Q.   And at the bottom of your résumé, do you see there's a

25   section on activities?

1     A.   I do.

2     Q.   And for the period of February 2008 to August 2014, what

3     activity were you referring to there?

4     A.   So, while I was working --

5          JUROR:  Excuse me, your Honor.  I'm sorry.  The juror

6     monitor is not on for the exhibits.

7          THE COURT:  Is it just one screen doesn't show?

8          JUROR:  No.  It's all.

9          COURTROOM DEPUTY CLERK URSO:  Okay.  I'm sorry.  None

10    of them?  No?

11         JUROR:  There we go.  Thank you.

12         MR. CHURCHILL:  May I proceed?

13         THE COURT:  Yes, please proceed.

14    Q.   So, Ms. Corda, in the section there on activities for

15    February 2008 to August 2014, that was during the period you

16    were at the DA's Office?

17    A.   It was.

18    Q.   Can you just briefly describe what those activities

19    were?

20    A.   Sure.  So, when I was at the DA's Office every year, I

21    would volunteer to work at -- there were two separate

22    programs.  It's called the Basketball For Peace Program and

23    there's a second one called Soccer For Peace Program.  So,

24    every year both of those programs were held and I would

25    volunteer for both of those programs while I was an assistant

1   district attorney.

2   Q.   Okay.  And was there a connection between those programs

3   and the work that you were doing as a prosecutor?

4   A.   Yes.  I think the DA's Office would throw those events

5   and -- obviously, to be part of the community and to try to

6   have programs that went towards having community members come

7   together and do positive things, was in conjunction with my

8   work, yes.

9   Q.   Now, going back to September 19th, 2014.  We were

10  talking before about a going-away party that was being held

11  that night?

12  A.   Yes.

13  Q.   And just as a quick recap, you said also that you had

14  done your self evaluation that day?

15  A.   Yes.  It was due on September 19th and I had just

16  finished it in the afternoon of September 19th of 2014.

17  Q.   And what time did you leave the office, approximately?

18  A.   I left the office sometime approximately after 5

19  o'clock.

20  Q.   And where did you go?

21  A.   I went to The Fours.

22  Q.   And is that where the party was being held?

23  A.   It is where the party was being held.

24  Q.   So, you didn't go anywhere between the office and going

25  to The Fours?

1    A.  No, I did not.

2    Q.  And just so we have a scope of time there, how long were

3    you at The Fours in total that night?

4    A.  I was at The Fours until, I believe, approximately 10:30

5    or so.  So, at least, I would say -- depending on how

6    calculate time, four and a half, five and a half hours.

7    Between four and a half and five and a half.

8    Q.  And when you got there to the party, how crowded was it?

9    A.  It was very crowded.

10   Q.  And how would you describe the noise level?

11   A.  It was as noisy as it would be in a bar when there are a

12   lot of people.  It was a very well-attended event.  So, it was

13   loud as in people were talking with each other, having

14   conversation and it was crowded.

15   Q.  And did you observe people drinking?

16   A.  Yes.

17   Q.  And was that common at these going-away parties?

18   A.  Yes, it was common at the going-away parties.  As I

19   previously testified, all the going-away parties that I

20   attended were actually held at bars.

21   Q.  How would you describe the culture of the DA's Office

22   from your experience?

23         MS. PICCIRILLI:  Objection.

24         THE COURT:  The objection is sustained.

25   Q.  All right.  So, when you arrived, who did you have

1    conversations with?

2    A.   So, I had conversations with a number of people because

3    at this going-away party or any going-away party, that are

4    always people that, obviously, I would know and spend time

5    with.  There would be assistant district attorneys I had

6    conversations with.  Police officers I had conversations with.

7    If you want specific names --

8    Q.   We don't need names.

9         So, in addition to people from the DA's Office, did

10   others typically attend these types of going-away parties?

11   A.   Yes.

12   Q.   Who else?

13   A.   So, there would be people that work in the office

14   outside of the assistant district attorneys, which would be

15   victim witness advocates or support staff members or members

16   from different areas of the office.  There could also be

17   police officers or detectives.  There could also be defense

18   attorneys.  There could also be friends of people that were

19   attending the party.

20   Q.   Now, to the best of your memory, how many drinks did you

21   have that night?

22   A.   I had six drinks.

23   Q.   And do you recall what you had?

24   A.   Yes.

25   Q.   What did you have?

1    A.   I had two pumpkin beers initially and then I had three

2    vodka soda drinks and then I had a shot of tequila.

3    Q.   And was that an unusual amount of drinks for you to have

4    at a party such as this?

5    A.   There's not a set amount that would be normal or not,

6    but over that period of time at a party, I don't think it's

7    unusual.

8    Q.   Now, is it the case that -- well, did you pay for all of

9    your own drinks?

10   A.   No.

11   Q.   Did you pay for some of your drinks?

12   A.   Yes.

13   Q.   And did you also buy drinks for others?

14   A.   Yes.

15   Q.   So, let me show you what has been marked as Exhibit 26.

16   Do you recognize this document?

17   A.   I do.

18   Q.   And what is it?

19   A.   That is the receipt from The Fours.

20   Q.   And this is a receipt, you understand, that is tied to

21   your credit card?

22   A.   Correct.

23   Q.   So, just so we can understand what's on here, over to

24   the left there's an entry, for example, that says Grey Goose.

25   Do you see that?

1    A.   I do.

2    Q.   And what does that refer to?

3    A.   Grey Goose is a type of vodka.

4    Q.   All right.  And then I think we all know what Michelobe

5    Ultimate and Bud Light and Sam Seasonal are.  Then there's

6    four Patron.  What does the "Patron" refer to?

7    A.   Patron is tequila.

8    Q.   And then, finally, there's another Grey Goose.  What

9    does that refer to?

10   A.   Grey Goose is a vodka.

11   Q.   So, over to the right there's also times when the orders

12   were put in.  Do you see that?

13   A.   I do.

14   Q.   And so, the first one -- this is, I guess, in military

15   or police time.  18:07, what does that refer to?

16   A.   6:07 p.m.

17   Q.   And then the final time there is 21:17.  And what time

18   is that?

19   A.   That would be 9:17 p.m.

20   Q.   So, as we can see there, how many rounds were there on

21   this receipt?

22   A.   Two -- or three, I guess, total.

23   Q.   And so, the times were 6:07, 7:18 and 9:17?

24   A.   Correct.

25   Q.   All right.  And when you ordered drinks, did you ever

1   order multiple drinks for yourself at the same time?

2   A.   No.

3   Q.   All right.  So, with respect to -- there's the four

4   drinks that are there at 7:18.  Were any of those drinks for

5   you?

6   A.   Yes, I believe the first one, which would be the Grey

7   Goose.

8   Q.   And what about the three beers?

9   A.   No.  That would be a point where I'm buying drinks for

10  other people.

11  Q.   And then for the entry where it says four Patron, you

12  said those are tequila shots?

13  A.   Correct.

14  Q.   And that was at 9:17?

15  A.   Correct.

16  Q.   Did you have any of those shots?

17  A.   Yes.

18  Q.   How many?

19  A.   One.

20  Q.   And who were the other shots for?

21  A.   The other shots I had bought for Dan Mulhern, who was a

22  prior chief of the Gang Unit, and Jack Zanini, who is the head

23  of the appeals unit and also trial counsel for the district

24  attorney's office, and the last shot the bartender took.

25  Q.   So, did you then drink those shots with Mr. Zanini and

1    Mr. Mulhern?

2    A.   Correct.

3    Q.   And Mr. Mulhern you said was formerly the chief of the

4    Gang Unit?

5    A.   Correct.

6    Q.   Was he still employed by the DA's Office at that time?

7    A.   No.  At that time he had left the office.  I think it

8    was February of 2014, it might have been, or a little earlier,

9    and he went to be the senior advisor for the mayor of Boston.

10   Q.   And had you had drinks with Mr. Mulhern before?

11   A.   Yes.

12        MS. PICCIRILLI:  Objection.

13        THE COURT:  Why do we need to know that?  The

14   objection is sustained.

15        MR. CHURCHILL:  All right.

16   Q.   So, at some point you found yourself at the bar near Mr.

17   Zanini and Mr. Towle; is that right?

18   A.   Correct.

19   Q.   And who were you with at that time?

20   A.   So, I initially was with Jack Zanini and Daniel Mulhern,

21   as I just testified.  We were on -- as you walk into The

22   Fours, the second floor, the bar is shaped like an L with a

23   shorter side to the right and the longer side to the left.  I

24   was on the right side of that with Mr. Mulhern and Mr. Zanini.

25   Q.   All right.  And did you observe Mr. Towle in the

1   vicinity as well?

2    A.   Yes.  I believe Mr. Towle was actually on the other side

3   of the L.  So, it would be almost directly diagonal from that

4   corner.  So, on the left side while we were on the right side.

5    Q.   All right.  So, as of this point, September 19th, 2014,

6   to what extent had you had any previous interactions with Mr.

7   Towle?

8    A.   So, I had numerous interactions with that Mr. Towle

9   previously.  When I was in the Major Felony Unit, which was

10   for a period of eight months, he would come down basically

11   every Friday to Paul Tresler's office.  So, when I worked in

12   the Major Felony Unit, there were two supervisors, Masai King,

13   who was my direct supervisor, and there's a second supervisor,

14   his name was Paul Tresler.  So, while I was in the Major

15   Felony Unit, John Towle would come down basically every Friday

16   to Paul Tresler's office and we would have talks in his office

17   with me and multiple ADA's that were around, including the

18   supervisor, Paul Tresler.

19    Q.   And other than that interaction, had you had any other

20   interactions with Mr. Towle?

21    A.   Yes.  Also, there was a press secretary who was going

22   away.  There was a small going-away party for her held at The

23   Hill Tavern in Beacon Hill and Mr. Towle and I attended.  He

24   actually sat across the bar from me and was drinking a beer

25   across from me at a table in the back room on the right of The

1    Hill for that going-away party and we were having discussions

2    because we were directly across the table from each other at

3    that point.

4    Q.   All right.  And other than that, did you have any other

5    interactions with Mr. Towle?

6    A.   Yes.  So, I had waitressed throughout the end of high

7    school, college and law school at different country clubs, and

8    most recently I was working at Wollaston Golf club, which is

9    in Milton on Randolph Avenue, and while I was waitressing

10   there, John Towle came in as a guest at Wollaston Golf Club

11   and I had interactions with him there.

12   Q.   And did you actually serve him?

13            MS. PICCIRILLI:  Objection.

14            THE COURT:  What's the objection?

15            MS. PICCIRILLI:  He asked if she actually served him

16   alcohol, your Honor.  I don't think that's relevant to this

17   case.

18            THE COURT:  It's not the alcohol that's relevant, but

19   the interaction that's relevant.  She didn't ask -- he didn't

20   ask what she was serving.  You may have the question.  Just

21   tell us yes or no whether you served him.

22   A.   Yes.

23   Q.   And at that point did you have any substantive

24   discussion with Mr. Towle?

25   A.   We did have a discussion.  It was when the Bruins were

1    playing and he was -- first of all, he acknowledged, Hi,

2    Christina.  I know you from the office, obviously.  I had a

3    name badge on, anyways, but we had interaction where he was

4    saying, I hope no one gets arrested tonight because of the

5    Bruins.  I wouldn't fault them if they get arrested, a little

6    bit of banter that way, that he was talking about, celebrating

7    that the Bruins were playing on that evening and a little more

8    commentary, but that was the extent of our interaction.

9    Q.   All right.  And when was this?

10   A.   That would be in the last few years of my work in the

11   DA's Office when I was in superior court.

12   Q.   So, turning to Mr. Zanini, how would you describe your

13   relationship with Mr. Zanini as of September 19th, 2014?

14   A.   So, the relationship that Mr. Zanini and I had I would

15   characterize -- I thought that we were friends at that point.

16   He was someone that I would talk to often in the DA's Office.

17   I would talk to him by myself about issues, legal issues or

18   issues in the office.  My colleague and good friend Rilwan

19   Adeduntan and I would actually talk to him together.  He would

20   come down to our floor on the 6th floor and meet with us in

21   our offices to talk to us.  He had called me before he left

22   the office and asked if we were going out after work before.

23   I've had interactions with him at court.  I had interactions

24   with him on the telephone, like I stated.  We had interactions

25   at parties previously.  He was someone that I spoke to, I

```
1   would say, at length about a lot of the issues.  We didn't
2   socialize a lot outside of work, which is how I mentioned it
3   now, but, for an example, there was one --
4           THE COURT:  Excuse me.  What was his position in the
5   office?
6           THE WITNESS:  He is the chief of the Appeals Unit and
7   I believe also --
8           THE COURT:  And what was Mr. Towle's position?
9           THE WITNESS:  He was Chief of Staff.
10           THE COURT:  Directly below Mr. Conley?
11           THE WITNESS:  Yes, Chief of Staff, yes.
12           THE COURT:  Okay.
13   A.   (Continuing)  So, I would go to him if I had issues or
14   wanted to run something by him regarding legal issues that
15   came up.  I specifically asked him about a few things.  He
16   would run things by me and Rilwan.  It was something that I
17   felt was a friendship.
18   Q.   And how did you and Mr. Zanini speak to each other?
19   A.   We spoke to each other like we were friends.  I
20   didn't -- when we spoke to each other, it wasn't as if I was
21   his inferior, he was my superior or anything like that.  We
22   spoke freely.  He would swear.  I would swear.  That was his
23   personality, and that's just how we spoke.
24   Q.   And in addition to being chief of the Appeals Unit, did
25   Mr. Zanini hold any other positions in the office?
```

1    A.   Yes.  I believe it was -- it's called trial counsel or

2    -- I'm sorry -- counsel for the attorney -- for the district

3    attorney.

4    Q.   All right.  So, at some point did you have any

5    conversation with Mr. Towle that night?

6    A.   I did.

7    Q.   And who initiated that conversation?

8    A.   Mr. Towle.

9    Q.   And at the time he initiated that conversation, who else

10   was around?

11   A.   Initially it was -- Jack Zanini was right there with him

12   and Mark Lee was initially around.

13   Q.   And this was -- where was this in The Fours?

14   A.   The same area that I already testified to.  So, where

15   there's an L at the bar, like I said, it's shorter on the

16   right side and it goes longer on the left side.  It would be

17   on the left side of that corner.

18   Q.   And how long after you had done the shot with Mr. Zanini

19   and Mr. Mulhern was it that you had this conversation with Mr.

20   Towle?

21   A.   It was sometime after.  I'd say probably within a half

22   an hour.

23   Q.   And when Mr. Towle initiated the conversation, what did

24   he say to you?

25   A.   He said something along the lines of, Hi, how are you?

1    I've heard that you're a good lawyer.

2    Q.   And then what happened?

3    A.   And then I then spoke and responded to Mr. Towle at that

4    point saying that I was a good lawyer and I wasn't getting

5    paid what I thought I should be getting paid.  I then

6    indicated to him that Darcy Kofol was specific ADA, had just

7    worked on a -- or, I'm sorry -- thrown a campaign party for

8    Dan Conley at her home and within two weeks received a

9    promotion and then did receive a large bonus -- or I'm

10   sorry -- a large raise, and that she was making $500 less than

11   me and I was more experienced than her and she was three

12   classes under me.

13   Q.   Did you say anything else about Mr. Kofol?

14   A.   No.

15   Q.   Did you comment on her performance?

16   A.   No.

17   Q.   Did you compare yourself to her in any way other than

18   talking about your years of experience?

19   A.   I believe I said I had more trial experience than her

20   and I would have had more motion experience as well, but I

21   just said the trial experience, I believe.

22   Q.   All right.  What happened then?

23   A.   At that point -- so, where the conversation was, Mr.

24   Towle was in front of me and Mr. Zanini was to my right.  And

25   so, I was having that conversation, and when I was saying

1    that, at that point Mr. Zanini was to my right, was saying to

2    me something along the lines of, Christina, you can talk about

3    this later.  That's what he -- what Mr. Zanini was saying to

4    me to my right when Mr. Towle was in front of me.

5        Q.   How many times did Mr. Zanini say that to you?

6        A.   He could have said it a couple of times, but I

7    specifically remember him saying it one time when we were

8    talking.

9        Q.   And what happened then?  What did you say to Mr. Towle

10   and what did Mr. Towle say to you?

11       A.   What did I say to Mr. Towle at that point?

12       Q.   Yes.

13       A.   Okay.  At that point I said that, you know, Rilwan and I

14   were very hard-working prosecutors and that we weren't getting

15   the money we deserved, and the reason that we weren't making

16   what we should is because I was a woman and Rilwan is black.

17       Q.   And then what happened?

18       A.   At that time Mr. Towle said, "You believe that?"  And I

19   said, "Yes, I do."  And he put down his beer and left.

20       Q.   All right.  Now, during the time that you were

21   addressing Mr. Towle, did you swear at him?

22       A.   No.

23       Q.   When you spoke to Mr. Zanini at the bar, did you use

24   swear words with him?

25       A.   Yes.

1    Q.   And was that to your mind any different than the prior

2    interactions you had with Mr. Zanini?

3    A.   No.

4    Q.   After Mr. Towle left, did you then have further

5    communications with Mr. Zanini?

6    A.   Yes.

7    Q.   And what did the two of you talk about at that time?

8    A.   After he -- after Mr. Towle left?

9    Q.   Yes.

10   A.   So, at that point I had a conversation, I think right --

11   it would be to the left of where the conversation had -- I had

12   with Mr. Towle was, a little behind a few feet to the left,

13   and I was having a conversation with Jack at that point, and I

14   was starting to get upset and I think I was just confirming

15   telling Jack, basically, you know this is true.  I said this

16   before kind of thing, but I would be using profanity with

17   Jack.

18   Q.   Had you previously complained to Mr. Zanini about what

19   you thought to be gender discrimination?

20   A.   Yes.

21   Q.   When was that?

22   A.   So, I had had a conversation with Mr. Zanini multiple

23   times.  I can't give you an exact date, but I do know that the

24   summer of 2014, I did have a specific conversation.  It was

25   actually in a group, but I had indicated to Mr. Zanini that I

1     thought that I wasn't getting paid what I should be because of

2     my gender and I was being discriminated against and that

3     Rilwan was because of his race.

4            THE COURT:  Ms. Corda, where in the hierarchy was Mr.

5     Zanini?  That is, was he responsible for you or were you

6     responsible to him?

7            THE WITNESS:  No, your Honor.  So, the whole time

8     that I was in superior court, I worked in either Major Felony

9     or the Gang Unit.  So, he was never my direct supervisor in

10    either of those units and he wasn't a supervisor to me in the

11    hierarchy of the office.  He wasn't, for example, a first

12    assistant district attorney.  He was just in --

13           THE COURT:  But in terms of the hierarchy, he was

14    above you?

15           THE WITNESS:  Oh, yes.  Yes.  Yes.  He was the chief

16    of the Appeals Unit.  So, he would certainly be ahead of --

17    above me.

18    Q.   All right.  And when you said to Mr. Towle at the party

19    that you thought you were getting paid less because you were a

20    woman, did you genuinely believe that?

21    A.   Yes.

22    Q.   Why did you believe it?

23    A.   There are a number of reasons why I believed it.  The

24    list is a little bit longer, but, first of all, Michelle

25    Granda, who started in the office in 2009, had told me that

1  when she was hired, that the 9th floor indicated that they

2  knew there was gender --

3          MS. PICCIRILLI:  Objection.

4          THE COURT:  This is not coming in for the truth of

5  it, only for her state of mind.  The objection is overruled.

6   A.   Michelle Granda, when she was hired in 2009, she

7  indicated that when she was hired, that the office disclosed

8  to her that they knew there was disparity in gender pay.

9          MS. PICCIRILLI:  Objection, your Honor.

10          THE COURT:  I just ruled on it.

11          Members of the jury, let me explain that to you.

12  Counsel for the defense is objecting on the grounds that she

13  says this is hearsay.  Hearsay means that that is -- let me go

14  back a moment.

15          Your job will be to determine what happened and the

16  extent to which you believe what the witnesses tell you, and

17  counsel, you can see, are allowed to question the witness

18  about what happened and what she said, but she cannot rely --

19  counsel cannot rely on what somebody else told her to prove

20  what somebody -- the truth of what somebody else told her.

21          So, for example, in this instance, Ms. Corda can

22  testify about what this other person told you, not to prove

23  that what the other person said -- the other person said, This

24  is a terrible place, everybody wears black on Friday.  It

25  could not be -- it could not be used to prove that everybody

1    was wearing black only Friday.  It can be used to show what

2    was in Ms. Corda's mind as a result of what she heard, and

3    that is all it is being offered for, not that everybody was

4    wearing black on Friday.  Do you understand the difference?

5           JURORS:  (Nodding ).

6           THE COURT:  Do you understand the difference?

7           MS. PICCIRILLI:  I do, your Honor.  Thank you.

8           MR. CHURCHILL:  Thank you, your Honor.

9    Q.  So, Ms. Corda, what were you saying about what Ms.

10    Granda said to you?

11    A.  So, when she was hired in 2009, she told me that the

12    office had indicated to her that they were aware that there

13    was disparity in gender pay and that they were trying to --

14           MS. PICCIRILLI:  Objection, your Honor.  That is

15    being offered for the truth of the matter.

16           THE COURT:  No, it is not being offered for the

17    truth.

18           MS. PICCIRILLI:  It's unduly prejudicial.

19           THE COURT:  For what?

20           MS. PICCIRILLI:  It's very prejudicial and it's being

21    offered to show that there is a disparity -- gender disparity

22    in the office.  There would be no other reason for offering

23    that testimony about what somebody else said.

24           THE COURT:  The objection is overruled.  You

25    understand the difference?

```
 1              JURORS:  (Nodding.)
 2     Q.   Continue, Ms. Corda.
 3     A.   Also, there was a meeting -- or I always call it a
 4     commission, but a meeting or a get-together in May of 2013 in
 5     the office because --
 6              THE COURT:  Were you present?
 7              THE WITNESS:  No, but I was called about it.
 8     Q.   What did you learn directly yourself about that meeting?
 9              MS. PICCIRILLI:  Objection, your Honor.  This is also
10     the subject of a motion in limine, your Honor, that you were
11     reserving.  So, I just wanted to alert your attention to that.
12              THE COURT:  Objection overruled.  You may proceed
13     briefly.
14     A.   Thank you.
15          There was a meeting held in May of 2013 because a woman
16     in the office had voiced concerns that there was a perceived
17     disparity in gender pay.  There were not women in leadership
18     positions and there was not transparency in promotions.  So,
19     because of those issues that were voiced to the office, there
20     was a meeting held to directly address the concerns I
21     outlined.
22     Q.   And how did you learn about --
23              THE COURT:  Excuse me.
24              I would remind you, members of the jury, this is not
25     evidence that there was, in fact disparity, in all of that.
```

1    It is simply to show what she thought.  That's it, which is

2    not proof that it was so, simply what she thought.

3    Q.   How did you learn about that meeting?

4    A.   I learned about it because Alan Bispham had actually

5    called me and had told me about it and asked me questions.

6    Q.   All right.  Were there any other reasons that you

7    believed at that point that you were being treated or paid

8    differently because of your gender?

9    A.   Yes.  So, obviously, I was a member of the Gang Unit

10   most recent at the District Attorney's Office.  People were

11   promoted from district court directly to the Gang Unit,

12   although it did not happen that much.  However, every single

13   person since I was there in seven years that had been promoted

14   directly was a male and there's never been a woman that's been

15   promoted directly to the Gang Unit.

16        Additionally, one of the district courts in Suffolk

17   County, East Boston District Court, there are several females

18   supervisors and several male supervisors.  The female

19   supervisors included Jennifer O'Keeffe, Brenna Flynn, and

20   Janine D'Amico, when they received their promotion to

21   supervise East Boston, they never received a meeting and were

22   not asked to meet with the District Attorney himself, Dan

23   Conley.  However, Eric Bennett, who a supervisor there, as

24   well as Kevin McCarthy, when they were promoted to the

25   supervisor position of East Boston, they both had direct

1    meetings and were asked to meet with Dan Conley, the District

2    Attorney.

3        Additionally, when a number of people -- or when you get

4    promoted from district court to superior court, a number of

5    people would have meetings directly with the District

6    Attorney, and sometimes when you're promoted to superior

7    court -- obviously, as in my case, you're promoted more than

8    once.  So, there's different times that you're promoted.

9        Several female ADA's had told me that they never met

10   with the District Attorney when they were promoted to superior

11   court, which would include Gretchen Sherwood, Sarah Stancato

12   (phonetic).  Her married name now is McEvoy.  Brenna Flynn,

13   Jen O'Keeffe, and myself.

14       Additionally, Gretchen Sherwood, who was a prosecutor

15   who is very competent, a very good prosecutor, she had been

16   told for years that she was getting promoted to the Gang Unit

17   and, in fact, I think in 2014 she received a call that she

18   should be expecting a call from the district attorney on

19   Friday.

20       However, she was never promoted to the Gang Unit, and I

21   think there were either five or six males that were promoted

22   over her in that time period that had less experience than her

23   or less years in the office, save for one male who requested

24   the transfer from narcotics to the Gang Unit and specifically

25   asked for that.  He was the only one that had more experience,

1    more years than her.

2         And the only reason she was given as to why she was not

3    promoted to the Gang Unit is that -- not from the head office,

4    but that Dan Conley did not want her to go to the Gang Unit.

5         Additionally, there's an ADA, her name is Darcy

6    Jordan --

7              THE COURT:  We need to have a question.  This

8    narrative is going on too long, but before we get there,

9    however, we will stretch.

10             (Stretch break.)

11             THE COURT:  Okay.

12   Q.  Ms. Corda, when you complained -- or when you said to

13   Mr. Towle that you thought you were being paid differently

14   based on gender, in addition to what you testified about, were

15   there other pieces of information that you had in your mind

16   that led you to that belief?

17   A.  Yes.

18   Q.  What else?

19   A.  So, there's an ADA, her name is Darcy Jordan, but she

20   was married.  So, her name is now Darcy Petris (phonetic).

21   She actually specifically told me --

22             MS. PICCIRILLI:  Objection.

23             THE COURT:  That is not evidence what she said.  It's

24   not evidence that it was so.  Again, it is simply Ms. Corda

25   telling us what she thought.

1    A.   -- that in regards to the raises, that we received the

2    letter form in February of 2014, that she had gone and met

3    with the executive office to inquire about her not receiving a

4    pay raise and that they had told her that she didn't receive a

5    raise because she was on extended maternity leave twice, and

6    then she asked them did it have anything to do her

7    performance, and they stated no.

8         Lastly, there was an ADA, Lindsey Weinstein.  She also

9    has a married name.  I can't think of it off the top of my

10   head.  She was the head of the Gun Unit and was supposed to be

11   promoted to the Major Felony Unit, and she pregnant at the

12   time.  She had a meeting with Patrick Haggan, and he had said

13   that they were going to wait to promote her until after she

14   had her child.  She -- that did not sit well with her.  So,

15   she went back to meet with Mr. Haggan, and then Mr. Haggan

16   said that she would be promoted prior to that.

17   Q.   So, after Mr. Towle left and you had a conversation with

18   Mr. Zanini at the bar, what did you do next that night on

19   September 19th?

20   A.   I then spoke to Caitlin Grasso.

21   Q.   And what's her position in the office?

22   A.   She's another assistant district attorney or ADA in the

23   office.

24   Q.   And did you speak to anybody else besides Ms. Grasso?

25   A.   I also spoke to Christine Walsh.

```
1    Q.   Did you start crying at some point?

2    A.   Yes.

3    Q.   Why?

4    A.   I was crying because, basically, how I saw how Mr. Towle

5    reacted when I was making my statements, and after he asked me

6    if I believed what I had said was true and I said yes, and he

7    put down the beer and left, based on his reaction and his

8    reputation in the office, which is that of -- there's a

9    nickname called the Grim Reaper that people call him in the

10   office, because he's the one that will dole out punishment --

11        MS. PICCIRILLI:  Objection.

12        THE COURT:  The objection is sustained.

13   Q.   All right.  So, how long did you stay at The Fours after

14   the interaction with Mr. Towle?

15   A.   I stayed there for sometime.  I did not leave

16   immediately.

17   Q.   And where did you go after you left?

18   A.   After I left, I went to down the street to a place

19   called The Harp.

20   Q.   And how long did you stay at The Harp?

21   A.   I did not stay a long time because at that point I was

22   upset and wanted to go home.

23   Q.   Did you have any drinks at The Harp?

24   A.   No.

25   Q.   And then where did you go after you left The Harp?
```

```
1    A.   I went to my apartment.

2    Q.   And how did you get there?

3    A.   Walked.

4    Q.   And that's in the North End?

5    A.   Correct.

6    Q.   Did you have any difficulty walking home?

7    A.   No.

8    Q.   Did you get sick that night?

9    A.   No.

10   Q.   All right.  The next morning -- were you sick the next

11   morning?

12   A.   No.

13   Q.   And at some point on Saturday, did you get a

14   communication from the DA's Office?

15   A.   I did.  I didn't receive it until Sunday because I went

16   to my grandfather's memorial on Saturday, but I did receive --

17   the actual email was sent on Saturday, I think, at four

18   something in the afternoon.

19   Q.   And showing you what's been marked as Exhibit 19.  Is

20   this the email that you received?

21   A.   It is.

22   Q.   And it says, "The district attorney would like to meet

23   with you on Monday morning at 8:30 on the 7th floor conference

24   room."  Do you see that?

25   A.   I do.
```

1    Q.   All right.  And when you received this email, did you

2    take any steps to prepare for that meeting?

3    A.   I did.

4    Q.   What did you do?

5    A.   So, I logged in to -- obviously, that's -- so, to

6    explain, that's an email sent to my work email.  So, you have

7    to log in if you're not at work to actually access your work

8    emails.

9         So, I was logged in to my work email when I observed

10   that email.  I then forwarded myself the chain of emails,

11   which are already introduced into evidence, when I was

12   reaching out to First Assistant District Attorney Pat Haggan

13   about the raise that he had said that Rilwan and I were going

14   to get.  So, those eight or so emails, I forwarded them to

15   myself and printed them out.

16        Additionally, I on Sunday evening wrote down a list of

17   notes that took up, basically, the whole page as to things

18   that I could address in the meeting on Monday with the

19   District Attorney, and then I also did other things after

20   Sunday.

21   Q.   All right.  Did you make any effort to reach out to Mr.

22   Zanini?

23   A.   I did.

24   Q.   And how did you attempt to reach out to him?

25   A.   On Sunday I sent Mr. Zanini a text message, something --

1    okay.

2    Q.   Is that a copy of the text message?

3    A.   It is.

4    Q.   And just so everybody can read this and understand what

5    it shows, this is a screenshot from your phone?

6    A.   Correct.

7    Q.   And the text message on the right that says, "Hey,

8    sorry," that's your message to Mr. Zanini?

9    A.   Correct.  "Hey, sorry I texted" -- "text on Sunday, but

10   can you talk for a few minutes?"

11   Q.   And what was his response?

12   A.   "Sorry, I can't."

13   Q.   And then what was your response?

14   A.   "Okay.  Thanks."

15   Q.   Why were you reaching out to Mr. Zanini?

16   A.   Because Christine Walsh had told me on Saturday that as

17   soon as Mr. Towle left the party, he actually called Mr.

18   Zanini up and was very angry and upset, and he said that I was

19   questioning the integrity of him and the District Attorney.

20   So, I knew that, and I wanted to reach out to Jack because I

21   felt I had a better relationship and a good relationship with

22   Jack Zanini at that time and that he would be the person that

23   I could speak to.  I had his cell phone number.  I had spoken

24   to him and texted him before, and I thought that I could ask

25   him what his thoughts were on how Mr. Towle was reacting after

1   the fact because I absolutely did not talk to Mr. Towle, and

2   basically asked him what he thought I should do.

3      Q.   So, let me show you what has been marked as Exhibit 31.

4   Do you recognize this document?

5      A.   I do.

6      Q.   What is this?

7      A.   These are the notes that I had typed up on Sunday night,

8   which I believe was September 21st of 2014.

9      Q.   Okay.  Now, we, obviously, don't want to read through

10  this now, but just directing your attention to No. 4 there.

11     A.   Yes.

12     Q.   Were you intending to apologize on Monday morning?

13     A.   Right.  So, depending on how -- I wrote these notes

14  depending on how the meeting went, but I was going to

15  apologize for the way I said, in that it was a social event,

16  because my understanding that some people -- I guess the

17  traditional value or old school sense think that it is not

18  appropriate to bring up work issues outside of work.  So, at a

19  social event.  So, that's what I was going to apologize for

20  and I apologized that I brought it up at a social event, and

21  how I did bring it up at a social event.  So, yes.

22     Q.   What else were you planning to address at the meeting on

23  Monday morning?

24     A.   So, actually, that morning I had also typed up a list of

25  -- I think it was eight males, most of which I had brought to

1   Mr. Haggan's attention at the meeting on May 10th -- March

2   10th, I'm sorry, 2014, and I had typed up the list of eight

3   males and their exact salaries, and I was bringing that, along

4   with these notes and the emails between myself and First

5   Assistant District Attorney Patrick Haggan because I was going

6   to address -- well, I thought they were going to let me talk

7   and speak, and I was going to address the issues of why,

8   again, I thought that I was being discriminated against

9   because I was a woman.

10   Q.   Okay.  If you can -- in one of the binders in front of

11   says, "Disputed Exhibits."  If you could turn to what's marked

12   as C for identification.

13   A.   Yes.

14   Q.   What is this document?

15   A.   That is a document that I was just referencing that I

16   typed on the morning of September 22nd, the emails, their

17   names and their salaries of males that either started my year

18   or after me or had less years in the office than me.

19   Q.   Where did you get this salary information?

20   A.   From the Website Massachusetts dot gov.  It's a

21   government -- it's Massachusetts dot gov.  There's a part of

22   that you can go into.  It's called Open Checkbooks where you

23   can access the amount of money that every assistant district

24   attorney was making.

25        MR. CHURCHILL:  Your Honor, I would move that this be

1  admitted into evidence.

2          MS. PICCIRILLI:  Objection, your Honor.

3          THE COURT:  What's the objection -- well, first, how

4  is it admissible?

5          MR. CHURCHILL:  Well, it's not being offered for the

6  truth of the matter asserted.  It simply demonstrates that she

7  came to the meeting with a list of comparators that she was

8  prepared to discuss.

9          THE COURT:  What's the objection?

10          MS. PICCIRILLI:  Your Honor, the objection is that it

11  is being offered for the truth of the matter because the

12  witness testified that it showed disparaging salaries between

13  males and females.  That was her opinion at the time and

14  that's why she made the list.  So, she's being -- she's

15  offering it --

16          THE COURT:  Her testimony was not that it was her

17  opinion.  Her testimony is it came from a document and that

18  document would be the correct way to get about this.  I don't

19  think this is admissible.  So, the objection is sustained.

20  She can talk in general about what she learned from this to

21  show her state of mind, but I think to get these numbers in,

22  you got to go to the document from which she took them.

23          MS. PICCIRILLI:  Thank you, your Honor.

24  Q.  In any event, Ms. Corda, you went to the meeting with a

25  list of who you believed to be comparators?

1    A.   I did.

2    Q.   And who were the comparators?

3    A.   Troy Anderson, Gregory Henning, Zachary Hillman, Dave

4    McGowan, Ben Goldberger, Nick Brandt, Ben Megrian, and Vince

5    DeMore.

6    Q.   And what salary -- what were each of their salaries?

7    A.   More than mine.

8    Q.   And all those individuals are ones who you understood to

9    have less time in the office than you or the same amount of

10   time?

11        MS. PICCIRILLI:  Objection.

12        THE COURT:  That's a leading question.

13   Q.   Okay.  How did these individuals compare to you in terms

14   of the amount of time or seniority in the office?

15   A.   So, they were either started with me in my exact class

16   in September of 2007 or they started after me in a class

17   after.  So, after September 2007.  Or they had less years

18   total as a prosecutor in the office.

19   Q.   All right.  So, you showed up on Monday morning at the

20   office, I presume, right?

21   A.   Correct.

22   Q.   Now, at that point had you ever received any prior

23   discipline at the DA's Office?

24   A.   No.

25   Q.   And did you go to the DA's Office first thing that

1  morning?

2  A.   Yes.  I actually went early in the morning to the DA's

3  Office.

4  Q.   And what time did you end up meeting in the DA's Office?

5  A.   Meeting?

6  Q.   At some point you met with the DA and others?

7  A.   Right.

8  Q.   What time was that?

9  A.   Initially it was 8:30.

10  Q.   And then when you showed up at 8:30, what were you told?

11  A.   I was told by Karen DiLoreto, who is the administrative

12  assistant to the district attorney, that they were not

13  ready yet -- or Daniel was not ready yet, although I saw him.

14  He was in the office behind her.  I then told her that I had a

15  civilian witness with a detective scheduled for the grand jury

16  at 9 o'clock, and if I should just have the civilian -- will

17  you tell him I'm going to be a few minute late?  She said that

18  would be fine and to come back at 9 o'clock.

19  Q.   Then you came back at 9:00?

20  A.   I did.

21  Q.   And where did you go?

22  A.   So, the executive floor, meaning the floor where the

23  district attorney, first assistant district attorney, chief

24  trial counsel, and so on, had their offices, the 7th floor,

25  which is what I'm calling the executive floor.  So, I went

1   back up from the 6th floor to the 7th floor at 9 o'clock.

2   Q.   And then where did you go?

3   A.   I went into the executive office and Lupita Donovan was

4   there.  I had spoken to her a little bit, the first

5   interaction, as well, but she was at the desk area, and told

6   me that I could go into the conference room, which is to the

7   left when you walk in.

8   Q.   When you went in the conference room, was anybody in

9   there?

10   A.   No.

11   Q.   And then who came in?

12   A.   I went in first and sat in the middle of the three seats

13   on the left farthest from the door, and First Assistant

14   District Attorney Patrick Haggan as well as Chief Trial

15   Counsel John Pappas walked in in that order, and Mr. Haggan

16   sat to my left diagonally, and Mr. Pappas sat to my right

17   diagonally.  So, in front of me.  Mr. Pappas was to the right

18   and Mr. Haggan was to the left, and then after that the

19   District Attorney walked in and sat on the -- well, he didn't

20   sit right away, but he stood at the end or head of the table

21   on the right side.

22   Q.   When the District Attorney came in -- well, first of

23   all, before the District Attorney came in, did you have any

24   conversation with Mr. Haggan or Mr. Pappas?

25   A.   Yes, I just said hello to them, and they both said, "Hi,

1    Christina" back and that was it.

2        Q.   After then the DA came in, what happened?

3        A.   So, he came in and said something to the effect of,

4    "This isn't how I want to start my week" or, "This is a bad

5    way to start my week."  Sat down and then immediately stated

6    that he had heard what I said Friday, untrue, offensive, and

7    he was at that point raising his voice, and I knew that he was

8    upset at that point, untrue and offensive, and a third word

9    that began with an "S."  I think it might have been

10   "slanderous."  You have no integrity.  He said, You have no

11   integrity.  You're not honest.

12              THE COURT:  Lisa.

13              COURTROOM DEPUTY CLERK URSO:  Yes.

14              (Witness hand tissues.)

15              THE WITNESS:  Thank you.

16       A.   He said, You have no integrity.  You're not honest.

17   When I hired you, I told you I wanted someone who had

18   integrity and was honest, and something else.  You didn't

19   fulfill that and you're immediately terminated, and give

20   Lieutenant Green your credentials, and follow him back.

21       Q.   Ms. Corda, were you given any opportunity to say

22   anything during that meeting?

23       A.   No.  I got up and walked out.  I said, "Okay."

24       Q.   Where did you then go?

25       A.   I walked out and Lieutenant Buddy Green was right there.

1    Q.   And then where did you and Mr. Green go?

2    A.   I just talked to him.  I didn't want to show that I was

3    going to cry.  So, I laughed with Buddy Green.  We had a

4    conversation, and then he escorted me to my office.

5    Q.   And when you were escorted to your office, did you see

6    any of your colleagues there?

7    A.   Yes.

8    Q.   And then what did you do when you got to your office?

9    A.   I was speaking with Buddy Green and he was being very

10   nice to me and saying, Don't worry about it, you can take your

11   time, gather your things, you can come back here if you

12   contact me, asking me if I wanted a ride from one of the other

13   officers that works in the office, and I told him I was okay,

14   no, thank you.  And he went and spoke with Patrick Mulligan

15   and it was decided that I was going to get a ride with Pat

16   Mulligan.  So, Buddy Green helped me carry some things outside

17   and I waited for Pat Mulligan to give me a ride.

18   Q.   And what was Mr. Mulligan's position in the office?

19   A.   He was also an assistant district attorney in the

20   office.  At that point I was crying because I couldn't hold it

21   anymore.

22   Q.   Have you been back to the office since then?

23   A.   No.

24   Q.   Have you seen some of your former colleagues since then?

25   A.   Yes.

1    Q.   And how has the loss of your job affected you?

2    A.   It's affected me in a number of ways.  Obviously, I was

3    humiliated after being escorted out of an office I worked in

4    for seven years in front of people.  It gave me anxiety.  I

5    have -- I was scared about whether I could get another job,

6    how this would affect my future, if I could ever be an

7    assistant district attorney again.

8    Q.   Ms. Corda, did you ever seek any psychological

9    counseling?

10   A.   No.

11   Q.   Why not?

12   A.   I was -- I just had never done that.  I didn't want to

13   do it.  I have a good support system where I spoke to my

14   parents and family and friends about it.

15   Q.   Are your parents here today?

16   A.   Yes.

17   Q.   Has the loss of your job at DA's Office affected your

18   sleep in any way?

19   A.   Yes.  Obviously, I was unemployed for some amount of

20   time and I was obviously worried about everything.  I was

21   wasn't sleeping as much, having anxiety, trying to stay

22   focused on getting another job and not have this affect me.

23   Q.   How close is your apartment to the DA's Office?

24   A.   I would walk to work.  It was about a ten-minute walk.

25   Q.   And so, have you made any attempt to avoid that area?

1    A.   Yes.

2    Q.   After you were terminated, what efforts did you make to

3    find a new job?

4    A.   I made as much effort as I could to find a new job.  I

5    looked online multiple Websites.  I looked on state Websites.

6    I went to a job training.  I would apply to jobs from anywhere

7    to three times a day to 20 times a day.  Basically, any job I

8    came upon if there was a potential that they might -- I could

9    possibly work there, whether it was public or private.  I

10   applied to every job that I could.

11   Q.   Did you apply to any other DA offices?

12   A.   Yes.  I applied to the Middlesex District Attorney's

13   Office.  I applied to Norfolk County District Attorney's

14   Office, and I might have sent applications to a couple of

15   others, but those were the two I know initially right away.

16   Q.   Did you get an interview with either one of those

17   offices?

18   A.   I did get a telephone interview initially with the

19   Middlesex District Attorney's Office.

20   Q.   During that interview, did it come up why your

21   employment with the Suffolk County District Attorney's Office

22   ended?

23   A.   Yes.

24   Q.   What did you say?

25   A.   I kept it very simple, obviously, and I said to her that

```
1    -- I thought she already knew at that point.  I said I'm not
2    sure if you know, but I had voiced my concerns about my salary
3    and was terminated for voicing those concerns.
4    Q.   Did you ever get an offer from the Middlesex DA's
5    Office?
6    A.   No.
7    Q.   Did you ever hear back from the Norfolk DA's Office?
8    A.   No.
9    Q.   Did you eventually get a job offer?
10   A.   Yes.
11   Q.   Who was that offer from?
12   A.   It's -- well, the partner is Marc Grimaldi.  The office
13   is called Bretta & Grimaldi.
14   Q.   And showing you now what's marked as Exhibit 36.  Do you
15   recognize this document?
16   A.   I do.
17   Q.   And what is it?
18   A.   That's the offer letter that Marc Grimaldi gave to me.
19   Q.   And it indicates here that your -- well, first of all,
20   when did you start working for Bretta & Grimaldi?
21   A.   November 24th, 2014.
22   Q.   So, you were unemployed for how long?
23   A.   Two months.
24   Q.   And as it indicates here, what was your starting salary?
25   A.   My starting salary there was $75,000.
```

1  Q.   And that was more than you were waxing at the DA's

2  Office, correct?

3  A.   Yes.

4  Q.   So, weren't you happy that you were in a position making

5  more money?

6  A.   Not really because I wanted to be a prosecutor.  So,

7  it's -- I would have stayed there.  The amount you make at the

8  DA's Office is obviously much more minimal than attorneys in

9  the private sector, and the point was I just wanted to be

10  treated equally.  It would only a few thousand dollars

11  difference.  Obviously, that wouldn't go a far way overall,

12  but the point is that they were treating me equally and I

13  would have stayed there for a long time because that was the

14  job I wanted to do.

15  Q.   So, at the time you were terminated, what was your plan

16  at that time in terms of how long you intended to remain at

17  the Suffolk DA's Office?

18  A.   I would have remained there at least ten years, but

19  probably longer.

20  Q.   When you say you would have remained at least ten years,

21  why is that?

22  A.   Because I was seven years into the job.  I loved the

23  job, what I was doing.  I think the job is unlike any other

24  job.  It's hard to describe if you aren't actually working in

25  the office.

1          Additionally, after ten years in the DA's Office is when

2    you are able to vest for your pension, which means only three

3    years later I would have vested in my pension with the DA's

4    Office, meaning that even if I left the DA's Office after ten

5    years, which I can say I probably would not have, 99.9 percent

6    would not have, but even if I did leave, when I turned 55

7    years old, if I wanted to retire, even if I was in the private

8    sector at that point, then I would receive 25 percent of my

9    top three years at the Suffolk County District Attorney's

10   Office for the rest of my office.

11   Q.   All right.

12   A.   There was also another reason outside of that.

13   Q.   Yes.

14   A.   Also, obviously, I had a lot of loans from law school

15   and --

16          MS. PICCIRILLI:  Objection, your Honor.

17          THE COURT:  What's the objection?

18          MS. PICCIRILLI:  Relevancy.

19          THE COURT:  Well, no.  This is relevant.

20          MS. PICCIRILLI:  And it's not damages in the case.

21   It's not stated damages.

22          THE COURT:  I'm sorry?

23          MS. PICCIRILLI:  It's not stated damages in the case.

24          MR. CHURCHILL:  The issue is really motivation, that

25   she would have stayed -- why she would have stayed for ten

1    years.

2            THE COURT:   The objection is sustained.

3            MS. PICCIRILLI:   Thank you.

4    Q.   All right.   Ms. Corda, now, as part of the state pension

5    system, you paid money into that system.   You understand that?

6    A.   Yes.

7    Q.   And showing you what's -- actually, if you can turn in

8    the exhibits binder to page -- or I'm sorry -- Exhibit 55.   Do

9    you recognize this document?

10   A.   I do.

11   Q.   And is this a package you received from the DA's Office

12   after your termination?

13   A.   Yes.

14   Q.   And one of the items in here at the bottom marked CC6 is

15   an application to withdraw cumulative pension deductions.   Do

16   you see that?

17   A.   Yes.

18   Q.   And you see there's a number of certifications that you

19   have to make in order to withdraw the contributions?

20   A.   Yes.

21   Q.   And the fourth one says, "I am not currently appealing

22   my termination or planning to appeal my termination."   And do

23   you believe you would be able to make that certification?

24   A.   No.

25   Q.   Why not?

1   A.   Because I thought that they had illegally terminated me

2   and I was going to do something about that.

3   Q.   You were going to do something about that?

4   A.   Yes.

5         MR. CHURCHILL:  May I have just one moment, your

6   Honor?

7         THE COURT:  Yes.

8         (Discussion off the record.)

9         MR. CHURCHILL:  I have no further questions.

10        THE COURT:  We will stretch and then we will go to

11   the cross.

12        (Stretch break.)

13        THE COURT:  How long will you be?

14        MS. PICCIRILLI:  I'm not sure, your Honor.  I think I

15   will be equally as long as the direct, if not longer.  I'll

16   try to keep it as brief as I can.

17        THE COURT:  You may proceed.

18        MS. PICCIRILLI:  Thank you.

19                      CROSS-EXAMINATION

20   BY MS. PICCIRILLI:

21   Q.   Ms. Corda, you testified that you were hired by the

22   Suffolk County District Attorney's Office as a full-time ADA

23   on September 24th, 2007; is that correct?

24   A.   Yes.

25   Q.   And your starting salary, like all other ADA's, was

1    $28,000; is that correct?

2    A.   Yes.

3    Q.   That was contingent upon passing the bar and getting

4    sworn in as an ADA; is that correct?

5    A.   Yes.

6    Q.   And then after passing the bar, your annual salary was

7    set at $37,500; is that correct?

8    A.   Yes, at some point after I passed the bar.

9    Q.   Yes.  And then in April of 2008, your salary was

10   increased, you received a pay raise to $40,000; is that

11   correct?

12   A.   Yes.

13   Q.   And then in September 2011, your salary was increased

14   again, you received a pay raise to $46,500; is that correct?

15   A.   Correct.

16   Q.   Yes?

17   A.   Yes.  Correct.

18   Q.   And then when you were promoted to Major Felony Unit,

19   you received another salary increase and your salary was

20   raised to $47,500; is that correct?

21   A.   Correct.

22   Q.   And then you were promoted to the Gang Unit in August

23   2012, correct?

24   A.   Yes.

25   Q.   And your salary was increased again to $52,000; is that

1   correct?

2    A.   A little time afterwards, yes, although my personnel

3   records I think say 52 five.

4    Q.   Right.  Well, after you were promoted to the Gang Unit,

5   your salary was -- excuse me.  You were promoted to the Gang

6   Unit in August 2012, and your starting salary was $52,000;

7   isn't that correct?

8    A.   I believe I received the raise a little bit after, but,

9   yes.

10    Q.   But you started at 52,000 in the Gang Unit, correct?

11    A.   I think I received it right -- a little bit after I went

12   to the Gang Unit, is what I said.

13    Q.   I understand that, but that's the salary you received as

14   a result of being promoted to the Gang Unit; is that correct?

15    A.   That could be because I was promoted, yes, but I just

16   received it a little after I went to the Gang Unit.

17    Q.   $52,000, correct?

18    A.   Correct, although I --

19    Q.   Okay.  And then you were -- you received a salary

20   increase, again, a raise, in January of 2014 to $53,550; is

21   that correct?

22    A.   I don't -- I received it February.  I don't believe it

23   was in January that it went into effect.

24    Q.   So, you believe it was in effect as of February 2014; is

25   that correct?

1      A.   That's when I received the letter.

2      Q.   In any event, when you were -- after you were promoted,

3    you were at $52,000 with the Gang Unit, you say a little after

4    you were promoted, correct?

5      A.   Correct, because, as I stated, the personnel records

6    said 52 five.

7      Q.   Well, Ms. Corda, as of 2013, when you were in the Gang

8    Unit, you were receiving $52,000; isn't that true?

9      A.   Yes.

10     Q.   Okay.  And that's a stipulated fact, that you received a

11   salary of $52,000 as the result of being promoted to the Gang

12   Unit; isn't that correct?  That's a stipulated fact in this

13   case, Exhibit 66.  Let's bring it up.

14     A.   Okay.

15          MS. PICCIRILLI:  You don't have it?

16          THE COURT:  Members of the jury, a stipulation is an

17   agreement between the parties that the fact stipulated is true

18   and you may, therefore, accept it.  You don't have to find it.

19          MS. PICCIRILLI:  So, we're not online at this time.

20   I'll use the overhead projector.

21          COURTROOM DEPUTY CLERK URSO:  Okay.  Wait a minute.

22   One sec.  Let me just get this up.

23          (Pause.)

24          THE COURT:  Is this an exhibit?

25          MS. PICCIRILLI:  It is, your Honor.  It's Exhibit 66.

```
 1              THE COURT:  Okay.  So that, members of the jury, is a
 2     list of facts that the parties agree are true.  So, you will
 3     have this document with you in the jury room and you may,
 4     therefore, use it in order to assist you in reaching your
 5     verdict.
 6     Q.   So, turning your attention, Ms. Corda, if you will, to
 7     these stipulated facts, Exhibit 66, Paragraph 10.  Do you see
 8     No. 10 there?
 9     A.   I do.
10     Q.   When you were promoted to the Gang Unit, your salary
11     increased to $52,000.  Do you see that?
12     A.   I do.
13     Q.   So, that was your salary when you were promoted to the
14     Gang Unit, and you were promoted as of August 2012.  Do you
15     see that at No. 9?
16     A.   I do.
17     Q.   It says, "Ms. Corda was promoted to the Gang Unit in
18     August of 2012."  Did I read that correctly?
19     A.   You did read that correctly.
20     Q.   And No. 10 says, "When she was promoted to the Gang
21     Unit, Ms. Corda's salary increased to $52,000."  Did I read
22     that correctly?
23     A.   Yes, you did read that correctly.
24     Q.   Now, in January of 2014, which is the pay increase that
25     you testified about yesterday, your salary increased to
```

1    $53,550; is that correct?

2    A.   Yes.

3    Q.   That's a stipulated fact, right?

4    A.   Yes.

5    Q.   And at Paragraph 11 -- I read that correctly, right?

6    A.   You did read that correctly.

7    Q.   So, your salary was $53,550, correct?

8    A.   Correct.

9    Q.   All right.  So -- now, yesterday you testified that you

10   received a letter from the district attorney's office in

11   approximately February 2014 that indicated that you would be

12   receiving a pay raise based on merit.  That was your

13   testimony, correct?

14   A.   I think I said I received a letter February of 2014 that

15   said, among other things -- part of it did say merit.  It also

16   said that the executive staff, and specifically named, all had

17   input into my raise.  It said other things among --

18   Q.   But what I said was true, right?  You received a letter

19   in February of 2014 that indicated that you would be receiving

20   a pay raise based on merit, correct?

21   A.   Yes.

22   Q.   All right.  And when you talked about that letter, you

23   referred to Exhibit 39, right?  You said you didn't have the

24   actual letter you received in February 2014, but you received

25   a letter that was similar to Exhibit 39, correct?

1    A.   If that's the one that was the form, yes.

2    Q.   And that form letter indicated something about the

3    percentage of raise that you would be receiving in February of

4    -- or excuse me -- that you would be receiving; is that

5    correct?

6    A.   Correct.

7    Q.   And you say that the letter you received in February

8    2014 had similar language, but indicated that you would be

9    receiving a percentage increase in your salary of 2.98

10   percent, correct?

11   A.   Yes.  It either said 2.89 or 2.98 percent, correct.

12   Q.   Well, something that to effect, right?

13   A.   Correct.

14   Q.   And your testimony was that you did not receive a pay

15   raise consistent with the percentage that was indicated in

16   your letter.  That was your testimony, right?

17   A.   I think I testified that the letter said 2.89 or 2.98,

18   that the personnel records that indicate the actual raises

19   from the office said 2.5 and that the district attorney's

20   office records that are an exhibit said I received 2.0.

21   Q.   So, it was your testimony -- that's what I remember as

22   well.  It was your testimony yesterday that you said the

23   letter indicated that you should be receiving a pay increase

24   of 2.98 percent or 2.89 percent, but you, in fact, only

25   received a pay raise of two percent; is that correct?

```
1      A.   That I believed that, yes.

2      Q.   That was your testimony, right?

3      A.   Correct.

4      Q.   That's what you told this jury yesterday, right?

5      A.   Correct.

6      Q.   Well, Ms. Corda, your salary was $52,000 and it was

7  increased to $53,550.  If you take the difference between

8  those two salaries, you subtract $52,000 from $53,550, that

9  equals $1,550, correct?

10     A.   I would have to do the math.

11     Q.   Well, let me do it for you.

12          THE COURT:  I think we can agree on that.

13          MS. PICCIRILLI:  We can agree on that, okay.

14     Q.   So, the difference between those two --

15          THE COURT:  53 five minus 52 is 1,500, right?

16          MS. PICCIRILLI:  It's actually $53,550 minus 52,000,

17  which is $1,550.  We can agree on that, your Honor, right.

18     Q.   So, $1,150, Ms. Corda, if you do the math, is actually

19  2.98 percent of $52,000.  Did you know that?

20     A.   With the math right now that you said, okay.  Sure.

21     Q.   So, in reality -- and you do that by dividing $1,550 by

22  $52,000.  That gives you .029, right?  .0029, and then you

23  move the decimal point twice to get it to be a percentage, and

24  that would be 2.89 percent, okay?

25     A.   Okay.
```

1    Q.   Do you understand that?  Are you following me?

2    A.   I'm following you.

3    Q.   So, in reality, Ms. Corda, you actually did receive a

4    2.98 percent pay increase in January of 2014, correct?

5    A.   Yes, but my personnel record does not say that.

6    Q.   Well, what you said yesterday, Ms. Corda, was not

7    actually true, was it?

8    A.   Yes, it was.

9    Q.   Why was it true?

10   A.   Personnel record says it was 53 five instead of 2.5

11   percent and the record that the district attorney's office

12   provided say that I received a raise of two percent.

13           MS. PICCIRILLI:  Your Honor, I would like to turn the

14   witness' attention to Exhibit Q, which is a disputed exhibit,

15   which are the payroll screenshots from the Suffolk County

16   District Attorney's Office that show salary amounts in various

17   years.

18           THE COURT:  Why is that not admissible?

19           MS. PICCIRILLI:  It should be admissible, your Honor,

20   but it wasn't agreed to.

21           THE COURT:  Excuse me.  Is this her record?

22           MS. PICCIRILLI:  This is the Suffolk County District

23   Attorney's Office.

24           THE COURT:  This is the attorney's office record

25   pertaining to Ms. Corda?

```
1              MS. PICCIRILLI:  Correct.

2              THE COURT:  Mr. Churchill?

3              MR. CHURCHILL:  We have no objection.

4              THE COURT:  Okay.

5              MS. PICCIRILLI:  So, I like, then, your Honor, to

6    offer this as the next exhibits, which I'm not sure what the

7    last number is.

8              COURTROOM DEPUTY CLERK URSO:  It would be 67.

9              (Exhibit No. 67 received in Evidence.)

10             THE COURT:  Q is a bunch of pages, right?

11             MS. PICCIRILLI:  That is correct, it's a bunch of

12   pages, and I would like to turn the Court's attention and the

13   witness' attention -- you don't have a copy, right, because

14   we're not online.  May I approach the witness, your Honor?

15             THE COURT:  Yes.  Are you offering at the entire

16   thing, entire Exhibit Q?

17             MS. PICCIRILLI:  Your Honor, I'm offering the entire

18   record, Exhibit Q because it is --

19             THE COURT:  I'm not -- I'm not being critical.  I was

20   simply asking a question.

21             MS. PICCIRILLI:  Yes.  It's a complete record, your

22   Honor.

23   Q.   You have it; is that correct?

24   A.   In this binder, yes.  The Q, yes.

25   Q.   Yes.  All right.  So, turning your attention to Page 5
```

1    of what is now Exhibit 67, this shows you that in -- and I

2    have a highlighted copy, unfortunately.

3              MR. CHURCHILL:  I don't have object to that.

4              MS. PICCIRILLI:  I have it.

5    Q.   So, it is actually the fifth page of the exhibit.  It's

6    Bates stamped CC162.  Now, Ms. Corda, turning your attention

7    -- it's difficult for the jury to see, but turning your

8    attention to where it says, "effective date."  Do you see that

9    in the upper left-hand corner?

10   A.   Yes.

11   Q.   That date is nine -- or excuse me.  September 24, 2012.

12   Do you see that?

13   A.   I do.

14   Q.   And then down towards the middle of this screenshot, it

15   says pay raises annual, 52,000.  Do you see that?

16   A.   I do.

17   Q.   And that would have been -- September 24, 2012, would

18   have been right after you were promoted to the Gang Unit in

19   August 2012, correct?

20   A.   Correct.

21   Q.   All right.  Now, next, turning your attention to the

22   third page, which is Bates stamp number CC160.  Do you see

23   that?

24   A.   I do.

25   Q.   Now, do you see where it says effective date, January

1   27, 2014?

2   A.   I do.

3   Q.   And underpay raises, do you see it where it says annual

4   $53,550?

5   A.   I do.

6   Q.   Thank you.

7        And so, again, the difference between those two numbers

8   is $1,550, which -- do the math -- is 2.98 percent of 52,000,

9   which means you received a pay raise of 2.98 percent versus

10  the 2.0 percent that you testified to yesterday, correct?

11  A.   Correct.

12  Q.   Now, you first complained to Pat Haggan about this raise

13  that you received in January 2014 in a meeting on March 10th,

14  2014; is that correct?

15  A.   Correct.

16  Q.   And at that meeting you indicated to Pat Haggan that you

17  were unsatisfied with the amount and that you were unhappy

18  because, in your view, you were being paid less than you

19  should because you're a woman; is that correct?

20  A.   If I directly said that?

21  Q.   Was that the gist of what you said to Pat Haggan?

22  A.   Yes.

23  Q.   And in doing so, you then -- you made two principal

24  complaints.  The first complaint was that Darcy Kofol was

25  making $500 less than you and you were three years her senior.

1   You weren't happy about that, right?

2   A.   To show, yes, that there was -- the office was treating

3   women differently, yes.

4   Q.   So, in part, in support of your proposition that you're

5   paid less because you're a woman, you mentioned a woman, Darcy

6   Kofol, correct?  Darcy Kofol is a woman, correct?

7   A.   She is a woman.

8   Q.   On the other hand, you said that there were several male

9   comparators -- I think you used that term, right?

10   A.   Yes.

11   Q.   And you're a lawyer, right?

12   A.   I am.

13   Q.   You're practicing in the civil world now, right?

14   A.   Yes.

15   Q.   And you were an ADA for seven years, right?

16   A.   Yes.

17   Q.   So, you're familiar with these legal terms, comparator,

18   right?

19   A.   Yes.

20   Q.   In fact, you used it in your testimony yesterday, right?

21   A.   Right.

22   Q.   And you understand, then, that to be a true comparator,

23   it has to be a person who is similarly situated to you, right?

24   A.   Correct.

25   Q.   Doing the same type of work, same experience, same

1   seniority, all those things, correct?

2   A.   Correct.

3   Q.   And you suggested to Pat Haggan at this meeting -- more

4   than suggested.  You told him that there were several male

5   comparators that were making more than you and that the reason

6   was because you're a woman; is that correct?

7   A.   If I said that directly?

8   Q.   Was that the gist of what you said?

9   A.   The gist is that I provided the names of the male

10   comparators to Mr. Haggan and said that I was not making the

11   same amount as them, even though they were people either in my

12   class --

13   Q.   Well, Ms. Corda, let me ask you --

14   A.   If I can just finish my answer.

15        -- either in my class, had less years experience in the

16   office or had started after me.

17   Q.   Let me ask you a question.  Ms. Corda, did you believe

18   that you were being discriminated against at this meeting with

19   Pat Haggan on March 2014?  Did you believe that there was a

20   pay disparity with regard to your salary because you were a

21   woman?

22   A.   Yes.

23   Q.   Now, when was the first time that you believed that you

24   were being paid less because you were a woman?

25   A.   It would be in 2000 and -- I think it would be 2012 or

1  '13.

2  Q.  So, back in 2012 you believed that you were being paid

3  less because you were a woman, correct?

4  A.  Correct.

5  Q.  You believed back in 2012 that you were being

6  discriminated against because you're being paid less because

7  you're a woman; is that true?

8  A.  Correct.

9  Q.  And did you also believe that in 2013, that you were

10  being paid less because you're a woman and you were,

11  therefore, being discriminated against?

12  A.  Yes.

13  Q.  And, yet, this was the first time you mentioned anything

14  to Pat Haggan, this meeting on -- in March 2014; is that true?

15  A.  Right, after we had received the notification of the

16  raises, correct.

17  Q.  And, in fact, you testified that you didn't really even

18  say that you were being paid less because you're a woman.  You

19  just mentioned some male comparators, gave him a list of males

20  that you felt were similarly situated to you and were being

21  paid more, right?

22  A.  Either males that were my year, had started after me or

23  had less experience than me, yes.

24  Q.  So, you didn't actually say, "Mr. Haggan, I believe I'm

25  being discriminated against based on gender," correct?

1    A.   Correct.

2    Q.   You never used those words?

3    A.   Correct.

4    Q.   But you put it out there, right?  You said, Hey, I'm

5    being paid less, I'm a woman, and here's several male

6    comparators that are being paid more than me, right?  You said

7    that?

8    A.   I did say that.

9    Q.   And you listed out some male comparators, correct?

10    A.   Correct.

11    Q.   And then you complained to Pat Haggan for a period of --

12    what is it? -- six months, right?

13    A.   I followed up with Pat Haggan for that period, yes.

14    Q.   And you emailed him, right?

15    A.   Correct.

16    Q.   You tried to schedule another meeting, right?

17    A.   I -- I wanted, yes, an update, schedule a meeting

18    eventually.

19    Q.   And he did meet with you again, right?

20    A.   Months later, yes.

21    Q.   And then you followed up with more emails, right?

22    A.   Correct.

23    Q.   Now, during that six-month period when you were

24    complaining that you weren't being paid enough because you're

25    a woman and you were complaining that there were these other

1    male comparators that were being paid more than you, you never

2    got reprimanded for those six months, did you?

3    A.   No, I never got reprimanded in seven years there.

4    Q.   You didn't get reprimanded by Pat Haggan, did you?

5    A.   No.

6    Q.   During the course of those six months?

7    A.   No.

8    Q.   He never sent you a nasty email, right?

9    A.   Correct.

10   Q.   He never suspended you, right?

11   A.   Correct.

12   Q.   Certainly didn't fire you, right?

13   A.   No.

14   Q.   Instead, you got praise; am I correct?

15   A.   Yes.

16   Q.   Over the course of those six months, you were sent

17   emails of praise by both Pat Haggan, correct?

18   A.   Correct.

19   Q.   And given -- you even got an email of praise by the

20   District Attorney, didn't you?

21   A.   I did.

22   Q.   And so, when you handled this pay disparity that you

23   believed existed and applied to you in a professional way and

24   you sent emails to the DA's Office and you met in the office

25   with Pat Haggan, you didn't get punished, did you?

```
 1    A.   No.
 2    Q.   You certainly didn't get terminated at that point, did
 3  you?
 4    A.   Correct.
 5    Q.   It wasn't until you went to The Fours and you had too
 6  much to drink and you went up to the Chief of Staff, John
 7  Towle, number two, under the District Attorney -- that was
 8  your own testimony.  He's number two under the District
 9  Attorney.  You got fired after that --
10          THE COURT:  Can we have a question, please, a
11  question without embellishing.
12    Q.   Is it true that when you were fired was after you went
13  to The Fours and you approached the Chief of Executive Staff,
14  John Towle?
15    A.   Yes.
16    Q.   And, in fact, you were fired two days after, correct?
17    A.   I believe it was Monday morning.
18    Q.   Yeah, first thing Monday morning.  The event happened on
19  a Friday night, right?
20    A.   Correct.
21    Q.   So, you were fired the very next business day, correct?
22    A.   Yes.
23    Q.   You understand, Ms. Corda, that was because of your
24  conduct, don't you?
25    A.   No.
```

1     Q.   Well, you went to The Fours on September 19th, 2014,

2   correct?

3     A.   Correct.

4     Q.   And you were there for Christine Walsh's after work

5   going-away party; is that correct?

6     A.   Correct.

7     Q.   And you went straight to The Fours from the office.

8   That was your testimony, correct?

9     A.   Correct.

10     Q.   And right before you left for the office, you completed

11   the self evaluations form; isn't that true?

12     A.   That is true.

13     Q.   And, now, that self evaluation form was a new form; is

14   that correct?

15     A.   Correct.

16     Q.   You had never had to complete that before; is that

17   right?

18     A.   Correct.

19     Q.   And you got notice of the announcement of this self

20   evaluation form earlier in September 2014; is that correct?

21     A.   Yes.

22     Q.   And in that notice, that announcement, it indicated that

23   the self evaluation form must be completed by September 19,

24   2014; is that correct?

25     A.   Correct.

1    Q.   And that was the very day of Christine Walsh's going-

2    away party, right?

3    A.   Correct.

4    Q.   And so, you completed that form -- correct me if I am

5    wrong.  You completed that form the very last day that it was

6    due; is that correct?

7    A.   Correct.

8    Q.   You waited until the last minute, right?

9    A.   Correct.

10   Q.   And you didn't really want to complete it; am I right?

11   A.   No, that's not true.

12   Q.   It's not true?  Well, Ms. Corda, you had been

13   complaining about wanting a salary increase for six months

14   with Pat Haggan, correct?

15   A.   Correct.

16   Q.   And now, even though you had been promised a raise, you

17   were asked to complete a self evaluation form, correct?

18   A.   Correct.

19   Q.   And isn't it true, Ms. Corda, that having to complete

20   that self evaluation form reinforced for you your feeling and

21   belief that you were doing a lot of work and not getting

22   compensated for what you should have been compensated for?

23   A.   Correct.

24   Q.   And you just finished completing it and then you go to

25   the party, right?

1    A.   Correct.

2    Q.   So, after having these feelings reinforced that you're

3    doing a lot of work, that you're not getting paid, having to

4    fill out the self evaluation form, you head to The Fours,

5    right?

6    A.   Correct.

7    Q.   In fact, you completed the self evaluation form and

8    submitted it at 4:51 p.m. that day, didn't you?

9    A.   I did.

10   Q.   And then you got to the party -- you left the office

11   around 5:30 and got to the party shortly thereafter, right?

12   A.   Yes.  I think I got there actually around 5:30, looking

13   back, but yes.

14   Q.   So, it was one of the last things you had to do that

15   day, right?

16   A.   Yes.  I think it was the last thing I did, yes.

17   Q.   And then you go to The Fours and you see that the

18   executive staff is there, right?

19   A.   I did.

20   Q.   And was it -- it wasn't typical, was it, for the

21   executive staff to be at the going-away parties?

22   A.   Some of them would be, but for Dan Conley and the

23   executive staff, they did not go to every party.

24   Q.   Did it surprise you that Dan Conley was there?

25   A.   Yes.

1    Q.   And didn't you announce in a group text that evening

2    after you got there, that Dan Conley and all the higher-ups

3    were there?

4    A.   To some of my friends, yes.

5    Q.   And did you say in that group text, "What the" -- "WTF"?

6    A.   Yes, I wrote "WTF" and --

7    Q.   Did "WTF" mean, "What the fuck"?

8    A.   Yes.

9    Q.   And so, why did you say that to your friends when you

10   saw the executive staff there?

11   A.   Because I was surprised that Dan Conley and the staff

12   had been there.  For an example, Mr. Conley did not come to

13   Dan Mulhern's going-away party and he was the prior chief of

14   the Gang Unit in the office, I think, for over twelve years.

15   Q.   And did it upset you that the executive staff was there?

16   A.   It didn't upset me.  I think it was just odd to see them

17   there, and it was a frustration, I guess.

18   Q.   You felt frustrated, right?

19   A.   At that point, yes.

20   Q.   Right.  So, you just had to fill out the self evaluation

21   form that you didn't want to complete because you had already

22   been promised a raise?

23   A.   Well, no.

24   Q.   And then you see the executive staff there and it

25   frustrated you, right?

```
 1    A.   No, I don't think I testified that I didn't want to

 2    complete it, but, yes, I was frustrated that they were there.

 3    Q.   Well, you waited until the last minute to complete it,

 4    right?

 5    A.   That's how I am.

 6    Q.   Now, did you plan to speak with anyone from the

 7    executive staff that night?

 8    A.   No.

 9    Q.   You didn't plan to go up to anyone and complain about

10    your salary to the executive staff, did you?

11    A.   No.

12    Q.   That wasn't your plan, right?

13    A.   It was not my plan.

14    Q.   Yeah.  Now, there were over 40 people at this party; is

15    that correct?

16    A.   Yes.

17    Q.   And you testified that there were people there that

18    included detectives, police officers, not just ADA's right?

19    A.   Correct.

20    Q.   And was Police Officer Omar Borgess there?

21    A.   Yes, he was.

22    Q.   You know him, right?

23    A.   I do.

24    Q.   And you spoke of him there, right?

25    A.   Yes.
```

```
1     Q.   Now, are you aware that ADA friends of yours were trying
2   to keep you separated from Officer Borgess that night?
3             MR. CHURCHILL:  Objection.
4             THE COURT:  Objection is sustained.
5     Q.   Mark Lee was there?
6     A.   He was.
7     Q.   And he was the deputy chief of the Homicide Unit; is
8   that correct?  Or he is now; is that correct?
9     A.   Yes.  I think he was at the time as well.
10     Q.   He was.  And you knew him, right?
11     A.   I did.
12     Q.   You spoke with him, correct?
13     A.   Yes.
14     Q.   Now, you testified at some point you spoke with the
15   Chief of Staff, John Towle; is that correct?
16     A.   Correct.
17     Q.   And you also testified that Mr. Towle -- or strike that.
18          You also testified that Mr. Lee introduced you to Mr.
19   Towle.  Was that your testimony?
20     A.   I don't think I testified to that today.
21     Q.   Well, didn't he say, "John, do you know Ms. Corda"?
22     A.   I think he said something along the lines of, "John,
23   have you met Corda?"
24     Q.   Okay.  So, he --
25     A.   Something like that, but he didn't introduce me.
```

1    Q.   So, he pointed you out to Mr. Towle; is that correct?

2    A.   Sure.  Yes.

3    Q.   And you also testified that Mr. Towle initiated the

4    conversation?

5    A.   Correct.

6    Q.   So, it's your testimony that Mr. Towle started the

7    conversation with you?

8    A.   Correct.

9    Q.   But isn't it true, Ms. Corda, that you couldn't remember

10   how the conversation started the very day after the party on

11   September 20th, 2014, at 9:16 a.m.?

12   A.   No.  That was about how the transition.  So, exactly

13   what Mark Lee had said -- that's why I'm saying something

14   along the lines of, I think, "Have you" -- "John, have you met

15   Corda?"  So that's, you know, about how it started.

16            THE COURT:  Let's stretch.

17            MS. PICCIRILLI:  Give me one moment.

18            THE COURT:  We'll stretch.

19            MS. PICCIRILLI:  Thank you, your Honor.

20            (Stretch break.)

21            THE COURT:  Okay.  You may proceed.

22            MS. PICCIRILLI:  Thank you, your Honor.

23   Q.   Ms. Corda, isn't it true that on September 20th, 2014,

24   at 9:16 a.m. in a group -- or excuse me -- in a text with Joe

25   Janezic, you indicated that, "You can't believe said, can't

1    remember his started," and then you put "how" to correct it?

2     A.   Correct.  Like I just said, "how," that's what I had

3    said to him, yes, regarding how the initiation started before

4    then.  So, when Mark Lee -- exactly what he had said, my

5    belief, was that he had said, "John, have you met Corda," to

6    that effect.

7     Q.   So, your testimony is that you can't remember how it

8    started; is that correct?

9     A.   The word for word that Mark Lee said, no.  I think it

10   was, as I just testified, "John, have you met Corda," but I

11   can't say if it was those exact words.

12    Q.   Well, didn't you also say that you can't remember all

13   that was said, meaning your conversation with John Towle?

14    A.   Can you repeat that question?

15    Q.   Sure.  Didn't you also say in this text to Joe Janezic

16   on September 20th, 2014, at 9:16 a.m. that you can't remember

17   it all and -- you can't remember all that was said, and then

18   you said, "Can't believe said it.  Can't remember how

19   started."

20    A.   I believe those were the words I used, yes.

21    Q.   And when you said you can't remember it all, you meant

22   that you couldn't remember the entire conversation with John

23   Towle, didn't you?

24    A.   No.  I meant I couldn't remember it all, the whole --

25   every single thing about the whole night.

1    Q.   Isn't it true, Ms. Corda, that you used, "can't even

2    remember it all" in the context of explaining that you were

3    pretty sure you said to John Towle that you and Rilwan were

4    not making as much because you're a woman and he's black?

5    A.   Yes.

6    Q.   And then you go on to say, "Wow, can't even remember it

7    all.  Can't been even remember it all.  Think said that."  He

8    said, "You think that?"  I said, yes, and he got pissed and

9    left?

10   A.   Correct.

11   Q.

12          MS. PICCIRILLI:  And then if I could show this to the

13   jury.  It's Exhibit JJ.

14          MR. CHURCHILL:  That's a disputed exhibit, your

15   Honor.

16          THE COURT:  Is it in evidence?

17          MS. PICCIRILLI:  It is not in evidence.

18          THE COURT:  Well, then you can't show it to the jury

19   until it is in evidence.

20          MS. PICCIRILLI:  Your Honor, I would like to offer

21   this in evidence as Ms. Corda's statements via text to Joe

22   Janezic.

23          THE COURT:  She's just acknowledged it.  Why do we

24   need the document, too?

25          MS. PICCIRILLI:  That's fine, your Honor, because

1   it's her -- it's her out-of-court statement and it's a

2   statement by a party opponent and we should be able to offer

3   it in evidence because it's not hearsay.  It's the hearsay

4   exception.  So, I would like to offer the entire email

5   exchange, if I could, for context for the jury to --

6          THE COURT:  The entire email --I don't know what

7   you're talking about, frankly.  What document is it?

8          MS. PICCIRILLI:  It's JJ and it's an email exchange

9   between Christina Corda and Joe Janezic, and Joe Janezic will

10  testify later on.

11         THE COURT:  Is there an objection to the --

12         MS. PICCIRILLI:  Text exchange.  Excuse me?

13         MR. CHURCHILL:  There is, your Honor.  It's a --

14         THE COURT:  What's the basis of the objection?

15         MR. CHURCHILL:  It's actually a text message exchange

16  between Ms. Corda and others, and I think, as your Honor said,

17  it's cumulative to what she's already testified to.

18         THE COURT:  Well, if that's the only objection, you

19  know, they can put it in if they want.

20         MS. PICCIRILLI:  Thank you, your Honor.

21         THE COURT:  Well, wait a minute.  Is there anything

22  else?

23         MR. CHURCHILL:  No, your Honor.

24         THE COURT:  What is this being offered for, Ms.

25  Piccirilli?

1          MS. PICCIRILLI:  It's being -- well, I've elicited

2    testimony that she cannot remember how the conversation

3    started.  She cannot remember what was stated, and I'm about

4    to get into why she can't remember, your Honor, and it's

5    stated in the text itself.  I would like -- for the purposes

6    of showing the context, I would like the jury to be able to

7    see the context of the text.

8          THE COURT:  Go ahead.

9          MS. PICCIRILLI:  Thank you, your Honor.

10          COURTROOM DEPUTY CLERK URSO:  So, it's going to be 68.

11          (Exhibit No. 68 received in Evidence.)

12          MS. PICCIRILLI:  Can I have the -- are we up, Mike?

13    Well, it's Exhibit 68, but it was previously JJ.  So, that's

14    how you would have it.

15          MR. PALERMO:  What page?

16          MS. PICCIRILLI:  It's Page 11.

17          MR. PALERMO:  Is it the last page?

18          MS. PICCIRILLI:  It's Page 11.

19          MR. PALERMO:  It only has nine pages.

20          MS. PICCIRILLI:  Exhibit JJ.  Oh, I'm sorry.  I have

21    a double copy.

22          MR. PALERMO:  Your Honor, if I may.

23          (Discussion off the record.)

24          MS. PICCIRILLI:  Sorry.  It's Page 2.

25    Q.   Okay.  Now, turning your attention to the middle of the

1    page, it says "EFF" --

2              THE COURT:  Is there any way of making it less fuzzy?

3              MR. PALERMO:  I was just waiting for Ms. Piccirilli

4    to focus in, your Honor, and when I do that, it will be clear.

5    It's the system.  It's the best we can do, but I will make it

6    so that everyone can see it.

7              MS. PICCIRILLI:  Mike, can you enlarge the section

8    beginning with "EFF" and ending with, "Too much" and the

9    martini glass.

10   Q.   Now, this says "EFF."  Do you see that?

11   A.   I do.

12   Q.   And what does that refer to?

13   A.   It's just -- what do you mean, what does it refer to?

14   Q.   What does it stand for?

15   A.   Just "F."

16   Q.   Does it stand for "fuck"?

17   A.   Usually when I'm talking I'll say "F" sometimes instead.

18   So, yes.

19   Q.   And then you go on to say, "Can't believe said.  Can't

20   remember how started" -- or "his started," and then you

21   corrected, "how," correct?

22   A.   Correct.

23   Q.   And then you say, "Too much," and there's a martini

24   glass, correct?

25   A.   Yes, emoticon.

1    Q.   Does that mean "too much alcohol"?

2    A.   Yes.

3    Q.   Then it goes on to say...

4         MS. PICCIRILLI:  And, Mike, can you blow up the next

5    section?

6    Q.   Let's focus on what you said.  "You think I should talk

7    to him?"  Do you see that?

8    A.   I do.

9    Q.   And did that mean John Towle or somebody else?

10   A.   It meant John Towle.

11   Q.   And then it goes on to say, "Ugh, I'm going to be

12   anxious all weekend."  Do you see that?

13   A.   I do.

14   Q.   And then the response was, "I would."  Do you see that?

15   A.   I do.

16   Q.   And then turning to the next page, you say, "I hope I

17   didn't say worse, ugh, ha."

18   A.   I did.

19   Q.   Do you see that?

20   A.   Yes.

21   Q.   And then it says, "And say what," question mark.  Do you

22   see that?

23   A.   I do.

24   Q.   And then the response was, "I'm sorry, definitely not

25   trying to make you anxious," but he uses "DEF."  Do you see

1  that?

2  A.  I do.

3  Q.  And then you say, "No.  No.  I am anyway.  I'm saying

4  because I said it."  Do you see that?

5  A.  Correct.

6  Q.  And you were anxious at that point, correct?

7  A.  Correct.

8  Q.  And you acknowledge that you had too much to drink,

9  correct?  Those were your words, right?  "Too much," martini

10  glass, meaning "too much alcohol"?

11  A.  Too much alcohol, emoticon.

12  Q.  And you acknowledge it said in this text the next

13  morning that you can't remember how it started and that you

14  can't remember all that was said, correct?

15       THE COURT:  It says what it says, and we have now

16  reviewed this at least twice and that's enough.

17  Q.  Now, you testified that you had several drinks before

18  speaking with the Chief of Staff, John Towle, right?

19  A.  Correct.

20  Q.  And you told the jury that you had two pumpkin beers,

21  three vodka sodas and a shot; is that right?

22  A.  Correct.

23  Q.  You also testified that that's not an unusual amount

24  over that period of time.  Do you remember that testimony?

25  A.  Correct.  I think I said there's not a set amount.  It

1    could be more.  It could be less.  It's not unusual, correct.

2          MS. PICCIRILLI:  Can we bring Exhibit 26 up, which is

3    the bar bill and, Mike, if you could highlight the first line

4    of Grey Goose all the way across.  Not highlight it.  I mean

5    make it bigger so everyone can see it.  Sorry.

6    Q.   Okay.  Now, you've already testified that Grey Goose

7    refers to vodka; is that right?

8    A.   Correct.

9    Q.   So that was the -- one of the three vodka sodas you

10   testified to having?

11   A.   Correct.

12   Q.   So, Grey Goose was in the vodka soda; is that true?

13   A.   Grey Goose is the vodka.

14   Q.   It's the vodka that was used in your vodka soda?

15   A.   Correct.

16   Q.   That's your vodka of choice?

17   A.   Correct.

18   Q.   If you move along, it says 18:07 and that's military

19   time, right?

20   A.   Yes.

21   Q.   That was 6:07; is that correct?

22   A.   Correct.

23   Q.   So, 6:07 p.m., correct?

24   A.   Correct.

25   Q.   All right.

1          MS. PICCIRILLI:  And then, Mike, can you blow up the

2   last Grey Goose reference all the way across.

3    Q.  And so, that says Grey Goose 21:17.  Do you see that?

4    A.  I do.

5    Q.  And so, that was 9:17 p.m., correct?

6    A.  Correct.

7    Q.  So that was approximately a three-hour period.  To be

8   exact, three hours and ten minutes; is that right?

9    A.  Yes.

10   Q.  So, you drank two pumpkin beers, three vodka sodas and a

11   shot in a period of three hours before you spoke with the

12   Chief of Staff, John Towle; is that correct?

13   A.  I think it was more towards four hours, but, yes, I did.

14   Q.  Well, this bar bill shows the time that they were --

15          THE COURT:  It shows when it was bought, not when it

16   was drunk.

17          MS. PICCIRILLI:  Correct.

18   Q.  But that would mean, if it shows when you're served, you

19   were served within a three-hour period or within a three-hour-

20   and-ten-minute period and you drank them within that period,

21   then you actually drank six beers within a shorter period of

22   time, correct?

23   A.  No.  As I testified, I had pumpkin beer prior to that.

24   So, that wasn't the period.

25   Q.  So, these aren't your beers?

```
1     A.   No.

2     Q.   You bought them for somebody else, did you?

3     A.   Correct, a round.

4     Q.   But you at least had -- let's see what on here.

5          MS. PICCIRILLI:  If you could blow up the whole

6    thing, Mike.

7     Q.   At least what's on here is the three Grey Goose vodkas,

8    correct?

9     A.   There are three Grey Goose vodkas, correct.

10    Q.   Those were yours, correct?  You said you drank three

11   vodka sodas, right?

12    A.   I did, but those were not all mine.

13    Q.   Oh, they weren't?

14    A.   No.

15    Q.   Do you have another tab that shows when you had other

16   drinks?

17    A.   No.  Sergeant Detective Joseph McDonald actually had

18   purchased the Grey Goose and soda.

19    Q.   And this four Patron, you said that was four tequilas;

20   is that correct?

21    A.   Yes.

22    Q.   You had one tequila, right?

23    A.   Correct.

24    Q.   Did you have a Patron tequila?

25    A.   Patron, yes.
```

```
 1      Q.   Patron.  I don't drink tequila, sorry.  Patron tequila?

 2      A.   Correct.

 3      Q.   And so, you say it might have been more like four hours

 4   to have the drinks that you had, the six drinks?

 5      A.   Right.

 6      Q.   That's because you got there more towards 5:30 than

 7   6:00?

 8      A.   Yes.

 9      Q.   That was your testimony, right?  You think you got there

10   about 5:30?

11      A.   Correct.

12      Q.   Now, you mentioned that you did these shots with Dan

13   Mulhern and Jack Zanini?

14      A.   That is correct.

15      Q.   And Dan Mulhern was not a member of the executive staff,

16   was he?

17      A.   No.

18      Q.   And he never has been, right?

19      A.   No.  He's the chief of the Gang Unit.

20      Q.   But he's not in the executive staff, is he?

21      A.   No.

22      Q.   He's not located on the 7th floor, the executive floor,

23   is he?

24      A.   No.

25      Q.   And Jack Zanini also is not a member of the executive
```

1    staff, is he?

2      A.   Correct.

3      Q.   He doesn't have his office on the 7th floor, the

4    executive floor, does he?

5      A.   No.

6      Q.   Now, when did you have -- oh, by the way, the shot was

7    tequila, right?

8      A.   Correct.

9      Q.   When did you have that tequila shot in relation to

10   approaching John Towle that night?

11     A.   I think I already testified it was within a half-hour.

12     Q.   But could it have been within ten minutes?

13     A.   Sure, it could have been, but I think it was closer to

14   half-hour.

15     Q.   But it could have been within ten minutes, right?  You

16   testified to that at your deposition, didn't you?

17     A.   I just said I think it could be within ten minutes, but

18   I think closer to a half-hour.

19     Q.   So, it was sometime within ten minutes to a half-hour of

20   approaching the Chief of Staff, John Towle; is that right?

21     A.   That's right.

22     Q.   And did you think it was a good idea to drink those six

23   drinks, including a shot of tequila, at a social function when

24   the executive staff was present?

25     A.   I don't think I thought it was a good or bad idea.  I

1    didn't know of whether it was a good idea.

2    Q.   You didn't think about it, right?

3    A.   Whether it was a good idea, no.

4    Q.   Did you think that it was becoming of an assistant

5    district attorney as a state official to drink that much when

6    the executive staff was present?

7         MR. CHURCHILL:  Objection.

8         THE COURT:  That's an argumentative question and the

9    objection is sustained.

10         MS. PICCIRILLI:  I'm just asking for her opinion,

11    your Honor, if she thought it was becoming of an ADA as a

12    state official.

13         THE COURT:  The objection is sustained.

14    Q.   Now, in your opinion, Ms. Corda, did you drink too much

15    alcohol that night?

16         MR. CHURCHILL:  Objection.

17         THE COURT:  Well, you know, you've already put in the

18    emails where this is all talked about.  I don't know why we're

19    continuing to beat this horse.

20         MS. PICCIRILLI:  I'm just asking if she felt that she

21    had too much alcohol that night.

22         THE COURT:  You may answer that one question and then

23    we'll go on to something else.

24    A.   Yes.

25    Q.   And did you -- was it your opinion that you told off Mr.

1  Towle that night?

2   A.   Told off and then said the truth to him, yes.

3   Q.   And, in fact, you used that word, that phrase, "told off

4  Mr. Towle" when you gave a recap of what happened that night

5  in a group text to several ADA's on September 20th, 2014,

6  approximately 8:00 a.m. the morning after the incident; isn't

7  that true?

8   A.   That is true.

9   Q.   In fact, when you were asked to give a recap, your

10  description of that night, was "Tons of people came.  All

11  higher-ups there.  Speeches.  Booze.  Black out.  Told off

12  Towle."  That's what you said, right?

13   A.   I think there was another line after that, too.

14   Q.   But was that included in what you said?

15   A.   That was.

16   Q.   So, you used the words, "Told off Towle"?

17   A.   Yes.  I agreed with that, yes.

18   Q.   Now, when you told off Mr. Towle, Ms. Corda, were you

19  hostile?

20   A.   No.

21   Q.   When you told off Mr. Towle, Ms. Corda, were you

22  aggressive?

23   A.   No.

24   Q.   When you told off Mr. Towle, were you disrespectful?

25   A.   No.

1    Q.   When you told off Mr. Towle, were you loud?

2    A.   No.

3    Q.   When you told off Mr. Towle, did you use profanities?

4    A.   No.

5    Q.   Now, Ms. Corda, do you agree with me that the phrase

6    "told off" implies aggressiveness?

7    A.   No.  How I was talking, no.

8    Q.   Do you agree with me that the phrase, "Told off Towle"

9    implies hostility?

10   A.   No.

11   Q.   Do you agree with me that telling off an executive staff

12   member, such as John Towle, who is the Chief of Staff, is

13   disrespectful?

14   A.   No, not how I made it seem how I was wording it.

15   Q.   Well, Ms. Corda --

16   A.   As I indicated, I was saying "telling off" means I was

17   telling him the truth.

18   Q.   Ms. Corda, when you spoke with Mr. Towle, did you say,

19   "You want to talk.  Let's fucking talk.  Why the fuck am I

20   making what I'm making"?

21   A.   No.

22   Q.   When you told off Mr. Towle, did you say, "Darcy fucking

23   Kofol is only making $500 less than I am.  I met with Pat

24   Haggan.  He said I was going to get a raise.  He lied."

25   A.   No.

1    Q.   Ms. Corda, when you told off Mr. Towle, did you say,

2    "I'm getting screwed.  The office promised me a raise.  I

3    haven't gotten a raise.  I'm getting screwed.  I sat down with

4    Pat.  What the fuck?  What the fuck?"

5    A.   No.

6    Q.   Now, you are aware that the Chief of Staff, John Towle,

7    is going to be testifying in this case, correct?

8    A.   Yes, I am.

9    Q.   And you're aware that's what he says you say?

10   A.   I am aware.

11        THE COURT:  The objection to that is sustained.  He

12   will testify and the jury will hear him.

13   Q.   And Mr. Zanini was present during this conversation with

14   John Towle; is that correct?

15   A.   Yes.

16   Q.   And I think you testified earlier that you didn't use

17   profanities when you spoke with the Chief of Staff, John

18   Towle, but you did use profanities when you spoke with Jack

19   Zanini; is that correct?

20   A.   That is correct.

21   Q.   So, in terms of positioning, Jack Zanini was right there

22   when you were talking to John Towle, correct?

23   A.   He was to my right and Mr. Towle was in front of me.

24   Q.   But somehow you're saying that you didn't swear when you

25   spoke with John Towle, even though Jack Zanini was right there

1    and you swore when you spoke to Jack Zanini?

2        A.   Correct.

3        Q.   So, is the reason why you did that because -- you know,

4    assuming it's true, is the reason why you did that --

5            THE COURT:   That may go out and the jury disregard

6    it.  It's for the jury to decide what is true.

7            MS. PICCIRILLI:   Thank you, your Honor.

8        Q.   Did you make that distinction, that you swore to Jack

9    Zanini, but you didn't swear to John Towle because you

10   recognized that you shouldn't address the Chief of Staff, John

11   Towle, in that way?

12       A.   I made that distribution because Jack and I had a

13   relationship where when we spoke, that's how we spoke to each

14   other.  When I spoke to John Towle -- when I had seen him in

15   Paul Tresler's office numerous times, at Wollaston Golf Club

16   when I served him, and at the press office secretary's going-

17   away party at The Hill Tavern, our conversations did not

18   include that, and I was not friendly with Mr. Towle; whereas,

19   I was friendly with Mr. Zanini.

20       Q.   So, you recognized then that using profanities, whether

21   you're telling somebody off, especially the Chief of Staff, is

22   not professional; am I correct?

23       A.   In the district attorney's office that I was working in,

24   people used profanity all the time.  I just wouldn't

25   personally do that with John Towle because I didn't have a

1   relationship with him, but a lot of higher-ups and people did

2   use profanity there.

3      Q.   Have you ever referred to John Towle while using

4   profanities?  In other words, called him a swear name or refer

5   to him in a profanity -- with a profanity?

6            MR. CHURCHILL:  Objection.

7            THE COURT:  No.  She may answer that.

8      A.   Called him a profanity?

9      Q.   Yes.

10     A.   In my whole life I could have, but --

11     Q.   You could have?

12     A.   In my life, yes.  I'm sure I did after this.

13     Q.   And after you left The Fours that evening, you did do

14   that, didn't you?

15     A.   I called him a name?  Is that what you're asking?

16     Q.   When you referred to John Towle, you used profanities,

17   yes, calling him a name.  Is that true?

18     A.   If I have after leaving The Fours call him a name?  I'm

19   sure I could have, yes.

20     Q.   And, specifically, you called John Towle a name when you

21   spoke with Josh Cummings; is that correct?

22     A.   I could have.

23     Q.   You ran into Josh Cummings after you left The Fours and

24   you went up to John -- to Josh Cummings and spoke with him and

25   asked him if he knew John Towle, didn't you?

1     A.   If he knew John Towle, no, I did not.

2     Q.   Did you say to Josh Cummings after you learned that John

3   Towle is Josh Cummings' son's godfather, "Then you're a

4   fucking pussy, too," and walk away?

5             MR. CHURCHILL:  Objection.

6             THE COURT:  What's the objection?

7             MR. CHURCHILL:  I don't see the relevance, your

8   Honor.

9             THE COURT:  That's part of the whole picture.  I'll

10   allow it.

11    A.   I could have said it at that point when I was upset and

12   very angry after the fact.

13    Q.   So, in doing so, you were referring to the Chief of

14   Staff as "a fucking pussy," correct?

15    A.   I could have been.

16    Q.   Right after Josh Cummings told you that the Chief of

17   Staff, John Towle, was his son's godfather?

18    A.   I think I already actually knew that, but yes.

19    Q.   Now, Ms. Corda, you're familiar with the office policy

20   and procedure manual, are you not?

21    A.   That we have, yes.

22    Q.   And that's Exhibit 29.

23            MS. PICCIRILLI:  You can bring that up.

24    Q.   Now, turning your attention to 5.2, unacceptable

25   conduct.

```
1              MR. PALERMO:  What page?

2              MS. PICCIRILLI:  Section 5.2 and it's Bates stamped

3    CC327.  Could you enlarge the first sentence.  That's not the

4    entire sentence.

5    Q.   Turning your attention to the first sentence, the

6    handbook says, "Staff are reminded that they are public

7    employees and as such are subject to scrutiny and standards

8    that may not be applicable to employees in the private

9    sector."  Did I read that correctly?

10   A.   You did.

11   Q.   And you understood that, correct?  You understood that

12   you stood in the shoes of the District Attorney, Dan Conley,

13   and represented the office as an ADA, correct?

14   A.   Correct.

15             MS. PICCIRILLI:  And then go down to the section that

16   starts with, "Behavior."  Yes, just that.  It ends with

17   "office."  No, not that.  I can't see it.

18             THE COURT:  Why don't we take the morning recess and

19   you'll find it during the recess.

20             MS. PICCIRILLI:  Thank you, your Honor.

21             COURTROOM DEPUTY CLERK URSO:  All rise, please.

22             THE COURT:  Members of the jury of the jury, you can

23   leave your notebooks.  We have provided you with refreshments

24   so that you should cheerfully be able to go on.

25             (Jury excused.)
```

1          THE COURT:  Court is in recess for about 15, 20

2    minutes.

3          (Recess taken.)

4          COURTROOM DEPUTY CLERK URSO:  All rise, please.

5          (Jury enters courtroom.)

6          THE COURT:  Please be seated.

7          You may proceed.  I would ask counsel, please, to be

8    done by 1 o'clock with this witness.

9          MS. PICCIRILLI:  I will do my best, your Honor.

10   Thank you.

11         THE COURT:  And we can do that if we do not repeat.

12         MS. PICCIRILLI:  Okay.

13   Q.   Turning your attention, again, to the 5.2, unacceptable

14   conduct section of the office policy and procedure manual.

15   The second section I'd like you to focus on is blown up.  It

16   says, "Behavior not expressly forbidden in this manual may

17   still be the basis for disciplinary action, including

18   termination if it is deemed contrary to the best interest of

19   this office."  Did I read that correctly?

20   A.   You did.

21   Q.   The next section I would like you to focus on is section

22   -- oh, yes, there's more in that section.  "Behavior that is

23   unacceptable and subject to disciplinary action, including

24   termination, shall include, but not be limited to the

25   following:"

1          And that if I could have you look at Section M.  M

2     indicates, "Exhibiting hostile, demeaning, disrespectful,

3     mean-spirited behavior or engage in any form of hazing or

4     bullying towards colleagues or other persons."  Did I read

5     that correctly?

6     A.   You did.

7     Q.   Now, you understood that this policy was in place at the

8     time of your hire, correct?

9     A.   Correct.

10    Q.   And you accepted this policy; is that correct?

11    A.   Correct.

12    Q.   And you agreed to uphold this policy as an assistant

13    district attorney; is that correct?

14    A.   Correct.

15    Q.   Now, if you told off John Towle in the manner that has

16    been described and will be described in this case, that would

17    not be consistent with this policy; is that fair?

18    A.   Correct.

19         MR. CHURCHILL:  Objection.

20    Q.   Now, Ms. Corda, is it that -- is the reason why -- or is

21    the reason why there's a discrepancy in the description -- is

22    the reason because you blacked out and you don't remember the

23    entire incident?

24    A.   No.

25    Q.   Well, Ms. Corda, you did indicate in a text -- a group

1    text the morning after the incident at -- so, that's September

2    20th, 2014, at approximately 8:00 a.m.

3           MS. PICCIRILLI:  If I could bring that up to the

4    witness.  It's Exhibit KK, your Honor, and it's for

5    identification.

6    Q.   On Page 5, when asked to give a recap --

7           MR. WHITE:  It's in your binder.

8           THE WITNESS:  Okay.

9    Q.   -- you indicated, "Tons of pple came."  That's "people;"

10   is that correct?

11   A.   I'm sorry, it's not in the front of me and I'm trying to

12   access it.

13   Q.   Let me have you take a look at the entire Exhibit KK.

14   A.   Right.  That's what I'm doing with the book.

15   Q.   Thank you.

16   A.   You're welcome.

17   Q.   And that is your email exchange with a group both the

18   night of September 19, 2014 and the morning of September 20th,

19   2014, the morning after the incident at The Fours, correct?

20   A.   No.  These are texts, not email.

21   Q.   Texts, excuse me.  These are your texts to the group?

22   A.   Correct.

23          MS. PICCIRILLI:  Your Honor, I would like to offer

24   this in evidence as the next exhibit.

25          MR. CHURCHILL:  We don't object, your Honor.

1          THE COURT:  Okay.

2          COURTROOM DEPUTY CLERK URSO:  So, it will be 69, KK.

3          MS. PICCIRILLI:  Yes.

4          COURTROOM DEPUTY CLERK URSO:  Yep.

5          (Exhibit No. 69 received in Evidence.)

6          MS. PICCIRILLI:  So, that's KK.  Can you bring up KK,

7   please.

8    Q.   Now, this is the same group text in which you announce

9   the higher-ups were there, Dan Conley and the executive staff;

10  is that correct?

11   A.   Correct.

12   Q.   And that's on Page 1 under September 19th between 6:21

13  p.m.  Do you see that?

14   A.   Correct.

15   Q.   And specifically it says, "Dan Conley and all higher-ups

16  here.  Wtf."  That you described earlier as, "What the fuck.

17  Normal."  Do you see that?

18   A.   I do.

19   Q.   Now, what did you mean by "normal"?

20   A.   As I think I already testified, that Dan Conley and all

21  the higher-ups would not normally come to a going-away party

22  together.

23   Q.   So, why did you use "normal" instead of "not normal"?

24   A.   That's how I speak with text messages, I'm sure you're

25  aware.  That's just how I talk.

1    Q.   So, it was sarcastic; is that fair?

2    A.   Right.  It's saying that it's not normal, but that's how

3    I speak.

4    Q.   Got it.  Okay.

5         And then turning your attention to Page 3, at the

6    bottom, that's when you indicated, "Yeah, that was crazy,

7    Although couldn't hear the speeches.  Can't get over that

8    everyone.  Can't get over that everyone went."  That was where

9    you indicated that; is that correct?

10   A.   That's where I indicated that?  Yes.

11   Q.   Okay.  And then on Page 4, there's a reference by Amanda

12   Cascione.  Who is that?

13   A.   She's an assistant district attorney.

14   Q.   And she says, "Am I fired lol."  What did that refer to?

15   A.   "Lol" means laugh out loud.

16   Q.   And then your response was, "Um I prob am;" is that

17   correct?

18   A.   Correct.

19   Q.   So, at that point were you concerned that you might be

20   fired?

21   A.   I was anxious a little bit because of how John Towle

22   reacted to that.  Although I had gone to him and told the

23   truth, how he reacted saying -- after I asked him -- or I'm

24   sorry.  After he asked me if I believed it.  I said yes.  He

25   put the beer down and left right away, and also that Christine

1    Walsh had told me that he called Jack Zanini right afterwards

2    and said that my statements were questioning the integrity of

3    him and the district attorney's office.  I was, of course,

4    anxious about that questioning.

5         Did I really think I was going to get fired?  Otherwise,

6    I wouldn't have gone to meeting with all the items and things

7    like that.  This is a group text where I think you can tell in

8    the email, she's saying, "Am I fired lol," joking around and

9    talking about it the next day.  It's not --

10   Q.   And then you go on when Amanda Cascione asks, "Can

11   someone give me a recap lol"?  Do you see that, "lol"?

12   A.   Yes.

13   Q.   And your response is, "Tons of people came."  "Pple"

14   means people; is that right?

15   A.   Correct.

16   Q.   "All higher-ups there," right?

17   A.   Correct.

18   Q.   "Speeches, booze, black out, told off Towle."  Do you

19   see that?

20   A.   Correct.

21   Q.   Did I read that correctly?

22   A.   You did.

23   Q.   And "black out," did you mean that you blacked out from

24   having too much alcohol?

25   A.   No.  If you read the next sentence to it -- so, I wrote

1    that and wrote, "I went home by 11:30 so not sure."  And she

2    wrote, "lol."  So this is -- all these people were actually at

3    the party.

4        Q.   No.  My question is, what did you mean by "black out"?

5    Did you mean you blacked out because of alcohol?

6        A.   No.  This isn't about me, obviously, when it says, "Tons

7    of people came, all higher-ups there.  This isn't a story

8    about me.  I'm just recapping the night as a joke, saying,

9    "All higher-ups came" and, "Tons of people there, speeches,

10   booze, black out, told off Towle."  It's not about me

11   specifically.  That's why I also wrote, "I went home by 11:30

12   so I'm not sure."

13       Q.   Well, just backing up a little bit.

14       A.   Sure.

15       Q.   It's true that there were tons of people that came,

16   right?

17       A.   It is true.

18       Q.   40 plus people, right?

19       A.   Correct.

20       Q.   It was a good turnout for Christine Walsh's party,

21   right?

22       A.   It was a very good turnout, yes.

23       Q.   And it's true that all higher-ups were there.  The

24   executive staff was, including the DA, Dan Conley, correct?

25       A.   Correct.

1    Q.   And it's true that speeches were given; is that correct?

2    A.   Correct.

3    Q.   Dan Conley gave a speech?

4    A.   Yes.

5    Q.   Others gave a speech?

6    A.   Correct.

7    Q.   And it's true that there was booze.  We've already gone

8    through that ad nauseam, right?

9    A.   Correct.

10   Q.   It's true that you used the phrase you, "told off

11   Towle," correct?

12   A.   Correct.

13   Q.   And you indicate that here in the text, correct?

14   A.   Correct.  That's where I used it, yes.

15   Q.   So, "black out" and "told off Towle" applies to you,

16   right?  You were the one that told off Towle.  That's what you

17   meant by that, right?

18   A.   Right.

19   Q.   So, "black out" doesn't apply to you?

20   A.   So, if Amanda is asking me, "Can someone give me a

21   recap," and she was there the whole night.  So --

22   Q.   My question is, does "black out" apply to you?

23   A.   No.

24   Q.   What does it apply to then?

25   A.   As I was just stating, you read the text in context.

1  We're all joking around about it, and Amanda says, "Can

2  someone give me a recap lol," but Amanda was present the whole

3  night and Evan Macphee were also there.  So, I'm giving her a

4  recap.  Obviously -- she's saying she needs a recap.  I'm

5  writing "black out," but this is all just done in a joke when

6  we're talking to each other.  It's not specific to me.  That's

7  why I also wrote, "I went home by 11:30 so not sure," but

8  she --

9  Q.  You're not sure about what?

10 A.  Of the rest of the night.  I can't give a recap on the

11 rest of the night.

12 Q.  Now --

13 A.  And then she wrote "lol" right afterwards.

14 Q.  Now, this text is obviously relevant to the events that

15 happened that night; is that correct?  It concerns the events

16 that happened that night, doesn't it?

17 A.  Sure.

18 Q.  And this text was not produced by you in this

19 litigation, was it?

20 A.  I don't think I had this group message.

21 Q.  Well --

22 A.  But I produced everything that I did have, which I think

23 is 99 percent of everything that you received.

24 Q.  I'll represent to you that this was produced to us

25 through an ADA, Joe Janezic?

```
1    A.   Right.

2    Q.   And you produced only one text from Joe Janezic; is that

3    correct?

4            MR. CHURCHILL:  Objection.

5            THE COURT:  Are you objecting?

6            MR. CHURCHILL:  I am.  I said "objection," your

7    Honor.

8            THE COURT:  I don't think you want to go into that.

9    I mean, you have it.  She produced -- she said she produced

10   what she had.  I mean, what more do you want?

11           MS. PICCIRILLI:  What I want is to establish that she

12   was ordered by this Court to produce all texts relevant to the

13   incident, and she did not produce this text or other texts,

14   including Exhibit 68 that we've marked as an exhibit, but --

15           THE COURT:  I don't want an entire argument.  She

16   said she had produced what she had.  Is that correct, Ms.

17   Corda?

18           THE WITNESS:  Correct.

19           THE COURT:  And where did the rest of this come from?

20           THE WITNESS:  I believe another ADA.

21           THE COURT:  Okay.

22   Q.   But just to clarify, this text was to you?

23           THE COURT:  It is clear.

24           MS. PICCIRILLI:  I'm sorry?

25           THE COURT:  It is clear.  There is nothing more to
```

1    clarify.  She produced what she had.  Other people had other

2    things and you got this from other people or somebody got it

3    from other people.

4            MS. PICCIRILLI:  So, I'll go to the one that she did

5    produce, your Honor, if I may from, Joe Janezic.

6            THE COURT:  As long as you don't repeat.

7            MS. PICCIRILLI:  If i COULD bring up Exhibit 32.

8    Q.   Now, Ms. Corda, this is a text that you produced, and

9    the Bates stamp for your production is CC509 at the bottom.

10   And this is, in fact, the only text that you produced from Joe

11   Janezic; is that correct?

12   A.   I believe so, yes.

13   Q.   And, yet, you texted with Joe Janezic over that weekend,

14   correct?

15   A.   Yes, I believe based on -- yes.

16   Q.   And you even texted with him in the group texting that

17   we just saw as exhibit -- it's now Exhibit 69, correct?

18   A.   Yes.

19   Q.   So, the group texting would have been on your phone; is

20   that right?

21   A.   At some point, yes.

22   Q.   But your claim is that you didn't have any of those

23   text, correct?

24           MR. CHURCHILL:  Objection, your Honor.

25           THE COURT:  What's the objection?

1          MR. CHURCHILL:  She's going over the same ground.

2          THE COURT:  Well, she's entitled to find out the

3    details about different things, a little bit.

4    Q.  But it's your claim that you didn't have those that are

5    marked as Exhibit, for example, 69 to produce; is that your

6    claim?

7    A.  Correct.

8    Q.  And this text that you produced actually is a text that

9    does what?

10          THE COURT:  What's the question?

11   Q.  What is this text about?  This text isn't about the

12   evening in question, correct?

13   A.  I produced all the texts I had and you had requested

14   anything.  So, I turned over every text that was responsive to

15   that.

16   Q.  My question is, this text is not about the incident on

17   September 19, 2014, correct?

18   A.  It is.  I think this is right after I got fired.  He

19   sent me a text saying that -- what he wrote on this.

20   Q.  This is a text praising you, right?

21   A.  Yes.

22   Q.  Joe Janezic praises you and says you're one of the best

23   ADA I've ever worked, right?

24   A.  Correct.

25   Q.  That's the text that you produced?

1    A.   Correct, after I was fired, yes.

2    Q.   And that's the only one, correct, for Joe Janezic?

3    A.   For Joe Janezic, yes, but I produced a lot more to you,

4    yes.

5    Q.   Now, on the one hand, there were some texts that showed

6    that you couldn't remember how the conversation started with

7    John Towle or you couldn't remember --

8         THE COURT:  Can we have a question?

9         MS. PICCIRILLI:  Yes.

10   Q.   You do remember certain things about what you said to

11   John Towle, fair?

12   A.   I remember what I said to John Towle.

13   Q.   Yes.  And you remember that you brought up Darcy Kofol,

14   the woman ADA again, correct?

15   A.   Yes.

16   Q.   And you recall that you said Darcy Kofol was three years

17   behind you, but she had campaigned by the DA Conley and was

18   promoted with a large raise within weeks.  Was that your

19   testimony?

20   A.   Along those lines, yes.

21   Q.   I think what you actually said at trial -- that was your

22   deposition testimony, but at trial what you said was, "Darcy

23   Kofol had just thrown a campaign party for the DA and then

24   received a large raise and I was more experienced than her.  I

25   had more trial experience.  She is paid only $500 less than

1    me."  That was your trial testimony, right?

2     A.   I think also that not just was she given a big raise,

3    but she promoted weeks later, I think is what I testified to,

4    that Darcy Kofol had thrown a campaign party, that she was

5    promoted and received a large raise afterwards, that she had

6    just three years -- or three classes, I guess, under me and I

7    had more trial experience than her and she was making $500

8    less, yes.

9     Q.   So, you were alleging at that time to John Towle

10   political favoritism, right?

11    A.   I was alleging the facts of what happened.

12    Q.   So, it's your belief that that was based in fact, not

13   fiction?

14    A.   It was based in fact.

15    Q.   Are you sure about that?

16    A.   Yes.  She was promoted -- she threw a party, I believe,

17   in the beginning of September and was actually promoted two

18   weeks later and received a 6 percent raise after being in this

19   superior court for two months.

20    Q.   Now, actually, Ms. Corda, the campaign party that you

21   reference for the DA Dan Conley's mayoral campaign was early

22   September 2013?

23    A.   Correct.  No.  2014, correct.

24    Q.   No.  It was 2013?

25    A.   Correct.

```
 1    Q.   Right.  Okay.  And I expect -- or I understand that the

 2    raise -- or the promotion you're talking about was Darcy

 3    Kofol's promotion from the Dorchester District Court to the

 4    Narcotics Unit, correct?

 5    A.   Correct.

 6    Q.   And you allege that that promotion -- the decision to

 7    promote her was made after she threw this campaign party for

 8    the DA; is that correct?

 9    A.   No.  The fact that I stated was that she was promoted

10    two weeks later.  If you look at the date, she was promoted,

11    it was two weeks after she threw that party September.

12    Q.   Right.  But you understand that the decision to promote

13    Darcy Kofol would have been made long before her actual

14    promotion and move?

15    A.   That's not necessarily true.  It could have been, but my

16    point is I said the fact that she had a party in September,

17    was promoted to two weeks laid, that's a fact, and that she

18    received a large raise, 6 percent raise after being in

19    superior court for two months, and I just stated facts.

20    Q.   But you agree with me that the actual campaign party was

21    early September 2013, correct?

22    A.   Correct.

23    Q.   And that that was a campaign party that was in the South

24    End; is that correct?  That's where she lived?

25    A.   Correct.
```

1    Q.   Right?

2    A.   Correct.

3    Q.   And you produced a Facebook page that indicates that the

4    party was held on September 4th, 2013.  Does that sound

5    accurate to you?

6    A.   It does sound accurate.

7    Q.   Okay.  And, Ms. Corda, are you aware that the actual

8    decision to promote Darcy Kofol was made before she threw that

9    campaign party?

10   A.   No, but I think I can state that.  I said she threw the

11   party.  What I actually said to John Towle was that she threw

12   a campaign party and was promoted two weeks after, which is

13   true, and that she received a large raise, which is true.

14   Q.   But you -- so, you were suggesting that --

15   A.   I wasn't suggesting anything.  I was stating facts.

16   Q.   Well, let's stick to the facts.  The facts are, if

17   you're aware, Ms. Corda -- and I'll ask you if you are aware.

18   Are you aware that Darcy Kofol -- the decision to promote

19   Darcy Kofol was actually made even before August 28, 2013?

20   A.   Would I be aware of that?  No.

21   Q.   Let me show you Exhibit 57.

22        MS. PICCIRILLI:  Can you blow up, first of all, the

23   date along with, you know, who it's from and who it's to.  Not

24   highlight.  Blow up, Mike.

25   Q.   So, do you see that this is an email from Pat Haggan; is

1    that correct?

2    A.   Yes, August 28th, 2013, yes.

3    Q.   And who is Pat Haggan?

4    A.   He's the First Assistant District Attorney of the

5    Suffolk County District Attorney's Office.

6    Q.   And it was sent to John Towle, correct?

7    A.   Correct.

8    Q.   And we know by now he's the chief of staff, right?

9    A.   Correct.

10   Q.   And it was also sent to John Pappas, correct?

11   A.   Yes.

12   Q.   And what was his role?

13   A.   He is the chief trial counsel of the Suffolk County

14   District Attorney's office.

15   Q.   And the subject is proposed promotions, transfers,

16   additional knew ADA's.  Do you see that?

17   A.   I do.

18   Q.   As you said, pointed out, it was dated August 28, 2013;

19   is that correct?

20   A.   Yes.

21   Q.   And that is before this campaign party thrown by Darcy

22   Kofol on September 4, 2013, correct?

23   A.   Right.  I think it's like five days before, correct.

24   Q.   And you understand that this is an actual proposed

25   promotion that's being sent via email already from Pat Haggan

1    to John Towle and John Pappas, correct?

2      A.   Yes.  It's proposed promotions, transfers, additional

3    new ADA's.

4      Q.   Right.  So, the decision to -- you know, the decision --

5    the thinking that went into who is going to be promoted, who

6    is going to be transferred, had to happen sometime before this

7    email, right?  That makes sense?

8      A.   I don't think so, because I think it says "proposed

9    promotions."

10     Q.   So, you don't think they thought about it before they

11   sent the email?

12     A.   Oh, I didn't say that.  You just asked me if it was

13   decided before and it says, "proposed promotions."

14     Q.   Ms. Corda, do you think they had to think about who they

15   were going to propose for a promotion and a transfer before

16   they send an email with the proposed promotions and transfers?

17     A.   Yes.

18     Q.   And you don't have any idea when that thought process

19   happened, do you?

20     A.   I don't.

21     Q.   And you don't know what decision making went into the

22   promotion of Ms. -- excuse me -- Darcy Kofol, do you?

23     A.   I don't.

24     Q.   Well, turn your attention to Paragraph 7.

25              MS. PICCIRILLI:  Can you go to Paragraph 7 on that

1    same exhibit, Mike, Exhibit 57.  It's Paragraph 7, and blow it

2    up.

3            MR. PALERMO:  What's the Bates stamp?

4            MS. PICCIRILLI:  000492.

5            MR. PALERMO:  What number?

6            MS. PICCIRILLI:  No. 7.

7    Q.   Now, this says, "ADA Darcy Kofol from Dorchester to

8    narcotics."  Do you see that?

9    A.   I do.

10   Q.   And it says, "The departure of ADA Phil O'Brien was a

11   significant blow to the Narcotics Unit based upon his caseload

12   between 40 to 50 indicted cases."  Did I read that correctly?

13   A.   You did.

14   Q.   "Darcy is one of the top performers in district court

15   and is one of the last of her hiring class."  Did I read that

16   correctly?

17   A.   You did.

18   Q.   She interned in narcotics before being hired and has an

19   interest in going there."  Did I read that correctly?

20   A.   You did.

21   Q.   "Macy has had very good experiences with that her work

22   and believes that she would make an excellent addition/

23   replacement to the unit."  Did I read that correctly?

24   A.   You did.

25   Q.   Now, Macy Lee was actually in the narcotics department;

1   is that correct?

2   A.   Yes.

3   Q.   That's who "Macy" refers to Macy Lee?

4   A.   I would assume so, yes.

5   Q.   And are you aware that Macy Lee actually sought Darcy

6   Kofol out to promote her to the Narcotics Unit from the

7   district court?

8   A.   I do know that that makes sense if she's going directly

9   to narcotics.

10   Q.   Now, when you had this -- strike it.

11        When you told off John Towle, you mentioned Darcy Kofol

12   and the fact that she had been promoted after giving this

13   campaign party and that you were three years her senior and

14   that she was making $500 less than you, correct?

15   A.   Yes.  It's nothing against her whatsoever.  She's, I'm

16   sure, a great person, a great ADA, as you've indicated.  It

17   has nothing to do with her performance or her abilities and

18   it's not about her.  It's about how the office treats people

19   differently.

20   Q.   Again, she's a woman, though, correct?

21   A.   Based on different things, the office treats people

22   differently and I just --

23   Q.   Ms. Corda, Darcy Kofol is a woman.

24   A.   If I can finish my answer.

25   Q.   I think you've answered it.

```
 1   A.  I didn't answer it, but I stated facts.  She had a
 2   campaign party actually after Dan specifically called us
 3   together and said no one should be -- no one should be having
 4   parties.  Called us together and said that and she had a party
 5   after that and all I stated was the fact that she had the
 6   party and the fact that she received a promotion two weeks
 7   later and the fact that she received a higher raise.  It's
 8   nothing against her.  It's about how the office was treating
 9   people differently, how they treated me differently for being
10   a woman and how -- the fact that they treated her
11   differently --
12   Q.  Ms. Corda, I'm going to interrupt you because I think
13   you've answered the question and --
14           THE COURT:  Do you have a question?
15           MS. PICCIRILLI:  Yes, I do.  It brings me to a couple
16   of questions --
17           THE COURT:  And, Ms. Corda, please answer just the
18   question she's asking.
19           THE WITNESS:  Sure.
20   Q.  You testified that you learned that no one should be
21   donating, no one should be throwing parties to help the DA for
22   the mayoral campaign; is that correct?
23   A.  That's correct.
24   Q.  Didn't you campaign for Dan Conley by holding signs and
25   doing other campaign activities when he ran for mayor?
```

1    A.   Yes, we --

2    Q.   And, in fact, a lot of ADA's did that, right?

3    A.   We were told that we basically had to do that, but he

4    had a meeting about --

5    Q.   Well, you did it, didn't you?

6    A.   He had a meeting about saying that you could not donate

7    or have parties.  That's what the meeting was.  It was in the

8    atrium.

9    Q.   Now, when you told off John Towle, you mentioned Darcy

10   Kofol, who was a woman, correct?

11   A.   Yes.

12   Q.   You didn't list any men that were being paid more than

13   you, did you?

14        THE COURT:  That's an argumentative question.  You

15   know, you can argue that to the jury, but please don't argue

16   with the witness.

17        MS. PICCIRILLI:  Fine.  I believe it was my tone,

18   your Honor, but it's a legitimate question, I think.

19   Q.   Did you mention any men --

20        THE COURT:  Nor do I appreciate your arguing with me.

21        MS. PICCIRILLI:  Sorry, your Honor.

22   Q.   Did you identify any men when you told off John Towle?

23   A.   No.  I said I was being paid not what I should because I

24   was a woman, is what I said.

25   Q.   But you did identify Darcy Kofol, who is a woman,

1    correct?

2    A.   I mentioned, yes, that she had a thrown a campaign party

3    and received a raise -- a six percent raise.  I didn't say six

4    percent, but I said a "large raise," and then she was promoted

5    two weeks later.

6    Q.   Now, you testified that you anticipated being fired

7    because you had heard from -- who was it? -- Christine Walsh

8    that you had questioned the integrity of the DA's Office?

9    A.   I think I testified that Christine Walsh told me that

10   John Towle, as soon as he left the party, called Jack Zanini

11   and told Jack Zanini that my statements were questioning the

12   integrity of him as well as the district attorney.

13   Q.   Now, that would be something that would not be

14   acceptable if you were to question the integrity of the

15   district attorney; is that correct?

16   A.   I think it depends on how you interpret the integrity

17   part, because me stating what I believed and what is fact at

18   the district attorney's office, I don't see how that can be

19   questioning someone's integrity.  I think that shows they're

20   offended by the statements I made.

21   Q.   Well, when you questioned -- or when you indicated that

22   Darcy Kofol was receiving a promotion and a raise as the

23   result of -- or after having thrown a campaign party, isn't

24   that questioning the integrity of the district attorney's

25   office by suggesting political favoritism?

1     A.   I disagree because I was stating facts.  Everything that

2     I said happened actually did happen.

3     Q.   Now, prior to starting your job, you were sworn in with

4     a group of ADA's, correct?

5     A.   Correct.

6     Q.   And when you were sworn in, you were sworn in as a

7     public official; is that correct?

8     A.   Yes.

9     Q.   And you raised your right hand up, correct?

10    A.   Correct.

11    Q.   And you took the oath twice; is that true?

12    A.   Yes.

13    Q.   You took it at -- is it Bulfinch?

14    A.   Yes.  One Bulfinch is the main office for superior court

15    and I think also Boston Municipal Court has an office there,

16    too, but, yes, that's where the superior court and the

17    executive staff have their offices.

18    Q.   And then you also took the oath again at a Christmas

19    party; is that correct?

20    A.   Correct.

21    Q.   And the DA administered that oath; is that right?

22    A.   That's right.

23    Q.   And with that oath you swore to faithfully and

24    impartially discharge and perform your duties as an ADA in

25    accordance with the rules and regulations of the Constitution

1    and the laws of the Commonwealth.  Is that true?

2    A.   That sounds like that would be the oath.  So, yes.

3    Q.   And you also swore to uphold the office?

4    A.   Correct.

5         MS. PICCIRILLI:  One minute, your Honor.

6         (Pause.)

7         MS. PICCIRILLI:  I'm sorry, your Honor.  Just one

8    moment.

9         (Pause.)

10   Q.   Now, did you indicate to Rilwan Adeduntan -- is that his

11   last name?  Is that how you pronounce it?

12   A.   Adeduntan.

13   Q.   Adeduntan.  That you were going to be fired because you

14   were questioning the integrity of Towle and the DA and that

15   they were going to say that favors for campaign and discuss

16   that you're questioning them?

17   A.   Correct.

18   Q.   So, you anticipated that the DA's Office would say that

19   you were questioning the integrity of the DA's Office because

20   you said that Darcy Kofol was giving favors by throwing a

21   campaign party and the DA's Office then promoted her as a

22   result?

23   A.   No.  I think -- as I already testified, I already knew

24   that they were going to say question the integrity, because

25   Christine Walsh had told me that when John Towle left the

1    party, he called Jack Zanini and he told Jack Zanini that my

2    statements were questioning the integrity of him and the DA.

3    So, at that point I already knew that John Towle was saying

4    that.

5    Q.   But you did say to Rilwan at 10:15 a.m. on September

6    20th, 2014, "They're going to say by saying favors for

7    campaign and discuss I'm questioning them," didn't you?

8    A.   Yes.  And, also, obviously, about the claim which I

9    talked about with Rilwan, as you know, and the text that I

10   provided to you, that I had brought up the fact that the

11   office was discriminating against me for gender and Rilwan for

12   race.

13            MS. PICCIRILLI:  Objection, your Honor.  Move to

14   strike that last statement about race.  It has nothing --

15   absolutely no part in this case and there's no evidence and

16   it's been ruled on in a motion in limine.

17            THE COURT:  Race goes out, except you asked for the

18   conversation.

19            MS. PICCIRILLI:  Your Honor, if I may.  Well, this

20   conversation doesn't include anything about that statement,

21   your Honor.  If I may, could I show the witness Exhibit CC?

22   It's for identification.

23            THE COURT:  Go ahead.  Is this a document in

24   evidence?

25            MS. PICCIRILLI:  It is not.  It's for identification,

1    your Honor.

2            THE COURT:  Well in that case, we shouldn't put it

3    in.

4            MS. PICCIRILLI:  It's for the witness, your Honor.  I

5    want to see if she recognizes it and acknowledges that this

6    is, indeed, her text.

7    A.   Do you want me to look at the book for that?

8    Q.   You can do that, Exhibit CC.  Thank you.

9    A.   This is one text between Rilwan.

10   Q.   Yes.  And that's one text at 10:15 a.m.; is that

11   correct?

12   A.   Right.  It's not the whole text.

13   Q.   You produced texts from Rilwan and this is one of the

14   pages of that; is that correct?

15   A.   That's one of the pages, correct.

16   Q.   Sure.  I can show you the entire group, which is for the

17   record CC1018 to CC1023.

18           MS. PICCIRILLI:  May I approach, your Honor?

19           THE COURT:  Yes.

20   Q.   Feel free to take your time and look through that if you

21   would like.

22           THE COURT:  But not too much.

23   A.   For a question or --

24   Q.   Yes.  I'm going to direct your attention to CC1023.

25   A.   Oh, yes, I have it out in the book.

1    Q.   But you did see that those are the texts that you

2    produced, texts with Rilwan -- and I'm going to say his last

3    name again -- Adeduntan?

4    A.   Adeduntan.

5    Q.   Adeduntan.

6    A.   I didn't look through all these.  I was just saying

7    there's more than just one text.

8    Q.   Can you look through them, because I'm going to offer

9    this one in evidence.  So, I want to make sure that you

10   acknowledge that those are your texts and those are all the

11   texts that you produced.

12   A.   (Examining).  These aren't all the texts I produced.

13   Q.   Those are the texts that you produced from Rilwan?

14   A.   I produced more than that.

15   Q.   I'm talking about the texts you produced between you and

16   Rilwan Adeduntan?

17   A.   Correct.  I produced more than what are in that file.

18   Q.   You produced more than in that file?

19   A.   Yes.

20   Q.   I'll represent to you those are the texts we got between

21   you and Rilwan.  We have another texts of other people, but

22   those are the only texts we got from you.

23   A.   Well, I think during my deposition the other lawyer

24   sitting here had asked me --

25   Q.   Okay.  Let me ask you this is.  Those are your texts

1    with Rilwan, correct?

2    A.   Some of them, yes.

3    Q.   Turning your attention to CC1023.  That is one of those

4    texts that's in that folder; is that correct?

5    A.   It is.

6    Q.   And that is your text with Rilwan, correct?

7    A.   It is.

8         MS. PICCIRILLI:  Your Honor, I would like to offer

9    Exhibit CC in evidence as the next exhibit.

10        MR. CHURCHILL:  I do object, your Honor, because

11   that's not complete, according to what I see.

12        THE COURT:  So, offer the complete one.  If it's not

13   complete, he's entitled to object because it's not complete.

14        MS. PICCIRILLI:  Your Honor, I believe it is.  I have

15   that -- that is what I believe is complete.  I thought you

16   were saying to him offer the complete one.  If I'm mistaken

17   and it's not -- I need to go back to the witness, if I could,

18   to read those Bates stamp numbers.  I need plaintiff's counsel

19   to let me know that, because I understand that this is all the

20   texts that she produced and if I'm wrong, it could be an

21   error, but I have CC1018 to CC1023 as being the texts that

22   were produced.  Is that not correct?  He's shaking his head.

23   So, what are the numbers?

24        MR. CHURCHILL:  No.  I have -- they go on after that

25   up until at least 1030, 1031, 1032.

1          MS. PICCIRILLI:  Do you have them?

2          MR. CHURCHILL:  There are many more.

3          MS. PICCIRILLI:  Well, your Honor, I would be glad to

4     produce --

5          THE COURT:  I'm sorry.  This is not all of what was

6     produced?

7          MR. CHURCHILL:  What she is showing to Ms. Corda are

8     not all the texts between Ms. Corda and Mr. Rilwan.

9          THE COURT:  Was the rest of that correspondence

10    produced?

11         MR. CHURCHILL:  Yes.  I'm looking at documents we

12    produced to the --

13         THE COURT:  Well, why don't we hold off until you can

14    put it together.

15         MS. PICCIRILLI:  Thank you, your Honor.  This is what

16    was provided to me in a folder saying these are all the texts

17    between them.  So, if there are more, then I'll just get them

18    together and we'll submit them at that time.

19         Your Honor, whereas, this particular text, though, is

20    already identified as being a text between Rilwan and Ms.

21    Corda, I just plan on introducing as evidence that one text.

22    If plaintiff's counsel would like to introduce all the other

23    texts -- I think I have two texts I want to introduce.

24         If plaintiff's counsel for completeness wants to

25    introduce all of the texts between Ms. Corda and Mr. Rilwan, I

1   certainly don't have any objection, but I don't intend to do

2   that.  So, can I just offer the two pages that she will

3   identify as being in that folder and as being her texts

4   between herself and Mr. Rilwan?

5           THE COURT:  Is there objection to that?

6           MR. CHURCHILL:  As long as we have the opportunity,

7   your Honor, to introduce what other parts there are between

8   them.

9           THE COURT:  So, she may start with this one and then

10  you will add the rest?

11          MR. CHURCHILL:  Yes.

12          THE COURT:  Okay.

13          COURTROOM DEPUTY CLERK URSO:  So, this is CC?

14          MS. PICCIRILLI:  It is.

15          COURTROOM DEPUTY CLERK URSO:  So, it's going to be

16  No. 70.

17          (Exhibit No. 70 received in Evidence.)

18  Q.   Now, if you could look at Exhibit CC.

19  A.   Sure.

20  Q.   Which is in that book and which is also in the folder

21  that -- I took that back, actually.  CC1023, do you see that

22  Bates stamp number at the bottom?

23  A.   I do.

24  Q.   Now, you say at the top "BC."  Does that mean "because"?

25  A.   Yes.

1 Q. "Because they're going to say I'm questioning the

2 integrity of Towle and the DA."  Did I read that correctly?

3 A. You did.

4 Q. And then he says, "But you're not.  You just need

5 answers and no one is giving to you."

6 A. Right.

7 Q. Then you say, "They're going to say by saying favors for

8 campaign and DISC."  Does that "discuss"?

9 A. Discrimination it means.

10 Q. "And discrimination I'm questioning them."

11 A. Correct.

12 Q. And so, you anticipated that there would be a problem

13 with the DA's Office in terms of them thinking that you're

14 questioning the integrity of the DA because you mention Darcy

15 Kofol throwing a campaign party and then receiving a

16 promotion; is that correct?

17 A. No.  I think if you read it in bulk, "They're going to

18 say by saying favors for campaign and discrimination I'm

19 questioning them."  And I think I already answered, but I'll

20 answer it again.

21   The reason I knew they were going to question -- saying

22 that I was questioning their integrity is because Christine

23 Walsh told me that John Towle said that to Jack Zanini.  So,

24 at this point I already know that he said that, and I'm saying

25 they're going to say because I brought up the Darcy thing and

1    also the discrimination -- that's what "disc" means -- I'm

2    going to question them because I had already known that.

3    Q.   So, you were acknowledging, I think -- I think we're in

4    agreement -- that you felt that they would say that you were

5    questioning the integrity of the DA, at least in part, because

6    you brought up Darcy Kofol and the fact that she had thrown a

7    campaign party for the DA?

8         THE COURT:   That is not what she said.   The objection

9    is sustained.

10   Q.   Let me ask you this:  Do you think that you were

11   questioning the integrity of the DA's Office because you

12   brought up the DA giving Darcy Kofol a promotion after her

13   throwing a campaign party for the DA?

14   A.   No, I did not challenge integrity in any way because I

15   had brought up facts on September 19th of 2014.

16   Q.   So, here you're simply saying what you think they're

17   going to say based on what somebody else told you?

18   A.   Correct.

19   Q.   And when you did meet with the DA and you were

20   terminated on Monday morning, the DA did say that you were

21   questioning the integrity of the DA?

22   A.   No.

23   Q.   They didn't?

24   A.   Did he say you're questioning the integrity of the DA?

25   No.

1    Q.   What did they say about the integrity?

2    A.   What did they say or Dan Conley say?

3    Q.   Dan Conley.  What did he say about --

4    A.   What he said when I walked in -- I sat down.  What he

5    said to me, essentially, was this is a bad way to start my

6    week.  This is not how I want to start my week.  I heard what

7    you said Friday.  It is offensive, untrue, third adjective

8    that begins with an "S."  I think it was slanderous or

9    something like that.  You have no integrity.  You're not

10   honest.  When I hired you, I told you that there had to be

11   someone who had integrity and honesty and you have not lived

12   up to that standard.  Therefore, you're immediately

13   terminated.  Leave your badge, credentials and phone to Buddy

14   Green.

15   Q.   And Dan Conley did not mention anything about

16   discrimination when he fired you, correct?

17   A.   He mentioned that the reason he was firing me is because

18   of what I said, and that's what he said to me.  The meeting

19   lasted probably under 30 seconds.

20   Q.   When he said it was because of what you said, how do you

21   know that it wasn't because of what you said about a fellow

22   ADA, Darcy Kofol, and the suggestion that there was political

23   favoritism?

24   A.   Because he did not tell that to me.  He said I heard

25   what you said Friday.  It's untrue, offensive and the other

1    word, even though what I had said were all facts.  That's fine

2    if he believes that they're not facts, but that is what I said

3    and that's what he said to me.

4    Q.   Did he tell you that -- strike it.

5            (Pause.)

6            THE COURT:  I think we should use the time to

7    stretch.

8            (Stretch break.)

9            THE COURT:  Okay.  You may proceed.

10           MS. PICCIRILLI:  Thank you.

11   Q.   Now, you testified that you planned to apologize; is

12   that correct?

13   A.   Correct.

14   Q.   And it's true, isn't it, that you believe that you owed

15   an apology to John Towle, the chief of staff?

16   A.   I think I testified that I was going to apologize

17   because I know that some people are of the view that you

18   should not bring up work things outside at social events.  So,

19   yes, I was going to apologize to John Towle saying that --

20   what I just stated.

21   Q.   I think your testimony was that you apologize that it

22   happened at a social event; is that correct?

23   A.   Correct.

24   Q.   And I think you also testified that it was the manner

25   and the timing that you were going to apologize; is that

1  correct?

2   A.   I don't think I testified to that, but I think in my

3  notes I had written something along the lines of apologize for

4  saying -- I think I wrote social event, like something else,

5  but, yes, because, again, as I've already testified, some

6  people believe that you shouldn't bring up work at a social

7  event.  So, yes, I was going to apologize for that.

8   Q.   So, you recognize that -- did you recognize that it was

9  not the right time or place to have any type of discussion

10  about pay or anything work related, especially gender

11  inequality, right?

12   A.   I think that, of course, that wouldn't be the best place

13  ever to discuss that, but at the end of the day, I told him

14  what I perceived, what I believed is true and were facts at

15  that time.  Could I done it at a different place?  Of course,

16  but at that point I felt like he needed to know and I said

17  that to him.

18   Q.   Did you feel that you should apologize for discussing

19  your complaints with Mr. Towle at a social event after having

20  too much alcohol?

21   A.   No.  I think how I just testified -- and I said I think

22  a few times -- is that it would be apologizing because it was

23  at the social event.  As I stated, of course, that's not the

24  optimal place to have a discussion, but at the end of the day,

25  I said it to him there and I stand by what I said and it's

1    true.

2    Q.   And you didn't think that it made a difference that you

3    had had too much alcohol before you approached him at a social

4    event about these issues?

5    A.   No, because my -- what I said is something that I had

6    been saying and have said and would say to him.  So, the fact

7    that I was drinking alcohol doesn't change what my thoughts

8    were or how I felt about being discriminated against as a

9    woman in the statements I made.  That wouldn't change

10   anything.  I had been feeling that for some time, as I

11   testified to.

12   Q.   So, you wouldn't change anything about what you did,

13   just that you did it at a social event?

14   A.   I think, like I stated, that's not the optimal place to

15   have done that.

16   Q.   No, but my question is, you wouldn't have changed

17   anything that you did.  It was just that you did it at a

18   social event.  That's what you would have apologized --

19   A.   The statements that I made, no.  Why would I -- I

20   wouldn't want to change those.  That's how I felt and that's

21   what's true and that's what I've been feeling this whole time.

22   So --

23   Q.   How about your conduct?  Would you have changed how you

24   said it or the fact that you were drunk?

25   A.   I didn't say it in -- no, I wouldn't change my conduct.

1    I didn't do anything that was how you're characterizing it.

2    Q.   And, you know, you texted about apologizing.  You even

3    got John Towle's phone number, didn't you?

4    A.   I believe Joe Janezic sent it to me.

5    Q.   He sent it to you in a text, right?

6    A.   He sent it to me in a text, yes.

7    Q.   But you didn't use it?

8    A.   No.  I think I also said to Joe that I would rather talk

9    to Jack first.  As I testified, I was more comfortable talking

10   to Jack.

11   Q.   So, you didn't reach out --

12   A.   So, I was going to call Jack, as I already testified, to

13   speak to him and discuss, because I knew, like I stated, that

14   John was angry and upset and made those statements.  So, I was

15   going to speak to Jack about what he thought, being someone

16   that's a friend of mine, I thought, in the office and I could

17   talk to and someone that isn't chief of appeals and he would

18   have insight into that.

19   Q.   But when Jack said that he couldn't talk to you -- I

20   mean, he is legal counsel to the DA and was a witness to the

21   incident, right?

22   A.   Right.

23   Q.   So, when he said he couldn't talk to you, why didn't you

24   reach out to John Towle or send an email to the DA?

25   A.   Because at that point it was Sunday and I had already

1    received an email that I was meeting with the district

2    attorney on Monday morning.  So, I had gotten things together

3    and I thought that they would give me an opportunity to speak

4    at the meeting.  I didn't know that Dan was going to come in,

5    speak at me for 30 seconds and tell me I was fired.  I came in

6    with paperwork and notes because I thought the whole point of

7    having the meeting is that they're going to give me the

8    opportunity to actually speak.  So, on Sunday when Jack said

9    he would speak to me, I already knew the next morning I was

10   going to have the meeting.

11   Q.   Didn't Jack Janezic indicate to you that if you're going

12   to apologize to John Towle, you probably didn't need to talk

13   to Jack first and that's why he gave you the phone number?

14   A.   Yes, that's his opinion.  I felt more comfortable

15   speaking to Jack first.  That was my relationship.  I don't

16   have a relationship where I text John Towle and, obviously, I

17   didn't have his number.  Joe Zanini provided it to me.

18   Q.   And you didn't think it was prudent to send an apology?

19   Even though you wanted to apologize, you felt you should, you

20   didn't think it was prudent to do that over the weekend?

21   A.   I wouldn't have sent a text apology, no.  Like I stated,

22   after it was Sunday and Jack said he wasn't going to talk, I

23   felt like since it was the next morning at 8:30, that I

24   gathered all my things together so that I could go and

25   actually have a chance to speak, but I wasn't given that

1    opportunity.

2    Q.   Well, what about a phone call to John Towle?  Jack

3    Zanini gave you his number and you chose not to call him,

4    correct?

5    A.   Jack Zanini did not give me his number.

6    Q.   Excuse me.  Joe Janezic gave you his number in a text,

7    correct?

8    A.   Correct.

9    Q.   And you chose not to use it?

10   A.   Correct.

11   Q.   Now, the comparators that you mentioned in your first

12   meeting with Pat Haggan, you actually provided a list?

13   A.   I orally provided him a list, and he had a list -- I

14   think he had -- or, actually, I know he had paperwork in front

15   of him that he was looking at because --

16   Q.   Now, those are of the comparators that you've identified

17   for this case, correct?

18   A.   Yes.  I think it was six or eight or maybe seven or

19   eight, yes.

20   Q.   So, now you have eight; is that true?

21   A.   That I wrote down that morning?  Yes.

22   Q.   No.  You had six then or five then and now you have

23   eight?

24   A.   No.  The morning before -- like I just said, I testified

25   that I had put together paperwork, the exhibit I think we were

1    referencing, but I had written the emails with their salaries

2    and written at the top that these are the males that either

3    started with my class, started after me or had less

4    experience.  So, that's what I had with me on Monday,

5    September 22nd, 2014.

6    Q.   So, that list differs from the list that you've used in

7    this case; is that correct?

8    A.   No.  It's in the exhibit book that we discussed.

9    Q.   No, but in terms of the comparators that you've

10   identified in this case, it's different from the list that you

11   have that you listed to Pat Haggan; isn't that right?

12   A.   Oh, no.  I think Pat Haggan -- when I met with him, I

13   had given -- I was just saying it off the top of my head, the

14   males that I knew that I wasn't making as much, even though I

15   was either their year, they had less experience or were in the

16   office less time than me.  I think I gave -- I was just naming

17   them off to him and that he would -- like I said, I think

18   yesterday he made a comment --

19   Q.   So, I'm correct, right, that the list that you've

20   identified for this case is different from --

21   A.   I think there's a couple more, yes, because I was just

22   orally talking to Mr. Haggan during the March 10th meeting.

23   Q.   Now, you've I.D.'d -- for the purposes of this case,

24   you've I.D.'d eight comparators, correct?

25   A.   I believe so.

1    Q.   So, your claim is that these comparators are similarly

2    situated to you in every way; is that right?

3    A.   I don't know what you mean by "in every way."

4    Q.   Well, we talked about this before, that you knew what a

5    comparator means, that you're a lawyer, that you're familiar

6    with the law, and that a comparator would be somebody who is

7    male, who is similarly situated to you, correct?

8    A.   Similarly situated, yes.

9    Q.   Yes.  So, that would be somebody who is the same level

10   of seniority, has the same experience, performs the same

11   tasks, correct?

12          MR. CHURCHILL:  Your Honor, object just on the

13   grounds this is getting in the legal definition of

14   comparatory.

15          THE COURT:  True.

16          MS. PICCIRILLI:  This is testimony that we had --

17   that she said earlier, your Honor.  I just reiterating it to

18   try to get --

19          THE COURT:  Well, let's not reiterate.  Let's just

20   keep going.

21          MS. PICCIRILLI:  Okay.

22   Q.   And so, your claim is that you were paid less than

23   similarly-situated men because you're a woman; is that

24   correct?

25   A.   Correct.

1     Q.  And the list of men are David McGowan -- correct me if I

2    am wrong -- David McGowan, Patrick Devlin, Zachary Hillman,

3    Ben Megrian, Nick Brandt, Vince DeMore, Greg Henning, and Troy

4    Anderson; is that correct?

5    A.  If I could -- do you know what exhibit that was that I

6    looked at before?  If I could just reference that.

7    Q.  I actually don't, sorry.

8    A.  I think there might be one other, but I can't say unless

9    I look at --

10    Q.  But these are the comparators that you've listed for

11    this case?

12    A.  Yes, I believe -- like I stated, I think there might be

13    one more that was in the exhibit, but --

14    Q.  Well, if you think of it, let me know, but this is what

15    I have.  This is what we've been working off of from your

16    attorney.  Do you have any reason to think it's different?

17    A.  No.  Just saying if I could look at the exhibit where I

18    listed other people, then I can confirm.

19    Q.  That you listed out the people for Pat Haggan, that list

20    you're talking about?

21    A.  The list that I wrote out when I was preparing to meet

22    with the district attorney on September 22nd.

23    Q.  I'm sorry.  Unless your attorney --

24    A.  The one you were talking about --

25    Q.  Now --

1    A.   Oh, it's Exhibit C.

2    Q.   So that's a disputed exhibit?

3    A.   Okay.

4    Q.   Okay.

5    A.   So, I'm sorry --

6    Q.   I'm not going to direct you to disputed exhibit.  So,

7    your attorney can do that on --

8    A.   If you could just rename the people that you said, I

9    could answer your question.

10   Q.   I think I've done that.  We're going to move on.

11        Did you consider their work experience in the DA's

12   Office when you made the claim that they were comparators?

13   Did you consider the work experience of the comparators when

14   you made this claim?

15   A.   The work experience in the DA's Office?  Yes.

16   Q.   And do you believe that their work experience in the

17   DA's Office would be a high factor in determining whether

18   someone should receive a raise?

19   A.   Yes.

20   Q.   And do you believe that work experience in the DA's

21   Office would be a high factor in determining whether someone

22   should be promoted?

23   A.   Yes.

24   Q.   And you understand that promotions are typically tied

25   with raises, right?

1    A.   In superior court?

2    Q.   Promotions are typically tied to raises; is that your

3    belief?

4    A.   Are you saying in superior court or in the --

5    Q.   I'm just saying in general.  Typically, promotions --

6    people who get a promotion, typically get a raise?

7    A.   Typically, sure.

8    Q.   And do you believe that performance and ability would

9    also be factors in determining whether someone should receive

10   a raise?

11   A.   Yes, if that's an objective standard, yes.

12   Q.   Now, there are many different units at the DA's Office

13   at the superior court level; is that true?

14   A.   Correct.

15   Q.   I think you listed a few of them, but I think I have

16   them all here.  If I count them up, there are 13 different

17   units; is that correct?

18   A.   I don't know that off the top of my head.  I would have

19   to --

20   Q.   Let me tell you what I think they are and you tell me if

21   I missed any.

22   A.   Sure.

23   Q.   There's the Gang Unit --

24        THE COURT:  This is very -- this is a sort of turn-

25   around with counsel testifying and asking the witness if

1   that --

2          MS. PICCIRILLI:  Well, this is cross-examination,

3   your Honor.

4          THE COURT:  I know.  You go right ahead.

5   Q.   There are several units.  I'll list them off and please

6   tell me if I miss anything:  Gang Unit, Narcotics Unit,

7   Homicide Unit, Child Abuse Unit, Appellate Unit, Special

8   Prosecution, Senior Trial, Narcotics Integrity, Child

9   Protection Unit, Elder Abuse and Disability Unit, Major Felony

10  Unit, Domestic Violence Unit, and Juvenile; is that correct?

11  A.   Yes.

12  Q.   Can you think of any others that I missed?

13  A.   I think the Domestic Violence Unit is also Sexual

14  Assault.  I think it's a dual unit.

15  Q.   Now, each of those units at the DA's Office performed

16  specific functions and specific work, correct?

17  A.   Yes.

18  Q.   And, for example, members of the Gang Unit -- or ADA's

19  of the Gang Unit do not prosecute any homicides; is that a

20  fair statement?

21  A.   No.

22  Q.   That's not a fair statement?

23  A.   No.

24  Q.   When do they prosecute homicides?

25  A.   Matt Feeney is a prosecutor in the Gang Unit.

1          COURT REPORTER:  I'm sorry, I didn't hear you.

2     A.   Matt Feeney, he's an assistant district attorney in the

3     Gang Unit.  He's had homicides.  Joe Janezic has had

4     homicides.  Dan Mulhern has had homicide.  Since I've been

5     gone, I'm not sure, but there could be others, but I know that

6     Matt Feeney also had homicides when we were there.

7     Q.   So, certain members of the Gang Unit have tried homicide

8     cases; is that correct?

9     A.   I don't know if at that point he had tried one, but Joe

10    Janezic and Dan Mulhern had, yes.

11    Q.   Okay.  So, Joe Janezic and Dan Mulhern are in the Gang

12    Unit, but they tried homicide cases; is that fair to say?

13    A.   Yes, the chief of the unit and deputy chief, correct.

14    Q.   Now, you as a member of the Gang Unit never prosecuted a

15    homicide, did you?

16    A.   No.  I believe it was an armed assault to murder.

17    Q.   And you testified early on when you were talking to the

18    jury about how the superior court handles high-level cases and

19    more serious cases, you gave as an example murder cases,

20    correct?

21    A.   I don't think I ever testified to that.  I think -- I'm

22    not sure what you're talking about.  I think --

23    Q.   I think you said the superior court handles more serious

24    crime.

25    A.   Right.

1    Q.   And then you gave the example of murder --

2    A.   Oh, yes.

3    Q.   -- as being a more serious crime?

4    A.   Of course, yes.

5    Q.   Right.  And of the three or four trials that you handled

6    in 2013, none of those were murder cases, were they?

7    A.   No.

8    Q.   And in the three trials you handled in 2014, none of

9    those were murder trials, were they?

10   A.   No.  Just the armed assault to murder.

11   Q.   So, two members of the Gang Unit did try homicides while

12   they were in the Gang Unit, correct?

13   A.   The chief and the deputy chief, yes.

14   Q.   Now, David McGowan is a comparator that you've listed,

15   and you've alleged in this case that you were discriminated

16   against because you were not promoted at the same time as Dave

17   McGowan; is that a true statement?

18   A.   Is that what I alleged?  No.  I think I alleged that I

19   am not making -- there's a disparity in pay because of gender

20   as compared to him.

21   Q.   Well, as part of that discrimination claim, do you take

22   issue with the fact that three individuals from your hiring

23   class were promoted to the superior court before you and those

24   include David McGowan and Patrick Devlin?

25   A.   As part of my claim you mean or --

```
1    Q.   Yes.

2    A.   They were promoted before me and were making more money

3    than me, but my claim is that I am being treated differently

4    as compared to all these comparators because I am a woman and

5    they're male.

6    Q.   Well, do you think the date when Mr. McGowan was

7    promoted?

8    A.   I believe it was -- I don't know the exact date.  I

9    think it was 2011, or maybe '10.

10   Q.   You're not sure?

11   A.   No.

12   Q.   Okay.  And do you believe that you have as much

13   experience as he does?

14   A.   Yes.

15   Q.   Do you believe that you have performed the same tasks

16   and have the same abilities that they do, such as David

17   McGowan?

18   A.   I guess when you say, "perform the same tasks," what do

19   you mean in the context of being a prosecutor?

20   Q.   As an ADA did you perform the same tasks?

21   A.   Yes.

22   Q.   Now, how do you know that?  You didn't witness the day-

23   to-day experience of Mr. McGowan, did you?

24   A.   How I know that is Dave McGowan never was in district

25   court, which means that he had -- before being promoted to
```

1     superior court, he had never had an arraignment and made a

2     bail argument.  He had never had a motion to suppress and done

3     a motion to suppress.  He had never had a trial.  He had never

4     handled a plea.  He had never stood up in front of the

5     district court.  He had never handled a civilian witness'

6     testimony.  He had never handled a law enforcement officer's

7     testimony.  He had never dealt with victims who are either

8     cooperative or uncooperative.  So, I do know that he was never

9     in the district court whatsoever.  So, I think he went from

10    appeals directly to Major Felony Unit.  So, I would know that

11    he had not done that one time in the years between that he was

12    an assistant district attorney --

13    Q.   That's right.  Those are the things you did, right?

14    A.   -- and Major Felony Unit.

15    Q.   Those are the things you did in the district court,

16    correct?

17    A.   Everyone did in the district court, yes.

18    Q.   Right.  You just listed off the things that were done in

19    the district court?

20    A.   Correct.

21    Q.   And the reason he didn't do those was because he was in

22    appeals, right?

23    A.   No, because I -- well, you want --

24    Q.   Wasn't he in appeals?

25    A.   He was in appeals, but that doesn't mean he wouldn't be

1    able to go to district court and get that experience.

2        Q.   And he was in a different courthouse, wasn't he, from

3    you?

4        A.   When?

5        Q.   When he was in appeals and you were in district court.

6        A.   Oh, yes.

7        Q.   Yeah.  And you didn't witness his performance ever when

8    he was in the appeals court, did you?

9        A.   No.

10       Q.   And, Ms. Corda, did you know that Dave McGowan spent the

11   first four years of his career as an assistant district

12   attorney in appeals?

13       A.   Yes.

14       Q.   You never worked in appeals, correct?

15       A.   I didn't.

16       Q.   You never briefed or argued appellate cases, did you?

17       A.   No.

18       Q.   Did you know that Dave McGowan briefed and argued 39

19   appeals court cases?

20       A.   Now I do.

21       Q.   Did you know that Dave McGowan handled eight Supreme

22   Judicial Court cases, he argued before the highest court in

23   Massachusetts eight times?  Did you know that?

24       A.   No, but I think that would make sense if you're in

25   appeals.

1    Q.   You never argued before the Supreme Judicial Court, did

2    you?

3    A.   I did not.

4    Q.   You never argued an appellate case at all, right?

5    A.   No.

6    Q.   Did you know that Dave McGowan argued before the Supreme

7    Judicial Court, the highest court in Massachusetts, his second

8    day at the DA's Office because he had interned at DA's Office

9    before he started work and had worked on that case that went

10   to the Supreme Judicial Court?  Did you know that?

11             MR. CHURCHILL:  Objection.

12             THE COURT:  Sustained.

13             MS. PICCIRILLI:  Your Honor, the plaintiff is

14   alleging that he is a comparator and I'm showing the

15   distinctions between what they did.  This is a guy who argued

16   before the SJC the second day of his position as an assistant

17   district attorney.  It's a very different situation and I

18   think I need to show that to show --

19             THE COURT:  You have.

20             MS. PICCIRILLI:  -- the distinction.

21   Q.   Did you ever try a first degree murder case?

22   A.   No.

23   Q.   Did you know that Dave McGowan tried four first degree

24   murder cases second seating the Honorable Josh Wall?

25   A.   As a second seat.  I think I did know he did that as a

1    second seat.

2       Q.   I'm sorry?

3       A.   I think I did know he -- I think appeals unit, usually

4    second seats are not the primary person trying, yes.

5       Q.   And you never second sat on a murder case, did you?

6       A.   No, but I was asked to participate in a --

7       Q.   But you never second sat a murder case, right?

8       A.   -- homicide in the grand jury because it hadn't started

9    yet.

10      Q.   Did you ever second seat a murder case?

11      A.   No.

12      Q.   Did you know that Dave McGowan was on the homicide

13   response for 4-1/2 years?

14          MR. CHURCHILL:  Objection, your Honor.  Just seems

15   like David McGowan should be the one testifying about this,

16   not Ms. Corda.

17          THE COURT:  Is that the issue, whether these people

18   are proper comparators rather than whether she knows it?  I

19   mean, all you can get from this witness now -- all you get is

20   whether she did or did not know that, but the evidence has to

21   be whether they, in fact, are proper comparators or not.

22          MS. PICCIRILLI:  To establish that she saw didn't do

23   the things these comparators did, I'm asking if she knows what

24   they've done.  I can't just assume that she knows what they've

25   done and ask her if she's done it.  So, I'm just asking it

1    that way.  I can ask it a different way, your Honor.

2            THE COURT:  Well, I don't know.  This is getting

3    longer and longer and longer.

4            MS. PICCIRILLI:  I'll move on to the next comparator,

5    your Honor.

6    Q.   Zach Hillman is another of the eight comparators that

7    you've identified in this case, correct?

8    A.   Correct.

9    Q.   Now, you did graduate law school together, Suffolk; is

10   that correct?

11   A.   Correct.

12   Q.   And you were both in the September 2007 hiring class for

13   the DA's Office, correct?

14   A.   Correct.  And Dave McGowan as well.

15   Q.   But that's where the similarities end, isn't it?

16   A.   What do you mean by "similarities"?

17   Q.   Well, you became a line ADA in 2007, correct, in the

18   district court?

19   A.   Right.

20   Q.   And he went to appeals, similarly to Mr. McGowan?

21   A.   Right.

22   Q.   So, he was in the appeals in 2007 while you were in the

23   district court as a line ADA, correct?

24   A.   Yes.

25   Q.   And are you aware that in 2009 he prepared and filed 17

```
 1   appellate briefs?

 2           MR. CHURCHILL:  Objection, your Honor.

 3    Q.   And it had ten arguments in the appeals?

 4           THE COURT:  I just don't understand why hers

 5   awareness is an issue.

 6           MS. PICCIRILLI:  Because she's listed these male

 7   individuals as comparators.

 8           THE COURT:  But the question is not whether she knows

 9   it now, but whether, in fact, they are proper comparators.

10   So, I don't understand the questioning.  I mean, she has to

11   prove that when she says that the district attorney

12   discriminated against women, she has to show that there were

13   men who are different or the same and got more money.

14           MS. PICCIRILLI:  The same.

15           THE COURT:  So, what her awareness of that is not the

16   crucial issue, is it?  The crucial question is whether, in

17   fact, they are the same.

18           MS. PICCIRILLI:  Right.

19           THE COURT:  And they get more money.

20           MS. PICCIRILLI:  And what I'm establishing is that

21   he's doing different things from her.

22           THE COURT:  Well -- but, no, you're not.  You're not

23   establishing that he is doing different things from her.

24   You're establishing what her awareness of it is, which is not

25   the same thing.
```

1            MS. PICCIRILLI:  All right.  So, I can ask her if

2    she's just down these things.  I'll do it that way.

3    Q.   Did you ever argue -- well, I've asked you that.

4         You've already testified, haven't you, that you didn't

5    argue in the appeals court or try a murder case, correct?

6    A.   Correct.

7    Q.   And you didn't argue in the -- before the SJC, correct?

8    A.   Correct.

9    Q.   Okay.  And comparator Mr. Devlin, what is his first

10   name?

11   A.   Patrick.

12   Q.   Patrick Devlin.  You were hired at the same time as him

13   as well?

14   A.   Correct.

15   Q.   Is that correct?

16        But you were not hired to the same court; is that right?

17   A.   Correct.

18   Q.   He was hired to the Boston Municipal Court; is that

19   correct?

20   A.   Yes.  It's called the Boston Municipal Court Central

21   Division.

22   Q.   All right.  So, you did not witness his day-to-day

23   experiences either; is that fair to say?

24   A.   Correct.

25   Q.   And Mr. Devlin was eventually part of the Domestic

1   Violence and Sexual Assault Unit; is that true?

2   A.   Yes.

3   Q.   And you were never part of the Domestic Violence and

4   Sexual Assault Unit, were you?

5   A.   No.

6   Q.   Now, Mr. Anderson, what is his first name?

7   A.   Troy.

8   Q.   Troy Anderson was actually hired before you, wasn't he?

9   A.   He was, and I think he had a total of six -- three years

10  as the -- in the DA's Office when I was at, I think, seven.

11  Q.   So, he was hired in September of 2006; is that correct?

12  A.   I believe so.

13  Q.   He was hired as part of the 2006 class, whereas you were

14  part of the 2007 class; is that right?

15  A.   I believe so, yes.

16  Q.   So, he worked a full year before you were even hired; is

17  that true?

18  A.   Before I was hired.  I'm not sure before I started in

19  the class.  Yes, I would say so.

20  Q.   And then he was called into active military service; is

21  that correct?

22  A.   I believe so.

23  Q.   And he was absent from the office to fulfill his duty in

24  the armed services; is that true?

25  A.   Yes.

1    Q.   And you were never part of the military, correct?

2    A.   No.  I stayed in the DA's Office from September 24, 2007

3    up until I was fired.  I never left.

4    Q.   Do you know what Mr. Devlin did in the military in terms

5    of his service for the United States?

6    A.   Mr. Devlin was not in the military.

7    Q.   I'm sorry?

8    A.   Mr. Devlin was not in the military.

9    Q.   I'm sorry.  Mr. Anderson.  Excuse me.  Do you know what

10   he did in military?

11   A.   No.

12   Q.   Are you aware that he served as the intelligence advisor

13   rule of law advisor?

14        MR. CHURCHILL:  Objection.

15        THE COURT:  What does her awareness prove?

16        Members of the jury, let me explain that to you.  The

17   plaintiff claims that she was discriminated against in a --

18   particularly in pay and maybe responsibilities.

19        In order to prove that, she has to show that she was

20   treated differently from men and then what she has to show is

21   that the men and she did substantially the same thing, but

22   they got paid more, got advanced more, or whatever.  Those are

23   called the comparators.  She compares what happened to her

24   with what happened to them.

25        She has to prove that, in fact, they did the same

1    thing, but they got paid more, got better positions.  Whether

2    she was aware of that or not is not the issue at the moment.

3    The issue is whether, in fact, they did the same thing and got

4    higher pay, and what the government is trying -- I'm sorry --

5    what the district attorney is trying to show is that she was

6    aware of how they were different from her; whereas, in fact,

7    she has to disprove -- or she has to challenge any proof that

8    they are -- she's trying to show that they are different and

9    are not the same.  Whether she is aware of that is not exactly

10   relevant.  It's not at all relevant.  It is whether, in fact,

11   they are different and, therefore, you can't make the

12   comparison.  Do you understand?

13            JURORS:  (Nodding).

14            THE COURT:  That's why I'm objecting to, "Are you

15   aware that they are different," because it is the fact of

16   difference that has to be shown, not Ms. Corda's awareness of

17   the difference.

18   Q.  You did testify with regard to Mr. Anderson that you

19   were a DA for longer than he is and you feel that's why you

20   should be paid as much as him; is that correct?

21   A.  I don't think I testified to that.  I think I testified

22   that I was a prosecutor from September 24, 2007 until I was

23   fired.  So, I was a prosecutor the whole time, is what I said.

24   Q.  But is it also your testimony that he was a district

25   attorney for a lesser period of time and, therefore, you

1    should be paid more than he is and you're not because you're a

2    woman?

3      A.   I think what I said was that he had less than three

4    years experience when I was at seven.  So, if you're asking me

5    about that, then his experience level, obviously, as a

6    prosecutor is very different than my experience level.  Him

7    going on, you know, active duty, that's honorable and that's a

8    good thing, but I'm talking about in terms of being a

9    prosecutor.  So, he actually had less than half the years I

10   did, and I think you asked me initially if I think experience

11   and tasks are important.  Of course, that's important as being

12   judged as a prosecutor, not what you were doing in the middle.

13   I had worked seven years.  So, of course, I do have more

14   experience and did have more experiences just being a

15   prosecutor because of what I was doing.

16     Q.   Do you know whether or not his experience in the

17   military was in any way considered by the DA's Office when he

18   was placed upon his return?

19          THE COURT:  You know, you're going back to the same

20   thing of her awareness.

21          MS. PICCIRILLI:  But she's saying that her experience

22   as a DA is important.  His experience in the military is

23   important, and the issue is whether or not she knows that when

24   she made him a comparator.

25          THE COURT:  I don't know what her knowledge matters.

1   What matters is whether he, in fact, is different, that he was

2   getting more money because he had more experience, not

3   necessarily here, but there.

4          MS. PICCIRILLI:   Understood.

5   Q.   Now, you testified that with regard to Ben Megrian, that

6   he was promoted to superior court and that the DA met with

7   him.  Was that your testimony?

8   A.   I don't believe I testified to that, but his name is Ben

9   *Megrian*.

10  Q.   Megrian.  Didn't you testify that the DA had met with

11  certain male -- certain of the male comparators when they were

12  promoted to superior court, but that he did not meet with

13  several female --

14  A.   Right.  Actually -- so, he did meet with Ben Megrian

15  when he became the head of the Gun Unit as well as Eric

16  Bennett, but he did not meet with Amanda Cascione when she

17  became head of the Gun Unit, but I never testified that Ben

18  Megrian specifically met with the DA in superior court, but

19  now that you're saying that, he did meet with him when he

20  became the head of the Gun Unit as well as Eric Bennett, but

21  Amanda Cascione did not.

22  Q.   And just so I'm clear, did it upset you that the DA met

23  with certain people, but didn't meet with you?

24  A.   I think it shows that he would meet with male

25  counterparts.  For an example, the East Boston supervisors or

1    the gun court supervisors, he would meet with every male that

2    I described.  With the female counterparts with the exact same

3    position he did not meet with.

4       Q.   And it's your testimony that the DA, Dan Conley, did not

5    meet with you when you were promoted to district court to

6    superior court?

7       A.   Correct, he did not meet with me when I was promoted

8    from district court to major felony that time.  He did meet

9    with me when I was promoted from major felony to gang.

10      Q.   So, he did -- the DA, Dan Conley, did meet with you when

11   you were promoted from major felony to the Gang Unit?

12      A.   The second time.  He did not the first, correct.

13      Q.   So, it is the case that Dan Conley meets with women when

14   they're promoted when he's available, right?  He met with you.

15      A.   I can't speculate as to when he's available, as you're

16   asking me, but I'm telling you that he has met with a number

17   of male supervisors, as I just stated, and females in the

18   exact same position, never met with the female, but always has

19   met with the male in both East Boston as well as the Gun Unit,

20   and he has met -- there's a number of females that did not

21   meet with him when we were promoted to superior court.

22      Q.   But he met with at least one female when they were

23   promoted, and that's you, right?

24      A.   He did not meet with me when I was promoted to superior

25   court.  As I stated, he met after the fact from major to gang.

1    Q.   So, he met with one woman, you, when you were promoted

2    from major to gang, at least one, right, because he met with

3    you?

4    A.   One time, yes.

5    Q.   Now, Ben Megrian was the gun court supervisor; is that

6    correct?

7    A.   Ben Megrian, yes.

8    Q.   Megrian.  You were never in the gun court, were you?

9    A.   No.

10   Q.   And is he the gun court chief, now?

11   A.   No -- oh, you mean of -- no.  No, he's not.

12   Q.   Was he the gun court chief at one point?

13   A.   Yes.

14   Q.   And you were never the gun court chief, were you?

15   A.   No, I was not.

16   Q.   And Ben Megrian was at some point in the Narcotics Unit;

17   is that correct?

18   A.   Correct, and he requested to leave the narcotics and

19   come to the Gang Unit.

20   Q.   So, you were never in the Narcotics Unit, correct?

21   A.   No.

22   Q.   Is that correct?

23   A.   Correct, yes.

24   Q.   Nicholas Brandt was a supervisor of the Chelsea District

25   Court; is that correct?

1     A.   Yes.

2     Q.   And you were never a supervisor, were you?

3     A.   No, I did -- I was not supervisor.

4     Q.   And, again, he was promoted to narcotics and you were

5   never in narcotics, correct?

6     A.   I never went to narcotics.

7     Q.   Now, Greg Henning is another of the comparators.  He,

8   too, was hired a year before you in September of 2006; is that

9   correct?

10    A.   I believe so.

11    Q.   And so, he, too, was a full -- he was an ADA for a year

12  before you were hired in September of 2007?

13    A.   Before I started as a hire, yes.

14    Q.   And he, too, was in the gun court, which you were never

15  a part of, correct?

16    A.   No.  The gun court is a part of district court that I

17  was never a part of.

18    Q.   And he received the 2009 Suffolk Award.  What is the

19  Suffolk Award?

20    A.   I'm not aware if he did or didn't receive that.

21    Q.   What is the Suffolk Award?

22    A.   There are more than one awards.  The Suffolk Awards are

23  a ceremony, I guess, that's held once a year and awards are

24  given out, but there are -- I don't know -- maybe six or

25  seven.

1    Q.   And you never received a Suffolk Award, right?

2    A.   No.  I was nominated for -- I was getting prosecutor of

3    the year in district court, but I didn't receive it.

4    Q.   And Greg Henning, after receiving two Suffolk Awards,

5    was senior trial homicide.  You were never senior trial

6    homicide, were you?

7    A.   I don't believe -- he was not senior trial when I was

8    there.  I think you're talking after I got terminated.

9    Q.   You were ever senior trial?

10   A.   He was not before I was terminated.

11   Q.   But were you ever senior trial?

12   A.   No.

13   Q.   Vincent DeMore was in the Narcotics Integrity Conviction

14   Unit in 2012.  Were you ever in the Narcotics Integrity

15   Conviction Unit?

16   A.   No.  That was a specialized small unit that handled

17   cases because of Annie Dookhan's mistakes.  So, it was trying

18   to figure out what to do with the cases and whether they would

19   be overturned or not, and things like that.

20   Q.   He was responsible for assembling and managing the team

21   of ADA's that investigated and filed the appeal to cases

22   relating to Annie Dookhan?

23   A.   I think actually Paul Tresler was the head of that unit.

24   Q.   Well, he was in it, right?

25   A.   Yes, he was in it.

1    Q.   And you were not involved with anything relating to the

2    Annie Dookhan scandal, were you?

3    A.   I was already in the Gang Unit by then, yes.

4    Q.   So, you were never in that particular unit, the

5    Narcotics Integrity Conviction Unit, correct?

6    A.   No.   I think they put in people that were getting

7    promoted from district court.

8    Q.   My question was, were you in it?

9    A.   No, because I was already promoted.   They put people in

10   there that were getting promoted from district court to start

11   there first before they were promoted to other specialized

12   units.

13   Q.   Now, you are currently working; is that correct?

14   A.   Yes.

15   Q.   And you got the a job at the law firm Bretta & Grimaldi,

16   P.A.; is that correct?

17   A.   Correct.

18   Q.   You began working on November 24, 2014; is that correct?

19   A.   Yes.

20   Q.   And that was within two months of your termination from

21   the DA's Office, correct?

22   A.   I think it was two months and two days, but, yes.

23   Q.   Okay.   Because you were fired on September 22nd, 2014;

24   is that correct?

25   A.   Correct.

1    Q.   So, you are right, it would be two months and two days,

2    correct?

3    A.   Correct.

4    Q.   Now, your starting salary at Bretta & Grimaldi was

5    75,000 per year; is that correct?

6    A.   Yes.

7    Q.   And we've already looked at your welcome letter, Exhibit

8    36.  Can we pull that up, please?

9         And this indicates that your compensation will be

10   $75,000 per annum, payable biweekly for the full-time position

11   of an associate attorney.  Did I read that correctly?

12   A.   You did.

13   Q.   And it sets your start date will be Monday, November 24,

14   2014; is that correct?

15   A.   Correct.

16   Q.   Now, your salary when your job ended with the DA's

17   Office was $53,550 per year, correct?

18   A.   Yes.  It's not the salary I should have been making,

19   but, yes.

20   Q.   So, when you started with Bretta & Grimaldi, you

21   received $21,450 per year than you earned at the DA's Office,

22   correct?

23   A.   If that's the math, then, yes.

24   Q.   And you're making even more than that at this point at

25   Bretta & Grimaldi, correct?

1    A.   Right, I have received raises based on my performance

2    there.

3    Q.   You received -- you're earning $90,000 today; is that

4    correct?

5    A.   I think I got another raise because of my performance.

6    I think it's 95,000 now.

7    Q.   So, you're earning $95,000 now?

8    A.   Correct.

9    Q.   And so, that is $41,450 more than you were earning at

10   the DA's Office, correct?

11           THE COURT:  Well, it's two years later.

12           MS. PICCIRILLI:  Yep.

13   Q.   Is that correct?

14   A.   If that's the math.

15   Q.   And you started making -- correct me if I'm wrong.  Did

16   you start making as much as $90,000 in November of 2015?

17   A.   I'm not sure of the dates.  It could have been that

18   date.

19           MS. PICCIRILLI:  Just give me one second, your Honor.

20           (Pause.)

21   Q.   Now, when you applied to Bretta & Grimaldi, did you

22   apply to other places?

23   A.   Yes.

24   Q.   In fact, you applied to hundreds of places, didn't you?

25   A.   Yes.

1    Q.   But you got this job within two months of leaving the

2    DA's Office, two months and two days, correct?

3    A.   Correct.

4    Q.   Now, did you apply to any other district attorney's

5    offices?

6    A.   Yes.  I think I already testified to that, but I did

7    apply to the Middlesex District Attorney's Office and the

8    Norfolk District Attorney's Office, off the top of my head

9    right now.  I could have applied to more.

10   Q.   And I think your testimony was that you actually

11   interviewed with the Middlesex County DA's Office; is that

12   correct?

13   A.   I had a telephone interview with them, yes.

14   Q.   I'm sorry?

15   A.   I had a telephone interview with them, yes.

16   Q.   And did you wait to hear whether or not you got that job

17   before you accepted the job at Bretta & Grimaldi?

18   A.   The Middlesex District Attorney's Office never offered

19   me a job.

20   Q.   No.  My question was, did you wait to hear whether or

21   not you got the job before you accepted the job at Bretta &

22   Grimaldi?

23   A.   No.  I think the last thing that Middlesex said is they

24   weren't -- they didn't know when they would be even

25   considering.  So, no.

1    Q.   Ms. Corda, is it true that you got hired at Bretta &

2  Grimaldi before you heard back from the Middlesex DA's Office

3  and so --

4    A.   No.

5    Q.   So, it's not true that you got hired at Bretta &

6  Grimaldi before you heard back from the DA's Office?

7    A.   I think I was just saying.  So, who I spoke to I think

8  was Patricia Gould at the DA's Office.  After the email, I

9  followed up -- I mean, the phone call, I followed up and she

10  said that they couldn't tell me when they would even be

11  hiring.  So, that's what I heard back from them.

12    Q.   Do you remember being -- taking a deposition or giving a

13  deposition in this case?

14    A.   Yes, and I have --

15    Q.   Do you remember testifying under oath at my office -- I

16  think my brother, Aaron White, deposed you, a deposition?

17    A.   I never heard back about the job saying --

18    Q.   I'm asking you about your deposition now, Ms. Corda.  Do

19  you remember being deposed at my office?

20    A.   Yes.

21    Q.   And you recall swearing to tell the truth under oath,

22  right?

23    A.   I do.

24    Q.   And you were asked in that deposition, at Page 511 -- if

25  I could have you turn to that page.

1    A.   Which packet?

2         THE COURT:  The books that are --

3         THE WITNESS:  I know.  There are two, though.

4    Q.   It's the second day of deposition testimony and they're

5    consecutively numbered, the pages.  So, if you take that book,

6    it will be 511.

7    A.   511, yes.

8    Q.   Turning your attention to Line 20.  You were asked,

9    "What happened with the Middlesex DA?"  And what was your

10   response at Line 21 through 22?

11   A.   "I got hired at this place before.  So, I told them."

12   Q.   And then the next question was, "All right," at 23, "Was

13   there an opportunity to land a position with Middlesex DA?"

14   What was your response?

15   A.   Like I just testified, I had --

16   Q.   Read it, please.

17   A.   "I had not heard back.  I think I was talking to

18   Patricia Gould and she was saying that they would let me know

19   basically then I got this job."

20   Q.   So, they said they would let you know.  You didn't

21   testify to that just now, did you?

22   A.   No.  I think we turned over the email that we're talking

23   about, but she had written back and said they didn't know when

24   they were to hire, and I think at the end it said, I'll talk

25   to you at some point or I'll let you know, but that's what I

1    just said.

2      Q.   You testified at your deposition, "I had not heard

3    back," and that this Patricia Gould would let you know,

4    basically, correct?

5      A.   Right.

6             THE COURT:  Excuse me one minute.

7             Members of the jury, a deposition is a method of

8    interrogating a witness or a party before we come to trial.

9    The witness or the party is asked to come to a lawyer's

10   office.  A reporter is present, like Ms. Handel.  The witness

11   is sworn and questions are asked.  The only real difference is

12   there is no judge there to say you can or cannot have this

13   question, and it is then is transcribed and it may be used for

14   any number of different purposes at the trial.

15            At the moment, what Ms. Piccirilli is doing to trying

16   to establish that the witness gave different testimony at the

17   time of the deposition from the testimony that she's giving

18   here, and she's entitled to do that.

19            One of the things that you may take into account when

20   you come to judge the believability of the witnesses is

21   whether the witness gave consistent answers on an earlier

22   occasion and at the time of trial.

23            So, your job in that respect is really a two-step

24   job.  The first question is to determine whether, indeed, she

25   gave different testimony on two different occasions.  And if

1    so, the second job is for you to determine whether that

2    influences your determination of the believability of the

3    witness.  Is she telling the truth?

4           So, many things are not two-step, but this is a two-

5    step.  Is there inconsistency and if so, does that

6    inconsistency affect your judgment of the witness'

7    believability.  Okay?

8           JURORS:  (Nodding).

9           THE COURT:  You may proceed.

10   Q.   Did you wait for Patricia Gould to let you know whether

11   or not you got the job at the Middlesex District Attorney's

12   Office before you accepted the job with Bretta & Grimaldi?

13   Yes or no.

14   A.   No.

15   Q.   Now, you testified that being an ADA is your dream job,

16   right?

17   A.   Right.

18   Q.   You testified that you wanted to work as an assistant

19   district attorney, correct?

20   A.   Correct.

21   Q.   And, yet, you didn't wait to hear back from the

22   Middlesex DA's Office before you accepted the job at Bretta &

23   Grimaldi?

24   A.   Well, I think what I testified to was that there was an

25   email that I provided that said that she didn't know when that

1    was going to happen, if there was going to be hiring, at what

2    time, and I'm sure that she would let me know.  I'm sure I

3    said that at the bottom, something like that.

4         But I also had to tell her that I was terminated by Dan

5    Conley and the conversation.  If they had offered me the job,

6    would I have taken it?  Yes, if that's what you're asking, but

7    I was unemployed for two months and two days where I was at

8    home every day.  So, I thought I should take whatever job was

9    offered to me.

10   Q.  And she didn't tell you how long you would have to wait

11   or anything like that, did she?

12   A.  She never gave me any timetable.  She just said, you

13   know, in the email that --

14   Q.  So.  You just didn't wait, right?

15   A.  No, because I didn't know if I was going to get the job,

16   especially where I said that Dan Conley had terminated me.

17   So, no.

18   Q.  Have you followed up --

19   A.  If she had offered, I would have said yes.

20   Q.  Have you followed up with the Middlesex DA's Office to

21   find out whether or not there are any job opportunities for

22   you?

23   A.  Have I followed up with Middlesex?  No.

24   Q.  Now, I think you know this.  If you got a job, a state

25   job, whether it be ADA or any other state job, the pension

1    that you spoke of in your testimony would vest within three

2    years of being at that job, correct?

3      A.   Correct.

4      Q.   And you still have money in the pension fund with the

5    DA's Office, correct?

6      A.   Yes, because I thought I was going to be able to get the

7    job back initially.  So, I kept it in there.

8      Q.   Well, it's still in there today, right?

9      A.   Correct.

10     Q.   And you understand that if you took that money out of

11   the pension and invested it somewhere else, you potentially

12   would make more than one percent, which is, essentially, what

13   the pension fund yields, don't you?

14     A.   I don't have any retirement funds or anything like that.

15   So, I don't know the in's and out's of it.  I just kept it in

16   because, like I said, I thought there was a chance I could get

17   my job back initially, and then we have this going on.  So, I

18   don't know the in's and out's of what the percentage is or

19   what -- I don't have a 401(k) or any retirement plan with my

20   new job.

21     Q.   Do you know that if you were to take it out, you could

22   even buy back in?

23     A.   No.

24     Q.   In other words, you're not stuck having it in that

25   pension?

1    A.   No.

2    Q.  But you do know that you could work at any state job for

3    three years and that that pension would vest?

4    A.   I think so, yes.

5         THE COURT:  I think we need to suspend here until

6    tomorrow morning at 9:00.

7         Members of the jury, I am most appreciative for your

8    promptness today.  I look forward to the same tomorrow.

9         COURTROOM DEPUTY CLERK URSO:  All rise, please.

10        (Jury excused.)

11         THE COURT:  Court is in recess until tomorrow morning

12    at 9:00.

13         (Adjourned, 1:01 p.m.)

14

15                C E R T I F I C A T E

16         I, Catherine A. Handel, Official Court Reporter of the

17    United States District Court, do hereby certify that the

18    foregoing transcript, from Page 1 to Page 170, constitutes to the

19    best of my skill and ability a true and accurate transcription of

20    my stenotype notes taken in the matter of Civil Action No.

21    15-10628-RWZ, Christina Corda versus Suffolk County District

22    Attorney's Office.

23

24
       May 26, 2016       /s/Catherine A. Handel

25       Date               Catherine A. RPR-CM, CRR