UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS


CHRISTINA CORDA,                    )
                                    )
    Plaintiff,                      )
                                    )
                                    )     Civil Action
vs.                                 )     No. 15-10628-RWZ
                                    )
SUFFOLK COUNTY DISTRICT             )
ATTORNEY'S OFFICE,                  )
                                    )
    Defendant.                      )



**JURY TRIAL**
**DAY ONE**


BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE


UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
May 23, 2016
9:00 a.m.


*   *   *   *


CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
(617) 261-0555

APPEARANCES:

For the Plaintiff:


FAIR WORK, P.C.
By:  Stephen S. Churchill, Esq., and
     Hillary A. Schwab, Esq.
     192 South Street
     Suite 450
     Boston, MA 02111



For the Defendant:

BOYLE, SHAUGHNESSY & CAMPO, P.C.
By:  Aaron R. White, Esq., and
     Dawn M. Piccirilli, Esq.
     695 Atlantic Avenue
     11th Floor
     Boston, MA 02111

```
                          I N D E X

WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

CHRISTINA ELIZABETH CORDA

     By Mr. Churchill:       37
     By Ms. Piccirilli:              --
```

Plaintiff's Opening Statement
     By Ms. Schwab. . . . . . . . . . . . . . Page  7

Defendant's Opening Statement
     By Mr. White. . . . . . . . . . . . . . Page 18

```
1                    P R O C E E D I N G S

2              (The following proceedings were held in open court

3      before the Honorable Rya W. Zobel, United States District Judge,

4      United States District Court, District of Massachusetts, at the

5      John J. Moakley United States Courthouse, 1 Courthouse Way,

6      Boston, Massachusetts, on May 23, 2016.)

7                            *   *   *   *

8              (Jury impanelment in a separate volume.)

9                            *   *   *   *

10             THE COURT:  How long will your opening be?

11             MS. SCHWAB:  About 30 minutes.

12             THE COURT:  Really?

13             MR. SCHWAB:  Maybe shorter.

14             THE COURT:  Is the defendant opening now or later?

15     That is, after the plaintiff's opening or after the

16     plaintiff's evidence?

17             MR. WHITE:  After the plaintiff's opening.

18             THE COURT:  Okay.  How long will you be?

19             MR. WHITE:  25 to 30 minutes.

20             THE COURT:  The trial will proceed as follows:  Now

21     that we have a jury, which is the very first and one of the

22     most important things, counsel are allowed to address you to

23     tell you what the -- what the evidence they expect to -- the

24     evidence they expect to offer, and the purpose of that is both

25     to tell you about the case and also to allow you to put in
```

1    context the testimony of each the first witness.  If you

2    didn't know something about the case and the total picture of

3    the case, it would be very hard to understand what the first

4    witness is talking about.  So, that's the purpose of it.

5             Defense counsel have the option of either following

6    plaintiff's opening immediately or waiting until the plaintiff

7    has concluded her evidence in this case, and then addressing

8    you.  They've decided to go now.  So, each side expects to be

9    somewhere around 25 minutes or so, and the question for you

10   is:  Do you wish to have a brief recess to use the facilities,

11   and whatever, have a cup of coffee?  Do you want to just keep

12   going?

13            JURORS:  Okay.

14            THE COURT:  Ms. Urso will give you notebooks and a

15   pen.  I would ask you, please, to put on the outside of the

16   notebook your name and the seat number you're in, which you

17   now know.

18            COURTROOM DEPUTY CLERK URSO:  If you could just

19   please stand for a moment so I can just swear you in, please.

20   Could I, please, ask you to raise your right hand, please.

21            Do you and each of you do solemnly swear or affirm

22   that you will render a true verdict according to the evidence

23   and law given to you?

24            JURORS:  I do.

25            COURTROOM DEPUTY CLERK URSO:  Thank you.

1              THE COURT:  Please be seated.

2              Members of the jury, the notebooks are for you to

3    take notes of the witnesses or the evidence as you see it.  I

4    will ask you to leave them on your chairs in the evening.

5    When you retire to deliberate on your verdict, we will give

6    them back to you, and you should then use them to assist you

7    in recalling the evidence that you have heard over the trial.

8              I would caution you in one respect, however.

9    Sometimes when we take notes, we paraphrase, and it may just

10   be that somebody remembers something differently from what

11   somebody else wrote down, and I ask you not to just discard

12   what somebody remembers because it's different from what was

13   written down because it may be more accurate just because of

14   the paraphrasing when we take notes.

15             Now, we will -- who will start for the plaintiff?

16             MS. SCHWAB:  I will, your Honor.

17             THE COURT:  Okay.  Understand that this is counsel's

18   expectation of the evidence.  It is not yet the evidence.  You

19   should not base your verdict on what counsel tell you now or

20   later.  They will address you again at the end of the trial,

21   but listen carefully to what they have to say because it will

22   be helpful to you in following the evidence.  So, you may

23   proceed.

24             MS. SCHWAB:  Thank you, your Honor.

25             PLAINTIFF'S OPENING STATEMENT:

1          MS. SCHWAB:  Good morning, members of the jury.  My

2    name is Hillary Schwab and with my co-counsel, Steve

3    Churchill, it's our pleasure to represent the plaintiff in

4    this case, Christina Corda.

5          Until September 2014, Ms. Corda was an assistant

6    district attorney at the Suffolk County District Attorney's

7    Office.  Ms. Corda raised issues with her superiors about the

8    fact that she was being paid a lower salary than male

9    assistant DA's with similar experience, and her employment was

10   terminated at 8:30 a.m. on the next workday after she raised

11   those issues.

12         Ms. Corda brought this case challenging to the

13   Suffolk County DA's Office's practice of paying male assistant

14   DA's more than female assistant DA's and she's challenging her

15   termination when she complained about that practice.

16         Ms. Corda is bringing, essentially, two claims in

17   this case:  First, she asserts that the termination of her

18   employment violates the Massachusetts anti-retaliation law,

19   which provides that employees may not be punished for speaking

20   up about gender discrimination.  Second, she asserts that the

21   DA's Office did discriminate against her on the basis of

22   gender by paying her less than male assistant DA's doing

23   comparable work.

24         Ms. Corda always wanted to be a prosecutor.  She grew

25   up in Holliston, Massachusetts.  She was the first person in

1    her family to go to law school.  Ms. Corda entered Suffolk

2    University Law School in the fall of 2004 with one goal:  Earn

3    her law degree and a get a job as a prosecutor in a district

4    attorney's office.  During law school Ms. Corda tried to get

5    as much experience as she could working in the district

6    attorney's offices.  In addition to waitressing on the

7    weekend, she worked as a student attorney during law school at

8    both the Suffolk County DA's Office and the Middlesex County

9    DA's Office.

10          When Ms. Corda graduated from law school, she got her

11   dream job as an assistant district attorney at the Suffolk

12   County DA's Office.  She started working there out of law

13   school as an attorney in September of 2007.

14          Throughout the trial you're going to hear the names

15   of a few key people who run the Suffolk County DA's Office,

16   the executive staff, and most of those people will testify at

17   the trial.  So, I just want to run through a few of those

18   names with you.

19          First, Daniel Conley.  He's Suffolk County District

20   Attorney.  He runs the office.  He's the defendant in this

21   case.  Mr. Conley's second in command is Patrick Haggan, whose

22   title is First Assistant District Attorney.  The legal counsel

23   for the DA's Office, the person who represents the office in

24   legal matters, is Jack Zanini.  He's also chief of the appeals

25   division, and the Chief of Staff for the DA's office is John

1  Towle.  John Towle oversees the business operations of the

2  DA's Office.  The Suffolk County DA's Office has about 150

3  assistant district attorneys, which is the job that Ms. Corda

4  had there.

5      Now, like all new assistant district attorneys in

6  Suffolk County, Ms. Corda started in the district court

7  division.  She immediately started distinguishing herself and

8  she was soon selected to be a prosecutor for what was called

9  the Safe Neighborhood Initiative where she had greater

10  responsibilities and independence.

11      After four years of excellent work at district court,

12  Ms. Corda was promoted to the Major Felony Unit, a superior

13  court unit, in October 2011.

14      Less than a year later, in August 2012, Ms. Corda was

15  again promoted to the Gang Unit, which is one of the elite

16  units of the DA's Office.  Ms. Corda was exactly where she had

17  hoped to be at that point.  She was working on challenging

18  high-profile cases, winning difficult trials and earning the

19  reputation of a highly-talented prosecutor.

20      Though you'll likely hear the defendant's witnesses

21  attempt to downplay it during this trial, by all accounts, Ms.

22  Corda's work was excellent.  On numerous occasions in 2014,

23  for example, she received praise from her superiors for the

24  successes that she had earned in high-profile trials that

25  year.  Mr. Conley himself wrote an email to the office in

praise of Ms. Corda saying, "I couldn't be more pleased by the
preparation, skill and persuasive arguments of ADA Christina
Corda in convincing the jury to credit our understanding of
the facts and take a very dangerous man off the streets of our
city."

Now, I'd like to explain a little bit about how
salary increases work at the Suffolk County DA's Office.  As I
mentioned, all assistant district attorneys start at the
district court, and at the district court, they all have the
same salary and their raises are standardized based on the
number of years they've been there.

Then when assistant district attorneys are promoted
to superior court, they all start at superior court at the
same salary, and then at that point raises become very
discretionary and there is no clear standard for how raises
happen.

The DA himself, Mr. Conley, makes all final
compensation decisions and he does that on an individual basis
for each assistant district attorney.  There's no clear
standard for what factors are considered on who should get
raises and in which amounts, and the evidence the defendant
will submit on this is vague.

Mr. Conley claims he looks at things like job
performance, enthusiasm, character, but he doesn't make any
notes or records of the factors that he considered in a

1    particular way or the reason for the salary increase.  He just

2    keeps a final list at the end of what the numbers are.

3            You're going to hear some testimony during the trial

4    about the year-end rankings.  This was something that was

5    instituted about two to five years ago.  The DA's Office began

6    to require the units to prepare year-end reports, which

7    included a ranking of the assistant district attorneys.  These

8    rankings are supposedly one of the many factors that Mr.

9    Conley looked at in deciding raises.

10            You're going to hear, though, some unit chiefs,

11   including the chief of the Gang Unit, which was Ms. Corda's

12   unit, didn't feel comfortable ranking prosecutors and many of

13   them would just rank according to seniority and avoid merits

14   rankings all together.  You're also going to see during the

15   trial that there was very little correlation between these

16   rankings and people's raises.

17            Another thing you'll learn during the trial is that

18   everybody at the DA's Office has access to each other's

19   salaries in a way that you wouldn't with a private employer.

20   Because it's a public employer, salary information is publicly

21   available on the Internet and it was common knowledge in the

22   office that everybody looked at and knew about each other's

23   salaries.

24            Now, this system that I've just described of Mr.

25   Conley deciding assistant district attorney salary increases,

1   without any objective criteria, led to pay disparities and

2   specifically it led to pay disparities based on gender.  Ms.

3   Corda noticed these disparities and she began to speak to

4   management about it in March of 2014.

5        She met with Mr. Haggan, First Assistant District

6   Attorney, at that time about her salary.  In the meeting she

7   noted that there were a number of male assistant district

8   attorneys that were hired with or after her and were making

9   more money than she and that there was also a black colleague

10  of hers who was making a low salary -- lower salary than these

11  other individuals.

12       Mr. Haggan told Ms. Corda he would talk to Mr. Conley

13  and Mr. Towle about her concerns and get back to her.  Ms.

14  Corda didn't hear anything from Mr. Haggan and she followed up

15  with him several times during the course of next several

16  months.  Mr. Haggan's response was always the same.  He was

17  seeing what he could do.  He was very happy with Ms. Corda's

18  performance, but no promises on a raise.

19       Ms. Corda also spoke to others about this issue.

20  During the summer of 2014, for example, she told Mr. Zanini

21  that she believed she was being paid less than her male peers

22  because of gender discrimination.

23       The evidence is going to show that, in fact, Ms.

24  Corda did receive a lower salary than her male counterparts.

25  Several men with the same or less seniority as compared to Ms.

1   Corda were paid more than she was.  Those other assistant

2   district attorneys worked in similar units to Ms. Corda, had

3   been on the job for the same or fewer number of years, but

4   received several thousand dollars per year more than Ms.

5   Corda.  The only difference seemed to be their gender.

6          Now, the District Attorney's Office will likely argue

7   that these other assistant district attorneys were paid more

8   because they were in different units, the Narcotics Unit, the

9   Major Felony Unit, but that reasoning doesn't bear out.  Ms.

10  Corda was in the Gang Unit, which is widely regarded as one of

11  the most important units in the office.

12         Ms. Corda became increasingly frustrated by the run-

13  around she was getting about her salary as compared to the

14  men.  Her concerns just were not being addressed.  She

15  continued to do excellent work for the office and she received

16  praise from the highest levels, but, still, she was earning

17  less than men, even those with less experience than her.

18         So, on September 19th, 2014, she spoke about her

19  frustration in a conversation with Chief of Staff, John Towle.

20  It was a Friday night and many members of the office were at a

21  going-away party for an assistant district attorney at a bar

22  called The Fours.  People were drinking, as was common at the

23  Suffolk DA's Office.  As you're going to hear, the DA's Office

24  is a very intense work environment and people often like to

25  let off steam together after work or sometimes during the work

1    by having a few drinks.

2         At this party, after a few hours of the usual

3    drinking and socializing, Ms. Corda was at the bar with her

4    friend and colleague, Mr. Zanini, who, as I mentioned before,

5    is legal counsel for the DA's Office.  Mr. Towle was also at

6    the bar and the three of them began to talk.

7         Mr. Towle started the conversation out with a

8    compliment to Ms. Corda, saying something to the effect,

9    "You're one of the best lawyers in the office who I have never

10   had a conversation with.  I heard nothing but good things

11   about you."  This praise from Mr. Towle brought up the

12   frustration that Ms. Corda was feeling about her salary being

13   lower than that of her peers.  If she was doing such a great

14   job, why was she being paid thousands of dollars less than

15   men.

16        So, she stated to Mr. Towle first that there was a

17   more junior assistant district attorney who gotten a promotion

18   and a large pay raise after right hosting a fundraiser for the

19   DA, Mr. Conley.  She then stated to Mr. Towle that she

20   believed that she and a black colleague were not getting paid

21   as much as the others because she is a woman and he is black.

22   Mr. Towle asked her if she really believed that.  She said she

23   did.  Mr. Towle then put down his beer and walked out, end of

24   discussion.

25        You're going to go hear some slightly different

accounts of what was said during this conversation, but
everyone agrees that Ms. Corda raised the issue of her being
paid less than the male assistant district attorneys because
she was a woman and that Mr. Towle abruptly cut off the
conversation.

So, that was a Friday night.  Over the weekend, the
next morning, Mr. Conley was told about Ms. Corda's comments
and he became agitated.  This was the first time that he had
heard about any allegation of discrimination from Ms. Corda
and he was very upset about what Ms. Corda said.  This is
important.

The defendants going to try to make this about how
drunk people were, how things were said, but Mr. Conley
himself has repeatedly said that what upset him about this
incident was what Ms. Corda said, and what she said was that
she was complaining about gender discrimination.

Over the weekend Ms. Corda was told to report to Mr.
Conley's office at 8:30 a.m. on Monday morning.  Ms. Corda
went into that meeting and she was prepared to discuss
specifics about the men who were being paid more than she was.
She arrived Monday morning and was shown into an empty
conference room.

Mr. Haggan and another executive staff member arrived
and sat down.  Shortly after that, Mr. Conley came in.  He
commented that this was a bad way for him to have to start off

1    his week.  Mr. Conley stated to Ms. Corda that what she had

2    said on Friday was untrue and offensive.  He said he needed

3    people in his office with honesty and integrity and she hadn't

4    held up to that standard, and he told her that she was

5    terminated effective immediately.  After seven years of

6    service, Ms. Corda was terminated in a two-minute meeting and

7    then escorted out by security.

8          During the trial you're going to hear the defendant

9    try to backtrack from the real reason that Ms. Corda was

10   fired.  You'll hear the DA's executive staff try to blame it

11   on intoxication, on the use of profanity, both of which were

12   undisputedly very common at the DA's Office, but Mr. Conley's

13   words at this termination meeting were clear.  He fired Ms.

14   Corda for what she said, not how she said it.

15         You're also going to hear evidence about what Ms.

16   Corda lost by being terminated from the Suffolk County DA's

17   Office.  You'll hear, for example, how devastated Ms. Corda

18   was by her termination.  She wanted this job for years, had

19   worked so hard at it, and had had so many successes, and then

20   she was terminated in a two-minute meeting for speaking up

21   about gender discrimination.  She had lost her dream job.

22         The defendant will likely suggest that Ms. Corda does

23   not have any real damages in this case.  We expect the

24   evidence to show otherwise, and ultimately it's up to you, the

25   jury, to decide that, not the defendant.

1          So, that's what you're going to hear over the course

2     of the next week.  It may get a little confusing at times

3     because you don't always hear all the evidence in a linear

4     way.  Each witness is going to give you some pieces of the

5     puzzle and at the end, you'll fit all those pieces of the

6     puzzle together.

7          When you're listening to the evidence and hearing

8     those pieces of the puzzle and trying to fit them together, I

9     ask you to keep in mind the simple straightforward facts in

10    this case.

11         Ms. Corda was paid less than comparable male

12    assistant district attorneys.  Ms. Corda challenged that

13    gender discrimination and asked her supervisor to remedy it.

14    When, after months of her efforts it became clear that they

15    just weren't going to do anything about it, Ms. Corda told the

16    Chief of Staff exactly what she thought, that she was being

17    paid less because she was a woman and that's why she was

18    fired.  It's as simple as that.  Thank you.

19         THE COURT:  Members of the jury, before we hear the

20    next, let us stretch.

21         (Stretch break.)

22         MR. WHITE:  Your Honor, may I see you at sidebar?

23         THE COURT:  What for?

24         MR. WHITE:  I would like to raise to objections to

25    some statements that --

```
1              THE COURT:  After you finish.

2              MR. WHITE:  Thank you.

3              THE COURT:  All right.  You may proceed.

4              MR. WHITE:  Thank you, your Honor.

5              DEFENDANT'S OPENING STATEMENT:

6              MR. WHITE:  Good morning, ladies and gentlemen of the

7    jury.  I, together with my client, the District Attorney for

8    the great county of Suffolk, Massachusetts, thank you for your

9    service.  We understand that --

10             THE COURT:  Excuse me, Mr. White.  Can you keep your

11   voice up, please.

12             MR. WHITE:  I sure can, your Honor.

13             THE COURT:  Thank you very much.

14             MR. WHITE:  I have a tendency to yell and I didn't

15   want to do that.

16             Ladies and gentlemen, this is a very serious case.

17   You've just heard allegations that the Suffolk County District

18   Attorney's Office first discriminated against the plaintiff

19   and then retaliated against the plaintiff when she raised her

20   complaints of discrimination.

21             While, it's a serious case, ladies and gentlemen,

22   it's not a complicated case.  It's not complicated.  There's

23   one theme that you'll hear throughout the case, which

24   ostensibly, ladies and gentlemen, is undisputed.

25             The evidence will demonstrate that on September 19th,
```

1    2014, the plaintiff, sitting in the front row, went to a

2    going-away party at The Fours Restaurant over near the TD

3    Garden.  She engaged in a night of drinking.  She approached

4    the Chief of Staff, a gentleman by the name of John Towle, who

5    runs the business side of the Suffolk County District

6    Attorney's Office, who she had little or no prior interaction

7    with throughout the office.

8         She also approached Jack Zanini, who is a gentleman

9    you'll hear from, who is the Chief of Appeals of the Suffolk

10   County District Attorney's Office as well as legal counsel to

11   the Suffolk County District Attorney and entered into a

12   profanity-laced, hostile, aggressive, demeaning tirade,

13   questioning her salary, but also questioning the salary of a

14   female colleague.  In doing so, show questioned whether or not

15   that female colleague was being compensated the way that she

16   was because she participated in Mr. Conley's mayoral campaign.

17        Now, when evaluating the evidence, I'll ask you to

18   consider several things:  Whether the plaintiff's actions,

19   statements and false allegations were reasonable, and whether

20   the statements were made at an appropriate time, place and

21   manner.

22        Ladies and gentlemen, we just heard a presentation

23   from counsel, but no matter how plaintiffs attempts to spin

24   the evidence here, I'm confident, ladies and gentlemen, that

25   you'll understand that the reason why we're here is because

1   the plaintiff lost control of herself.  She had a dream job.

2   She wanted to be a district attorney, and she lost control of

3   herself that night and was unable to keep the stature that the

4   District Attorney thought that all ADA's should have.  She was

5   irresponsible.  You'll hear that, ladies and gentlemen, in the

6   evidence.  You'll hear that she lacked judgment in the

7   statements that she made.  You'll hear that, ladies and

8   gentlemen.

9           We're here because the plaintiff cannot accept

10  responsibility for her actions.  I'll be surprised to hear if

11  the plaintiff gets up to the stand and tells you that she now

12  is claiming responsibility for her actions.  She's never done

13  that.  Instead, ladies and gentlemen, she fired this lawsuit

14  -- or filed this lawsuit and says that she was terminated

15  because she raised complaints of gender discrimination.  She's

16  trying to shift responsibility, ladies and gentlemen, and it's

17  your duty to view the evidence and to figure out whether she

18  should be permitted to do that.

19          As with all stories, there's another side of the

20  story.  Before you know the other side of the story, I'd like

21  you to know a little bit more about the legal framework with

22  which we're talking and which at the end of the case you'll

23  have to consider before you decide the case.

24          The plaintiff claims that my client, the Suffolk

25  County District Attorney's Office -- and we represent the

1    office, not the District Attorney individually.  He's not a

2    defendant in this suit.  It's just the office who was her

3    employer, but that the office violated General Law Chapter

4    151B in discriminating against her in her pay.

5            The plaintiff next claims -- or the plaintiff will

6    have to prove, though, ladies and gentlemen, that that

7    discrimination was because of an intent to discriminate.

8    Ladies and gentlemen, I'll submit to you the evidence will

9    demonstrate that there was never an intent and, in fact, never

10   discrimination in the plaintiff's pay.

11           I expect, ladies and gentlemen, that you'll hear this

12   concept that's called similarly situated and when you're

13   evaluating whether or not the plaintiff's pay was fair and

14   whether or not it was reasonable and equitable when compared

15   with males and females, you'll have to look at this concept of

16   similarly situated.  The Judge will instruct you on that later

17   on.

18           The next legal claim is retaliation claim.  Ladies

19   and gentlemen, the evidence will demonstrate in this case that

20   the plaintiff's motivation was her dissatisfaction with her

21   salary compared to a female.  She also raises dissatisfaction

22   with males, but it's the female that she continued to raise

23   this dissatisfaction with.  The female, you'll hear from her,

24   she'll testify, was an ADA in the office and recently left.

25   She'll testify that Ms. Corda was never her friend.  Never

1   nice to her.  They worked together.  Never supported her.

2   You'll hear testimony from that individual in this Court.

3   That's the dissatisfaction, ladies and gentlemen.

4           You heard about a meeting with Mr. Haggan.  Ms. Corda

5   met with Mr. Haggan.  She reported her salary -- that she

6   believed her salary was low.  The first thing she said to Mr.

7   Haggan was, Ms. Kofol is two and a half years, three years my

8   junior.  She's earning $500 less than me.  Why is that?

9           There's also two other claims that the plaintiff

10  makes and that is that my client violated what's called the

11  Massachusetts and the federal equal pay acts, and that simply

12  is that the plaintiff claims that she was paid less as a woman

13  than male comparators, but plaintiff's counsel didn't spend

14  much time on comparators, but in order for you to determine

15  the -- whether or not there are individuals who are

16  comparators, you've going to have look at evidence about the

17  skill, the effort, the responsibility, the performance, and

18  the experience of those male -- male ADA's that Ms. Corda

19  compares herself to.

20          To understand how the plaintiff was paid, I'll

21  provide you a little bit of background about the office

22  structure.  The District Attorney was elected -- or appointed

23  first in 2002.  He's been the leader of the District

24  Attorney's Office for better part of 14 years.  He's hired 324

25  assistant district attorneys since that time, a majority of

1   which have been female.

2          In 2007 the plaintiff entered as an ADA in the office

3   with 26 other individuals.  At the time of her termination,

4   there was only ten people from her class left.  As we stand

5   here today, there's only two.

6          You also have to gain an understanding -- and you'll

7   hear this in the evidence -- ladies and gentlemen, about

8   fiscal constraints and budgetary issues that impact the

9   office.  It's probably well-known within your personal

10  knowledge that the period of 2008 to 2011, there were

11  hardships in the financial economy, in the markets.  Many of

12  the divisions of the Commonwealth and many of the public

13  agencies suffered from budget cuts, suffered from flat or

14  underfunding.  That impacted the way that the District

15  Attorney's Office was able to pay the assistant district

16  attorneys in the office.  In fact, the plaintiff went through

17  a period of three years where she didn't receive a raise, just

18  like all of the other people in the office that didn't receive

19  a raise during that period, except for those who received

20  promotions, and there were people that received promotions

21  during that period.  The plaintiff was not one of them.

22         You'll also have to understand hiring and how people

23  are hired within the office.  There will be evidence presented

24  about the hiring process from the chief of the district

25  courts, Christina Miller.  She'll tell you about how the

1    plaintiff was hired, how others are hired.  You'll hear that

2    all of the individuals -- all the ADA's are at will employees,

3    and that's set by the statute, the statute known as General

4    Law Chapter 12, Section 16, which authorizes the district

5    attorney to hire and fire at will based on the needs of the

6    office so long as it's not for discriminatory purpose.

7              You'll hear about the plaintiff's position in the

8    office, and you'll also hear that the plaintiff was considered

9    a good prosecutor.  Counsel alluded to that in her opening

10   statement.

11             But you'll hear that the plaintiff's skill, duties,

12   responsibilities, performance and experience in the office was

13   different.  It was different than almost everybody in the

14   office.  In fact, there's only one person that she truly

15   compares to.  That's an individual who at the time of her

16   termination had worked in the Dorchester District Court with

17   her, had worked in the Major Felony Unit with her, promoted at

18   the same time and had been promoted to the Gang Unit at the

19   same time.  All the other individuals that you'll hear

20   evidence about, ladies and gentlemen, didn't have that career

21   track.  They had variances in their career track, working in

22   different units, having different responsibilities.  Some

23   argued in front of the Supreme Judicial Court of the

24   Commonwealth, some held leadership positions, supervisory

25   positions, some work worked in specialized courts.  They all

had different skills, duties, responsibilities, performance
and experience from the plaintiff.

Now, you'll also hear that when ADA's become
employees, they take an oath of office.  The oath of office is
important.  ADA's are public officials.  When they take the
oath of office, they indicate that they'll agree to stand in
the shoes of the district attorney throughout the courts of
Suffolk County.  And they're also told when they're hired --
and this hiring happens at an in-person meeting with the
district attorney -- that they're public officials and that
they're to hold themselves out as public officials at all
times.

During that meeting you'll hear that Attorney Conley
stresses that individuals -- the ADA's need to show respect,
respect for litigants, to victims, to one another.  They need
to show civility.  They need to demonstrate control,
integrity, respect, judgment, all things that you need to have
when you're a district attorney in the Suffolk County District
Attorney's Office.

I'm halfway through, ladies and gentlemen.  I'm sure
you're asking, Why are we here?  We're here because there was
a complaint, a complaint made by the plaintiff in 2014 about a
new raise that she received.  She received the raise in
January 2014.  Her salary was $52,000 and it was raised to
approximately two percent to $53,550.

1          You'll hear about factors that led to the evaluation

2     which led to her raise.  You'll hear that her individual

3     performance at the time was considered.  Her experience at the

4     time was considered.  The complexity of the cases she had

5     handled up to that point in time was considered.  Her skills

6     up to that point in time were considered.  You'll also hear

7     that the success of the unit she worked in was a factor.  In

8     fact, ladies and gentlemen, I expect you'll hear that the

9     individuals in her unit received the same or very close to the

10    same percentage of raise as Ms. Corda did.

11         The plaintiff wasn't satisfied with that.  So, she

12    spoke with or got in touch with the Deputy Assistant and

13    that's a gentleman by the name of Patrick Haggan, and when she

14    met with Patrick Haggan, as I alluded to earlier, she

15    complained about Darcy Kofol.  She complained about this

16    individual, Darcy Kofol, a female.  She also complained about

17    males.

18         What she never said was, I think that my salary is

19    where it is because of my gender.  She said the individuals

20    started before or started after me and that I have the same

21    experience and I should be earning the same amount of money.

22    She never said that this is a gender claim.  She never said

23    that I'm being discriminated against.  That never came up.

24         Now, Attorney Haggan, who you'll hear from, followed

25    up with her the complaints.  He looked at the list of

1    individuals that are -- were in the 2007 and 2008 classes to

2    see if there was anything to what the plaintiff was saying,

3    and the evidence will show that he didn't find anything.   In

4    fact, he found many females in the 2007-2008 class and many

5    males that were earning more than the plaintiff, and you'll

6    hear evidence, ladies and gentlemen, that that was so because

7    they all had different skill, different experiences.   They had

8    different performance levels and performed different functions

9    for the office.

10            Now, counsel here didn't spend much time on the real

11   issue why we're here.   I told you about the theme earlier.

12   The theme is this party that happened on September 19, 2014.

13   It was a going-away party for an individual by the name of

14   Christine Walsh, who you may hear from as a witness.   She

15   operated in the Gang Unit with Ms. Corda as a female ADA.

16            There was a party that was organized by the Gang

17   Unit, including Ms. Corda, at The Fours Restaurant over by the

18   TD North, and the plaintiff admits, ladies and gentlemen, to

19   drinking six drinks in three hours.   She drank three vodka

20   sodas, two pumpkin beers, and at least one shot of tequila.

21   You'll see in the evidence, ladies and gentlemen, Ms. Corda's

22   tab.   The timing of those drinks was 6:07 p.m. to 9:21 p.m.

23   It's quite clear.   It's right there on the tab.

24            I'll expect you'll hear testimony from the Deputy

25   Chief of the Homicide Unit, Mark Lee.   Mr. Lee is going to

1    testify, ladies and gentlemen, that he interacted with Ms.

2    Corda throughout the evening, that when he interacted with

3    her, he noticed that she was escalating.  She was becoming

4    verbose.  She was also becoming significantly intoxicated.

5    She was complaining amongst her friends in circles about her

6    salary, becoming louder and louder.

7         You'll hear testimony from Mr. Lee that he was

8    curious about why that was happening and whether or not she

9    should be saying things like that in a public place, in

10   earshot of people that could hear it.

11        After becoming significantly intoxicated and

12   boisterous at approximately 9:30 a.m. -- excuse me -- p.m.,

13   Ms. Corda was at the bar, at The Fours.  Mr. Lee was to her

14   left.  Mr. John Towle was to his left and Mr. Jack Zanini was

15   to his left, four in a row.

16        The plaintiff knocks over a drink on the bar.  That's

17   the evidence you'll hear.  Mr. Lee turns to Mr. Towle and

18   introduces them.  Mr. Towle states to the plaintiff -- you'll

19   hear this -- that she's one of the better ADA's in the office

20   that he's never had the chance to communicate with or meet.

21   The plaintiff looks at him with a blank stare.  That will be

22   the testimony you hear.

23        Seconds later, after Mr. Towle has turned back to his

24   conversation with Mr. Zanini, the plaintiff steps around Mr.

25   Towle, gets in his face, and enters into a hostile, profane

1   rant about her salary and the salary of Darcy Kofol.

2          She indicated to Mr. Towle and Mr. Zanini that she

3   believed Mrs. -- Ms. Kofol was being paid because she had

4   participated in the District Attorney's mayoral campaign back

5   in 2013.  The evidence, ladies and gentlemen, will show you as

6   we move on through the evidence, that that claim is a

7   fictitious claim and there's no facts to support it.

8          The plaintiff didn't care.  She continued in her

9   rant.  She was swearing.  She was hostile.  She was

10  aggressive, right in Mr. Towle's face the whole time.  You'll

11  hear from Mr. Zanini and Mr. Towle who confirm that.  You'll

12  hear that she continued to press.  You'll hear that during the

13  time, Mr. Towle asked her to stop, tried to calm her down.  We

14  should talk about this at a different time.  You'll hear that

15  in the evidence.  You'll hear that Mr. Zanini took the step to

16  reach out and put his hand between her and Mr. Towle to try to

17  get her to stop and she wouldn't.  She continued to rant.  She

18  continued to swear.  She continued to raise these allegations.

19         Only at the end of the conversation, the evidence

20  will show, ladies and gentlemen, the plaintiff stated to Mr.

21  Towle, You're paying me and my colleague less because I'm a

22  woman and he is of a different race.  To that Mr. Towle, the

23  evidence will show, responded, "So, are you alleging racial

24  discrimination and gender discrimination?"

25         The plaintiff said -- instead of saying, Yes, and I

1    can prove it, she said, Yes, I can prove it.  Darcy Kofol

2    participated in the campaign and that's why she's earning

3    money.

4         Now, it doesn't make sense.  She's alleging

5    discrimination and then she goes back to the female who she's

6    been explaining about for six months.

7         You'll hear testimony from Attorney Zanini.  He'll

8    testify the plaintiff's conduct and her statements were

9    outrageous, hostile, aggressive.  She used multiple

10   profanities and she failed to heed the request to stop and

11   request to talk about on Monday.  If she had a legitimate

12   complaint, let's talk about it on Monday.

13        Now, you'll hear about the plaintiff's recollection

14   of the events, ladies and gentlemen, and I'll ask that you pay

15   attention intently to what the plaintiff recalls and doesn't

16   recall.

17        What we do know in the evidence, ladies and gentlemen

18   -- and you'll hear this -- is that the next morning, the very

19   next morning, the plaintiff started to reach out to her

20   friends, her friends that are colleagues in the office.

21        You'll see a piece of evidence where the plaintiff

22   admitted in writing, ladies and gentlemen, that she told off

23   Mr. Towle, told off Mr. Towle.  That doesn't sound like what

24   we just heard from counsel here.  That she blacked out, ladies

25   and gentlemen.  It's right there in writing.  You'll see it.

1  And that she can't recall the statements she made to the

2  district attorney.

3          Over the weekend, ladies and gentlemen, you'll hear

4  evidence that the plaintiff spent the weekend worried about

5  her state of employment.  You'll hear that.  It's written.

6  You'll hear that she thought she might be fired for what she

7  did.  You'll also hear evidence that she thought she may be

8  fired because she attacked integrity of the District

9  Attorney's Office.

10         You'll also evidence that throughout the course of

11 the weekend, she was communicating with her friends, trying to

12 figure out a way to apologize.  In fact, you'll hear testimony

13 from Joe Janezic, who was the Chief of the Gang Unit, the

14 chief of the unit she worked in.  She reached out to him early

15 on Saturday and communicated with him over the weekend.

16         You'll learn this from Mr. Janezic.  He recommended

17 the plaintiff apologize.  You'll also learn this, that he

18 indicated that the plaintiff -- or that Mr. Towle is a

19 reasonable individual and she should apologize.  He also went

20 so far as to provide the plaintiff with Mr. Towle's phone

21 number so that she could contact him and apologize.

22         But, ladies and gentlemen, that never happened.  The

23 plaintiff never reached out to the District Attorney, never

24 reached out to the First Assistant, never reached out to Mr.

25 Towle.  She reached out to Mr. Zanini, who was a witness to

1    the incident, and Mr. Zanini, rightfully so, said, I can't

2    talk to you about it.

3         On Monday, the 22nd -- September 22nd, 2014, the

4    District Attorney requested that the plaintiff come to his

5    office for a meeting.  Before that meeting the District

6    Attorney met with Mr. Haggan and Mr. John Pappas, the chief

7    trial counsel, to discuss what had occurred at The Fours the

8    night before.

9         Mr. Zanini and Mr. Towle were present.  Mr. Towle and

10   Mr. Zanini described the same thing that I described to you to

11   the District Attorney.  The plaintiff was outrageous.  She was

12   offensive.  She was profane.  She was demeaning to not only

13   her colleague, but to Mr. Towle.  She was hostile, aggressive.

14   Statements she made were untrue and she directly questioned

15   the integrity of the DA's Office in making the political

16   statements that she made.  In addition, they described that

17   she was unprofessional and insubordinate.

18        The DA, you'll hear, ladies and gentlemen, weighed

19   his options, what could he do with this DA who took this oath

20   of office to stand in his shoes and now demonstrated this kind

21   of conduct.  After consulting with Mr. Pappas and after

22   consulting with Mr. Haggan, the decision was made to terminate

23   the plaintiff.

24        Ladies and gentlemen, the plaintiff expects to

25   demonstrate that her termination was as a result of the

1   statements that she made, ladies and gentlemen.  I'm certain

2   that after you hear all of the evidence, that you'll agree

3   with me that she was terminated because of her conduct.

4          Now, I talked about comparators earlier, ladies and

5   gentlemen.  There's eight that the plaintiff has identified.

6   These are male individuals who she believes she had the same

7   skill, experience, performance, and you'll hear a lot about

8   those individuals, but, ladies and gentlemen, the evidence

9   will lead you to the conclusion that -- I'm sure, that she was

10  not similarly situated in skill, performance, experience,

11  qualification or seniority, and that's important.

12         Ladies and gentlemen, counsel touched a little bit on

13  damages in this case.  The plaintiff claims that she was

14  damaged as a result of this, and you'll be asked at the end of

15  the case whether or not she was.  You'll hear evidence that

16  the plaintiff contends that she lost rights to a pension that

17  she may have received if she served enough time with the DA's

18  Office.  She was only there seven years.  She hadn't been

19  there ten.  So, she hadn't yet vested.

20         Ladies and gentlemen, you'll hear that the plaintiff

21  within two months after being terminated gained employment

22  with a private firm and she gained employment earning $22,000

23  more than she was at the DA's Office two months time after she

24  was terminated.  As we stand here today, the plaintiff is

25  earning $37,000 more than she earned at the DA's Office.

1          You'll also hear evidence, I expect, from the

2     plaintiff that she has emotional distress.  Counsel alluded to

3     it.  I feel certainly, ladies and gentlemen, that the evidence

4     will show that the plaintiff has not sustained any damages in

5     this case.

6          In fact, ladies and gentlemen, the pension that we're

7     talking about is still available to her.  Her money is still

8     parked in the pension fund.  All she have needs to do is go

9     back and earn three more years of employment and she'll earn

10    those pension benefits that she says that she lost.

11         Now, ladies and gentlemen, as you view all the

12    evidence, everything that I've just said, one thing that you

13    need to focus on is credibility.  In evaluating the

14    credibility of the witnesses, I want you to look at the

15    statements of the individuals.  I want you to compare that

16    evidence -- or those statements with the evidence that you're

17    shown, and then I went you to think about the truthfulness of

18    the statements.

19         We believe, ladies and gentlemen, that you'll hear

20    evidence in this case that question whether or not the

21    plaintiff is being honest about her statements about -- on the

22    night in question, whether or not she's being honest about her

23    statements about the night in question, and whether she's

24    provided conflicting statements in sworn testimony.

25         You have important decisions to make, ladies and

1    gentlemen.  You'll hear emotional testimony, I'm certain of

2    that.  I'd ask that you keep an open mind.  It's very

3    important for these cases.  I expect you'll make intelligent

4    and informed decisions, but as you do make those decisions,

5    I'm going to ask that you keep the following -- keep the

6    following concepts in your mind:

7            First, responsibility.  Who is responsible?  Who can

8    take responsibility for the plaintiff's actions and the

9    plaintiff's termination?  Control.  Who was in control of the

10   plaintiff's actions which led to her termination?

11   Accountability.  Ladies and gentlemen, who is accountable for

12   the plaintiff's actions?  If not her, then who?

13           Ladies and gentlemen, I'm certain after you hear all

14   of the evidence in this case, that you'll find that the answer

15   to each one of these questions is the plaintiff.

16           Thank you for your time and your service.

17           THE COURT:  We stretch.

18           (Stretch break.)

19           THE COURT:  Plaintiff -- I don't know who is going to

20   do this -- call your first witness, please.

21           MR. CHURCHILL:  Ms. Corda.

22           THE COURT:  Ms. Corda, step into the witness box,

23   which is over here, please.

24           MR. WHITE:  Your Honor, may we see you on objections,

25   very briefly?

1          THE COURT:  Yes.  Okay.  Excuse me one moment.  May I

2    see counsel.

3     **AT SIDEBAR:**

4          THE COURT:  I neglected to mention that we will not

5    have any sidebar conferences.

6          MR. WHITE:  I understand, your Honor.  I didn't want

7    to do this in front of the jury and I didn't want to interrupt

8    counsel's statements, but two things that were said.  One,

9    that Dan Conley is the party of interest in this case.

10   Clearly, he's not.  So, I would like to ask that you inform

11   the jury that that's, in fact, who the defendant is, the

12   office.

13         And the second is, we discussed earlier this culture

14   of drinking issue.  Counsel brought up that the evidence will

15   show twice during her statement that there will be evidence of

16   culture of drinking in the office and I thought we had

17   already --

18         THE COURT:  Okay.  What about Mr. Conley?  He's not a

19   defendant.

20         MS. SCHWAB:  He runs the office.  I misspoke by

21   calling him the defendant.  He's the representative of the

22   office.

23         MR. WHITE:  Thank you, your Honor.

24         (End of sidebar conference.)

25         COURTROOM DEPUTY CLERK URSO:  Can I please ask you to

1     raise your hand.

2              CHRISTINA ELIZABETH CORDA, SWORN.

3              COURTROOM DEPUTY CLERK URSO:  May I please ask you to

4     state your full name for the record, please.

5              MS. CORDA:  May I sit, your Honor?

6              My full name is Christina Elizabeth Corda.

7              THE COURT:  You will need to pull the microphone

8     toward you.

9              Members of the jury, there may have been a mistake in

10    one of the opening statements.  Mr. Conley is not a defendant.

11    The defendant is the Office of the Suffolk District Attorney.

12    He is, of course, a witness, but he's not a defendant.

13             How long will you be?

14             MR. CHURCHILL:  Your Honor, I expect we'll be

15    probably an hour and a half, two hours.

16             THE COURT:  We'll watch it.  You may proceed.

17                        DIRECT EXAMINATION

18     BY MR. CHURCHILL:

19    Q.   Good morning, Ms. Corda.

20    A.   Good morning.

21    Q.   Would you please state your date of birth.

22    A.   March 8th, 1982.

23    Q.   And so, how old does that make you today?

24    A.   34.

25             THE COURT:  If you lean back, you need to pull the

1    microphone further toward you.  Thank you.  Now, you can lean

2    back.

3        Q.    Ms. Corda, where did you grow up?

4        A.    I grew up in Holliston, Massachusetts.

5        Q.    And did you grow up your entire life there?

6        A.    Yes.

7        Q.    And where did you then go to college?

8        A.    I went to New York University for one year and then I

9    transferred to Boston College where I ultimately graduated.

10       Q.    And what year did you graduate from Boston College?

11       A.    I graduated from Boston College in 2004.

12       Q.    And what was your degree in?

13       A.    I was a double major in psychology and communications.

14       Q.    And what did you do immediately after going to -- or

15   graduating from college?

16       A.    I went directly to law school.

17       Q.    And why did you go to law school?

18       A.    I went to law school because ever since I was a child, I

19   wanted to be a prosecutor.

20       Q.    And what spurred your interest in being a prosecutor?

21       A.    Actually watching Law and Order is what initially

22   spurred my interest.  No one in my family has ever been a

23   lawyer, but I decided that I wanted to be a prosecutor.

24       Q.    So, what year did you then begin law school?

25       A.    I began law school in 2004.

Q.   And during law school, did you work some -- did you work
at all?

A.   Yes, during law school I had several jobs, one of which
I was a waitress.  I had started waitressing, I think, in high
school, actually.  I was waitressing and bartending in college
as well as law school.  So, I waitressed in law school at --
it was Woodland Golf Club in Newton.  Aside from that I also
worked for a solo practitioner in family law business.
Additionally, I interned in the Middlesex Probate and Family
Court under a program called Senior Justice Program, where I
would work behind desk counters at the Middlesex Probation and
Family Court, which were the probate, divorce or paternity
desks.  Aside from that, I also interned in the Suffolk County
District Attorney's Office Homicide Unit.

Q.   Let me stop you there.

     When did you intern in the Suffolk County DA's Office in
the Homicide Unit?

A.   In the Homicide Unit?  I believe it was in 2006.

Q.   And was that during law school or during the summer?

A.   That was during law school.

Q.   And how does that work?  How did it work that you were
working there while you were in law school?

A.   I would work around my classes, my scheduled classes, so
that I could work.

Q.   And were you being paid for that work?

```
1    A.   No.

2    Q.   Were you getting credit for the work?

3    A.   No.

4    Q.   So, you were a volunteer?

5    A.   Yes.

6    Q.   And how long did you intern or volunteer at the Suffolk

7    County DA's Office in the Homicide Unit?

8    A.   In the Homicide Unit, I believe it was either three or

9    four months where I was interning there.

10   Q.   And were there any other occasions when you worked at

11   the Suffolk County DA's Office during law school?

12   A.   Yes.  In my third year of law school, I was accepted

13   into a prosecution clinical program through the law school.

14   When I was accepted there, I was able to obtain an internship

15   in the Suffolk County District Attorney's Office where I

16   worked at the Roxbury division of the Boston Municipal Court

17   as a 303 certified student.

18   Q.   Let me ask you, because I'm sure the jury doesn't know,

19   what is a 303 certified student?

20   A.   So, there's a SJC or Supreme Judicial Court rule in

21   Massachusetts under 303, which states after your second full

22   year of law school, if you apply and are accepted, you can

23   then practice under a supervisor in court.  So, although

24   you're not actually a lawyer at that point, you can argue

25   motions or bails or do work inside the courtroom under a
```

1    supervisor.

2    Q.   And was this prosecution clinic for the entire third

3    year of law school?

4    A.   Yes.

5    Q.   And how many hours a week did you work at the Suffolk

6    County DA's Office?

7    A.   So, in junction with my class, the first semester that I

8    worked in Roxbury, I was going at least one day -- full day a

9    week.   In the second semester I would go at least two days a

10   week.

11   Q.   And what type of work generally did you do in that

12   clinic placement?

13   A.   When I was a 303 student at Roxbury, I did a variety of

14   work.  I would go in every day and speak to all the

15   prosecutors, including my supervisor at the time, who was

16   Jonathan Thymes (phonetic) and ask if any of the prosecutors

17   or the supervisor had any work that they would like me to do.

18   That would include intern responsibilities, such as copying.

19   It would also include doing research for certain issues or

20   law.  It would include writing up briefs, if one of the ADA's

21   had actually let me argue a case.  Additionally, on top of

22   that, I had my own assigned cases that were, obviously, not

23   that serious when I was an intern, but my supervisor had

24   assigned me cases as well.  I ended up actually arguing

25   motions, motions to suppress.  I filed memorandum of law for

1    motions to suppress.

2    Q.   Let me stop you there just to get some terminology

3    correct here.

4         So, when you say you argued a motion, what does that

5    mean to a lay person?

6    A.   So, as a prosecutor, you're working for the Commonwealth

7    of Massachusetts.  On the other side of the case, is what's

8    called a defense attorney and that's the person who represents

9    the person who is accused.  So, a lot of times in criminal

10   cases, when a defense attorney believes that something wasn't

11   done right constitutionally; for example, a search was illegal

12   or that there's not enough evidence to go forward in the case,

13   not enough probable cause, they can file certain motions

14   throughout the case.

15        A motion to dismiss can vary, but the most common one is

16   called a *DiBennadetto* motion, which is that the defense

17   attorney believes that there's not probable cause to actually

18   go forward on the case.  So, if someone was charged, for an

19   example, with possession of cocaine, then the defense attorney

20   could file a motion saying that the elements are not present

21   in the police report to go forward.

22        For a motion to suppress, that would be if a defense

23   attorney believed, for an example, that something was searched

24   in the defendant's house or home, person, car, or in any way

25   like that, that there was an illegal search or there were

1    statements that were illegally given.  There's all different

2    ways you can file motion to suppress, but they would file a

3    motion to state that --

4            THE COURT:  Ms. Corda, can you slow down a little

5    bit, please.

6            THE WITNESS:  Yes.  Sorry.  I just get faster.

7            THE COURT:  And, members of the jury, when she talks

8    about a motion, a motion is simply a request to the Court to

9    do something.

10           MR. CHURCHILL:  Thank you, your Honor.

11   A.   (Continuing) And then when that's filed, there is --

12   usually for a motion to suppress, there's actually an

13   evidentiary hearing --

14           THE COURT:  Slow down.

15   A.   -- where you present witnesses, and then there's also

16   oral argument regarding the motions.

17   Q.   Okay.  Now, in addition to the year-long clinical

18   placement you did in the Suffolk County DA's Office, did you

19   during law school intern or work in any other DA offices?

20   A.   Yes.  I also interned in the Middlesex District

21   Attorney's Office.

22   Q.   And when did you intern in the Middlesex DA's Office?

23   A.   I did that full time in the summer after my second year,

24   going into my third year.

25   Q.   And what unit did you work in in the Middlesex DA's

1    Office?

2    A.   I worked in the Cambridge District Court.

3    Q.   All right.  So, at some point in your third year, I take

4    it, you applied to be a prosecutor in the Suffolk County DA's

5    Office?

6    A.   I did.  I had some more work in law school.  I don't

7    know if you want to address that or if I --

8    Q.   What other work did you do?

9    A.   I also worked at a law firm in Boston, the Law Office of

10   Joel Schwartz for some time as well.

11   Q.   Okay.  So, at some point in your third year of law

12   school, you applied to the Suffolk County DA's Office?

13   A.   Correct.

14   Q.   And did you go through an interview process as part of

15   that application?

16   A.   I did.

17   Q.   And were you ultimately hired?

18   A.   I was.

19   Q.   And when did you begin working as a prosecutor for the

20   Suffolk County DA's Office?

21   A.   I began on September 24th of 2007.

22   Q.   What was your initial assignment?

23   A.   I was assigned back where I interned, which was the

24   Roxbury division of the Boston Municipal Court.

25   Q.   And can you explain briefly the difference between the

1    state court system, district court and the superior court?

2      A.   Sure.  So, there is district court or there is superior

3    court.  District court is the lower level of the two courts

4    and it's usually for lower-level crimes, although felonies are

5    also charged in district court, but when a defendant, I guess,

6    graduates or has a more serious crime, like murder or if they

7    have a record and there's more serious crimes, then there's a

8    superior court, which is, in essence, a step above district

9    court.  So, it depends on -- for a defendant to be charged in

10   either, what the type of crime is and what their past history

11   is.  Superior court is only felonies, and the district court

12   has a mix of felonies and misdemeanors where you can be

13   charged.

14     Q.   So, you started off at the district court level?

15     A.   Correct.

16     Q.   And how long were you at that initial assignment?

17     A.   At Roxbury?  I was there for a period of two years from

18   September of 2007 until September of 2009.

19     Q.   And what type of cases, generally, did you work on while

20   you were at the Roxbury District Court?

21     A.   I worked on a variety of cases, but there were actually

22   not just small cases in Roxbury.  There are serious cases as

23   well.  So, I worked on cases ranging from something small,

24   like a trespass or a shoplifting case, which was usually

25   dismissed, to ranges of possession of drug cases, possession

1  with intent or distribution, meaning that the person is

2  intending to deal drugs, violent cases, including stabbings I

3  had in Roxbury court.  I tried -- I'm sorry.  I had cases that

4  included breaking and enterings.  I had cases that included --

5          THE COURT:  Do the jurors understand what breaking

6  and entering means?

7          JURORS:  Yes.

8          THE COURT:  Do you?  Okay.  Do you understand the

9  difference between misdemeanors and felonies?

10         JURORS:  Yes.

11         THE COURT:  Good.

12  A.   (Continuing) I also had cases that included larcenies

13  where something is stolen.  I had domestic violence cases, and

14  I think actually I had a child abuse case as well.  So, I had

15  a range of cases when I was at Roxbury court.  Since -- the

16  good thing about -- in Suffolk County, I think, is since a lot

17  of the courts where I worked were in the city, there was a

18  range of crime.  It wasn't just small types of crimes.  I also

19  did trials or cases like operating under the influence,

20  assault and batteries, crimes involving police officers, and

21  so on.

22  Q.   And when you began as a district attorney, did you begin

23  with a group of other new employees?

24  A.   I did.

25  Q.   And is there -- do you refer to them as a class or some

1   other term?

2   A.   Yes.  We refer to it as a class.

3   Q.   Now, after your two years in Roxbury District Court,

4   where did you go then?

5   A.   I then was an assistant district attorney in the

6   Dorchester division of the Boston Municipal Court.  At that

7   time I transitioned in that my role was a Safe Neighborhood

8   Initiative prosecutor.

9   Q.   And what is the role of a Safe Neighborhood Initiative

10  prosecutor?

11  A.   So, at the time when I was sent to Dorchester to be a

12  Safe Neighborhood Initiative prosecutor, there were only four

13  in all of district court.  Every single district court in

14  Suffolk County that were --

15         COURT REPORTER:  I'm sorry.  Can you slow down,

16  please?

17         THE WITNESS:  Sure.

18  A.   (Continuing) When I was promoted there -- or sent there,

19  there was only four out of all of the district courts in

20  Suffolk County that were actually Safe Neighborhood Initiative

21  prosecutors.  In Dorchester it was myself and another

22  prosecutor, and what the role is, is that the Safe

23  Neighborhood Initiative prosecutors were assigned -- we're

24  assigned to kind of look over the hotspot areas where there

25  was a lot of gang influence or high crime and community issues

1    and things like that.  So, the DA's Office had focused on four

2    specific areas in Suffolk County where there was a prosecutor

3    who would specialize in that particular area for prosecuting

4    crime.

5    Q.  And as part of your position as an SNI prosecutor, did

6    you have to go out and have meetings in the community?

7    A.   Yes.  As a Safe Neighborhood Initiative prosecutor, I

8    was assigned to an area which is called B-3, which was

9    Mattapan and parts of Dorchester.  As part of my role, I would

10   attend not only community meetings with community members, but

11   I also would attend meetings with other community heads,

12   meaning law enforcement or ABCD or other community groups, and

13   when I would attend those meetings, I would often -- or every

14   time, actually, I would present information to update the

15   community members and the community heads about what was going

16   on in my specific area.  That would include that I actually

17   would write up maps and pinpoint areas where the most crime

18   was so that community members and community heads could see

19   what type of crime was going on and where they were

20   concentrated.  I also gave summaries on defendants that were

21   indicted or if a community member or if a group had asked me

22   about a specific address or concern, I would then update them

23   at the next community meeting as to whether anything was done

24   in that specific address or neighborhood to address those

25   issues and what, if any, crimes were committed, what, if

1    any --

2    Q.   Let me ask you, Ms. Corda, how were you selected to be

3    an NSI prosecutor?

4    A.   I was -- I believe that Dan Mulhern, who at the time was

5    chief of the Gang Unit, and, I'm assuming, the higher-ups -- I

6    basically was told that I was getting moved to Dorchester to

7    be a Safe Neighborhood Initiative prosecutor.  So, it was by

8    the office.

9    Q.   And then how long did you serve in the SNI role?

10   A.   I served in the SNI role for two years and one month.

11   Q.   And then where did you go?

12   A.   I then went to the Major Felony Unit in superior court.

13   Q.   And so, the difference, then, there was in Dorchester

14   you were in district court, and when you went to Major Felony

15   you were then in superior court?

16   A.   Correct.

17   Q.   And is that considered a transfer or a promotion?

18   A.   That is a promotion.

19   Q.   And did you get a raise at the same time?

20   A.   I believe I received a raise before -- slightly before I

21   was promoted to Major Felony Unit and then the raise in

22   conjunction with being promoted was I think a couple of months

23   afterwards.

24   Q.   And how long were you in the Major Felony Unit?

25   A.   Approximately eight months.

```
1    Q.   And did you have an understanding about -- well, strike
2    that.
3         What types of cases did you work on when you were in the
4    Major Felony Unit?
5    A.   In the Major Felony Unit the cases varied.  I would work
6    on armed robberies, bank robberies, unarmed robberies.  The
7    difference between an armed robbery, you have a weapon.  An
8    unarmed robbery you don't have a weapon.  I would work on
9    breaking and enterings.  I worked on stabbing cases, violent
10   cases.  I had -- I believe my first trial was an OUI fourth
11   offense trial.  So, I worked on a variety of cases that
12   involved victims, civilians, and law enforcement.  I also had
13   drug cases when I was in the Major Felony Unit as well.
14   Q.   And based on your experience with the DA's Office, was
15   it common for prosecutors to get promoted from the district
16   court into the Major Felony Unit?
17   A.   Yes.
18   Q.   And when you worked in the Major Felony Unit, who was
19   your are supervisor or unit chief?
20   A.   Masai King.
21   Q.   Is that a man or a woman?
22   A.   That's a man.
23   Q.   And then you said after about eight months, you went
24   somewhere else.  Where did you go then?
25   A.   I was then promoted to the Gang Unit in superior court.
```

1    Q.   All right.  And is the Gang Unit what's known as a

2    specialty unit?

3    A.   Correct.

4    Q.   And what other specialty units are there besides the

5    Gang Unit in superior court?

6    A.   There is the Child Abuse Unit, Sexual Assault and

7    Domestic Violence Unit.  That's one area.  The Narcotics Unit,

8    White Collar Crime or Special Investigations Unit.  That's one

9    unit.  And Homicide Unit.  There's a unit called Senior Trial.

10   I wouldn't say that's specialized.  That's usually the team

11   that you go on before you go on to the Homicide Unit.

12   Q.   And did the work that you performed for the Gang Unit --

13   well, first of all, you said that was a promotion for Major

14   Felony to Gang?

15   A.   Correct.

16   Q.   And were prosecutors ever promoted directly from

17   district court into the Gang Unit?

18   A.   That has happened, yes.

19   Q.   Has it happened with men?

20   A.   Correct.

21   Q.   Has it happened with women?

22   A.   No.

23   Q.   And in the Gang Unit, what kinds of cases did you work

24   on?

25   A.   At the Gang Unit I also had a variety of cases.  These

1    would be, in my opinion, more serious cases, but I also had

2    the same type of drug cases.  So, I had trafficking in

3    different classes.  It could be heroin.  It could be cocaine

4    or different drugs.  I had possession with intent to

5    distribute or distribution of drugs.  Again, that's when

6    someone either possesses a large amount of drugs in order to

7    sell it or actually did sell the drugs.  I had possession of

8    firearms cases.  I had shootings.  I had stabbings.  I had

9    aggravated assault and battery with dangerous weapon cases.  I

10   had armed robbery cases.  I had armed assault to murder case.

11   So, it would be a variety of cases, most of which would either

12   involve serious violence, firearms or drugs.

13     Q.   And it may be obvious from the name of the unit, but

14   what distinguishes, for example, working in the Gang Unit from

15   working in the Major Felony Unit?

16     A.   So, the Gang Unit focuses on gang members in the City of

17   Boston and tries to control the gang violence and focus on

18   gang violence as well as gang members.  So, the primary focus

19   is the violence and the members that are causing issues,

20   destruction, violence, death, and thing going on in Boston.

21     Q.   What are the issues doing gang work that make it more

22   difficult to prosecute those cases?

23          MS. PICCIRILLI:  Objection.

24          THE COURT:  What's the problem?

25          MS. PICCIRILLI:  He's asking for opinion, calling for

1    speculation.

2              THE COURT:  Are you objecting?

3              MS. PICCIRILLI:  Yes, I objected, your Honor.

4              THE COURT:  No.  She may continue.

5     A.   So, regarding a lot of the victims and even witnesses in

6    gang cases, a lot of them are not willing to come forward and

7    cooperate because of consequences that they either perceive or

8    actually happen regarding testifying against a specific person

9    or specific gang.  So, a lot of times there are issues with

10   people cooperating, and a lot of times the gang prosecutions

11   involve other gang members.  So, the victim of a shooting by a

12   gang member could also be a gang member.  So, a lot of times

13   there are the problems with people coming forward and

14   providing information or cooperating on cases.

15    Q.   So, let's just walk through briefly the life of a

16   typical case.  So, when a case gets assigned to you, what's

17   the first thing that you do in the Gang Unit?

18    A.   So, when a case first gets -- or got assigned to me,

19   what I would do is initially look over the reports that I did

20   have at that time.  There's usually at least an initial police

21   report.  I would then speak to a victim/witness advocate, who

22   are members who also work in the district attorney's office,

23   and check whether there had been any contact up until that

24   point, because when I'm assigned a case, it could either have

25   come from district court and sent up or it could be coming

1    directly from the police as an investigation.

2         After I did that, I would then speak to any of the

3    police officers or detectives that were assigned to the case

4    to ask them if they had any information and to try to get a

5    feel for the direction the case was taking or what information

6    or evidence that the officers knew at that time.

7         Depending on whether it was a case that came from

8    district court or from the police, it would depend on what I

9    would do.  If there was a case that came directly from the

10   police, that means it wasn't charged in district court.  We

11   call those John Doe investigations.  So, for an example, if

12   there was a shooting that happened and I was assigned the

13   shooting, but the police did not yet know who actually had

14   done the shooting, we would then investigate and put that case

15   in the grand jury and call different witnesses to try to see

16   if we could actually come up with who actually did the

17   shooting, and that happened in a range of cases.

18   Q.   Let me stop you there because I think --

19   A.   Sure.

20   Q.   -- we may need another clarification.

21        Can you explain in one or two sentences what a grand

22   jury is?

23   A.   Sure.  So, a grand jury is a group of jurors, much like

24   the jurors here, who are picked for a period of three months

25   at a time, and they sit and -- we had two grand juries at

1    Suffolk County, one was a special grand jury and one was a

2    regular grand jury.  So, the grand jurors sit for either three

3    or four days a week, the grand jurors, and all they do is hear

4    criminal cases day in and day out, and those jurors, after we

5    presented evidence, would ask determine whether there was

6    probable cause or not for any of the defendants that we asked

7    to be voted or any of the charges we asked to be voted.

8         So, when you're in superior court, you can't just go

9    forward with a case.  You have to bring it to the grand jury

10   first for it to be a case.  So, the grand jury would have to

11   determine that there is probable cause based on what the

12   prosecutor's presented, that the defendant could then get

13   arraigned in superior court.  So, that was something you had

14   to do first in superior court.

15   Q.   So, then, let's say charges are brought.  What's the

16   next step that you would then take as a prosecutor?

17   A.   Charges in superior court?

18   Q.   Yes.

19   A.   So, the next step I would take is that -- it's called an

20   arraignment.  That's the beginning of a criminal case.  I

21   would myself gather discovery prior to that.  I would write up

22   a statement of the case that I would read to the clerk,

23   magistrate at the arraignment, and I would also get together

24   discovery that I had on the case to present to the defense

25   attorney on the arraignment date, and we would go to the

1    session and arraign a defendant.

2        Q.   And then what happens after arraignment?

3        A.   After arraignment is done, conditions of bail are set or

4    not set, and then the next point is a pretrial.  So, what you

5    would do for a pretrial is you would get the other types of

6    discovery and turn that over to the other side as well.

7    There's also different steps aside from a pretrial in a

8    superior court case, which you set the schedule for at the

9    arraignment date.

10       Q.   So, eventually the case would go to trial or not, right?

11       A.   Right.   In between, I think how -- we touched upon it in

12   district court.  A lot of times there are many motions in

13   superior court that are also filed by defense attorneys.  So,

14   in between the arraignment and even necessarily the trial,

15   there is most likely to be a motion to suppress if any

16   evidence had been gathered on any of the cases.

17       Q.   And so, these motions that are filed before trial, what

18   role did you play as a prosecutor in terms of dealing with

19   those motions?

20       A.   So, I kept all of my cases.  We wouldn't hand off cases.

21   So, if every case that I had had a motion, I would every

22   single time submit a memorandum of law regarding the issues

23   and I would myself call witnesses, depending on the type of

24   motion, and then make arguments on the motion to suppress.

25       Q.   And then ultimately, cases that weren't otherwise

1    resolved would go to trial; is that fair to say?

2    A.    Correct.

3    Q.    And there's also something called a plea.  Can you

4    explain what that is?

5    A.    So, a plea is when a defendant decides that he or she

6    wants to actually admit the crime that they are accused of,

7    that's called a plea.  So, there would be a date set and I

8    would make a recommendation, the defense would make a

9    recommendation, and/or we would agree or disagree on one, and

10   the defendant would be accepting responsibility at that point.

11   Q.    Okay.  Now, when you first started working in the Gang

12   Unit -- and, again, that was in August of 2012 -- did you try

13   cases in the Gang Unit?

14   A.    Yes.

15   Q.    And how many trials did you have during in 2013?

16   A.    During 2013?  I believe I had either three or four

17   trials.

18   Q.    And then in 2014, how many trials did you do in the Gang

19   Unit?

20   A.    I believe I had three.

21   Q.    Okay.  And how did that compare relative to your peers

22   in terms of how many trials they were doing?

23             MS. PICCIRILLI:  Objection.

24             THE COURT:  What's the objection?

25             MS. PICCIRILLI:  It's not relevant to -- this case is

1    not relevant to trial experience of her peers.

2             THE COURT:  No, the objection is overruled.

3       A.   I'm sorry, could you repeat the question?

4       Q.   Sure.  How did the number of trials that you did in 2013

5    and 2014 compare to the number of trials that your peers were

6    doing?

7       A.   I would say there were some peers who would be doing the

8    same amount of trials.  There were some that would be doing

9    more and some doing less.  I would say, in general, for a Gang

10   Unit, we were a unit that tried a lot of cases, and I think we

11   either matched or were always over every other unit for trials

12   for the year in statistics.

13      Q.   All right.  What were your hours in the Gang Unit?

14      A.   So, it definitely is not a nine-to-five job.  My hours

15   differed depending on what I had to do.  Sometimes I would

16   come in at 6 o'clock in the morning and leave at 10:30 at

17   night.  Sometimes I would come in at 8:30 in the morning and

18   leave at 5:30 at night.  It depended.  I would say it's much

19   more than a 40-hour workweek.  I would take work home with me

20   on weekends.  I would go into work on weekends and complete

21   more work.  If I was on trial, then I would be in every

22   morning probably by 6 o'clock, 6:30, and I would be leaving

23   late at night, almost -- possibly to midnight, sometimes 8

24   o'clock.  It depended again, but it was a job where you

25   definitely had to put in more than 40 hours a week to even

```
 1   come close to getting any work done.

 2   Q.  And did you -- were you expected to keep a record of

 3   your hours or just -- or not?

 4   A.  No.

 5           THE COURT:  Let's stop for a moment and stretch.

 6           (Stretch break.)

 7           THE COURT:  I should mention, members of the jury --

 8   do sit down.

 9           Catherine Handel, who is the court reporter, is the

10   person who works harder than anybody else in the courtroom.

11   So, when we stretch, I need to wait for her to be able to

12   finish stretching because she has to pay constant attention.

13   She cannot sneeze.  She can't do anything.  She just has to

14   listen and record what is being said.  So, we need to be a

15   little bit cognizant of what she does.  You may proceed.

16           MR. CHURCHILL:  Thank you, your Honor.

17   Q.  Ms. Corda, so in early 2014 did you get information

18   about a raise in pay?

19   A.  Yes.

20   Q.  And let me put on the monitor here...

21           THE COURT:  Is this an exhibit in evidence?

22           MR. CHURCHILL:  It is, your Honor, yes.  This is

23   Exhibit 39.  If we may give the witness a set of exhibit

24   binders.

25           THE COURT:  Ms. Corda, you can pull the screen up,
```

1  adjust it so you can see it and tilt it.  There you go.

2  Q.  All right.  Ms. Corda, I'm showing you what has been

3  marked as Exhibit 39.  Now, this is a form letter, but did you

4  get a letter in substantially this form on or around January

5  -- in or around January 2014?

6  A.  I received a letter -- the day I received it -- it was

7  actually in February of 2014 that I received it.  I remember

8  because I was going to a Boston College basketball game with a

9  colleague.

10  Q.  And just directing your attention to the third paragraph

11  there, just to read along with me, "The difficulty of the

12  current fiscal year dictates that most salary improvements

13  will fall in the 2.5 to 3 percent range.  There are many

14  factors considered in adjusting staff salaries, but chief

15  among them is always merit."  Do you see that?

16  A.  I do.

17  Q.  Now, as of this time had you had any negative feedback

18  at all about your performance?

19  A.  No.

20  Q.  In fact, had you received praise about your performance?

21  A.  Yes.

22  Q.  And when you got this letter, you said in early --

23  February 2014, what percent raise did you get?

24  A.  So, the letter that was written to me said that I

25  received a -- I think it was either 2.89 or 2.98 percent

1   raise; however, my personnel records said I received 2.5

2   percent raise and the documents that the DA's Office provided

3   that are exhibits say that I received a 2 percent raise.

4   Q.   Well, did you ever do the math to determine exactly what

5   percent raise you did get?

6   A.   I believe I received a 2 percent raise.

7   Q.   What was your new salary?

8   A.   53,550.

9   Q.   When you learned about the raise that you received, did

10  you obtain any information from anywhere about what raises

11  other people received?

12  A.   Yes.

13  Q.   And how did you go about doing that?

14  A.   So, I am good friends with a lot of people I work with.

15  That's the nature of working at the District Attorney's

16  Office.  And so, a lot of my friends indicated what they

17  received, and there was just also the ability to look up what

18  people receive on online, since it is the district attorney's

19  office, on Mass dot gov open checkbooks.

20  Q.   So, you can go on the Internet and see the actual salary

21  of anybody in the office?

22  A.   Correct.

23  Q.   And did you do that?

24  A.   Yes.

25  Q.   And what conclusions did you come to as a result of the

1    information you looked at?

2    A.   I came to the conclusion that I was being paid less

3    overall than a number of males who were either my class, had

4    started after me, so were below my class, or had less combined

5    years of experience.

6    Q.   So, what did you do as a result?

7    A.   I initially -- this was something that was discussed and

8    I touched on a little bit between friends in the office.  This

9    was something that had already come up within the office

10   regarding concerns about females getting paid less than males

11   in pay disparity.  This was something that was ongoing.  What

12   I specifically did was I discussed this with a number of

13   people and I also sent out an email to Patrick Haggan in March

14   2014 to address this.

15   Q.   Okay.  So --

16           THE COURT:  Excuse me one minute.

17           Members of the jury, in the second row there is a box

18   next to some of your seats.  You can open that and pull out

19   the screen.  So you don't have to look over the shoulders of

20   your fellow jurors.

21           (Pause.)

22           THE COURT:  Okay.  You may proceed.

23   Q.   Remind us who Patrick Haggan -- what his position was at

24   the time?

25   A.   Patrick Haggan is the First Assistant to the District

1    Attorney.  In other words, he's the first person below the

2    District Attorney.

3      Q.   And why did you go to him as opposed to somebody else?

4      A.   I went to him because I know that people have gone to

5    him before, because I have had interactions with him, and

6    since he is the first person under the District Attorney, I

7    thought that he was an appropriate person to discuss this

8    with.

9      Q.   And so, showing you now what has been marked as Exhibit

10   11.  This is an email that was sent to Mr. Haggan about a

11   meeting that was -- he was going to have with you.  Do you see

12   that?

13     A.   I do.

14     Q.   And when was your initial meeting with Mr. Haggan?

15     A.   It wasn't until May 10th of 2014.

16     Q.   And who was present at that meeting?

17     A.   Myself and Patrick Haggan.

18     Q.   And describe for us briefly what you said to Mr. Haggan

19   and what Mr. Haggan said to you.

20     A.   So, when I went to the meeting, I went into his office.

21   He had some paper in front of him that he was referencing, and

22   I know he had already met with met Rilwan Adeduntan at that

23   time.

24     Q.   Let me ask -- let me stop you there because his name

25   hasn't come up.  Who was Rilwan?

1    A.   Rilwan Adeduntan was another prosecutor I worked with

2  that I was good friends with.  He's someone that started in my

3  class in 2007.  I first went to Roxbury and then we both were

4  together in Dorchester for the last two years in district

5  court.  We were also promoted together to the Major Felony

6  Unit, and then we were also promoted together to the Gang

7  Unit.

8    Q.   So, when you went to the meeting then -- continue to

9  describe what you said to Mr. Haggan and what Mr. Haggan said

10  to you.

11    A.   So, I believe Mr. Haggan initially said he knew why I

12  was there about the salary.  What I had said to Mr. Haggan is

13  -- I basically went there and said I'm unhappy with the amount

14  of money that I got for that raise.  I wanted to ask you if

15  there's anything that I can improve on or if there's any

16  problems with my work, if there's anything I can improve on

17  and if that's a reason why my salary is where it is at this

18  point.  He assured me that that was not a reason, that I doing

19  great work.

20       I then also explained to him that there was an ADA,

21  Darcy Kofol, who has been mentioned, who had -- I think she

22  was three classes under me.  So, three years after I had

23  started.  And that she was making, I think, 500 less than me

24  at that point.  I then specifically named a number of

25  comparators -- or male comparators that were exactly my class,

1    less experienced than me or total less combined experience and

2    named all of those people as people who made more money than

3    me.

4    Q.   And what did Mr. Haggan say to you?

5    A.   He initially said that there was a female that made less

6    than Rilwan and I and that was Migdalia Nalls, and she's an

7    Hispanic female.

8          THE COURT:  Can you pull the microphone toward you

9    again, please.

10         THE WITNESS:  Sure.  Sorry.

11   A.   (Continuing) He initially said that there was one person

12   and making less than Rilwan and I in our class.  That was

13   Migdalia Nalls, who was an Hispanic female who left the office

14   a short after that.

15         MS. PICCIRILLI:  Objection, your Honor, relating to

16   the motion in limine that was allowed.

17         THE COURT:  In that case, don't talk about it.

18         MR. CHURCHILL:  All right.

19   Q.   So, what did you say in response?

20   A.   I don't think I said anything at that point in response.

21   And he then said that he went through some of the people I

22   named.  So, I had named Troy Anderson, Greg Kenny, Ben

23   Goldberger, Nick Brandt, and I believe there was one other

24   person.  Oh, Vince DeMore.  So, I named those specific people

25   at the meeting with him.

```
1              I think for actually Mr. Brandt, what he said to me is
2     if I was -- or if I were Mr. Brandt, I would say I wasn't
3     compensated for being a supervisor.  So, now I'm getting --
4     I'm evening it out now.  I think he made a comment about Ben
5     Goldberger, and that was basically it about comments back.
6     What he said is that --
7              MS. PICCIRILLI:  Objection.
8              THE COURT:  If we're getting into matters that I
9     ruled out earlier, please don't.
10             MR. CHURCHILL:  I don't think this particular
11    testimony was, your Honor.
12             MS. PICCIRILLI:  That was actually a hearsay --
13             THE COURT:  The question is not just the question,
14    but the answer.
15             MR. CHURCHILL:  Yes.  Understood.
16    A.   Could you repeat the question?
17    Q.   Well, let's move on.
18         So, you discussed with Mr. Haggan some of the specific
19    comparators that you were looking at?
20    A.   Correct.
21    Q.   And how was the meeting left?  What was going to happen
22    next?
23    A.   So, he had said that he was going to speak with John
24    Towle and the District Attorney and -- because he actually
25    didn't have any say in this raise that we received since he
```

1    was on trial, he specifically said that, he believed that

2    Rilwan and I were being had for a bargain at that point, and

3    he said that he would recommend to the District Attorney and

4    John Towle that we would be receiving raises.

5    Q.   You said something about Mr. Haggan not being involved

6    in the last raise process.  What did he say to you in that

7    regard?

8    A.   So, he said that -- so, the form letter that is in

9    evidence isn't exactly the one that I received.  It had said

10   that -- it specifically named people that were involved in the

11   decision making for receiving a raise, and it included the 7th

12   floor, which is the executive floor, which was Pat Haggan,

13   John Towle, Pappas and -- John Pappas, et cetera.  So, what he

14   said is that he was actually on trial at the time that the

15   decisions were made for the raises.  So that he specifically

16   actually did not have any input in the raises for -- the

17   raises that I received the letter in February of 2014, and

18   that he agreed that we should be making more money and would

19   make that recommendation to the District Attorney.

20   Q.   So, let me show you now what has been marked as Exhibit

21   13, and you if you look at the bottom, it's an email chain.

22   So, chronologically it starts from the bottom and works up.

23   There's an email from you to Mr. Haggan on April 7th, and it

24   indicates that you're following up from your meeting on March

25   10th?

1    A.   Oh, that reminds me.  I'm sorry.  I said May 10th in my

2   earlier testimony.  I meant March 10th.  I apologize.

3         Yes, that is.

4    Q.   And then we can see his response there where he is

5   apologizes for the delay.  He says, "My recommendation is with

6   the DA now, but I do not yet have an answer.  I will let you

7   know as soon as a decision is made.  Feel free to come speak

8   to me if you would like any additional explanation."

9    A.   Correct.

10   Q.   And then you got back to him on April 27th at the top

11  and you were checking in, again, to see what was going on?

12   A.   Correct.  Although he said that he would let me know as

13  soon as a decision is made.  I hadn't heard.  So, then I

14  responded a few weeks later to check in.

15   Q.   So, then showing you what's been marked as Exhibit 14,

16  there's an email below from Mr. Haggan saying, "Please come

17  and see me when you have a moment, so I can update you on the

18  salary discussion."

19        And you responded -- this is on May 8th -- that you're

20  impanelling a jury today, but you'll try to stop by later in

21  the afternoon or tomorrow?

22   A.   Correct.

23        MS. PICCIRILLI:  Objection.

24   Q.   Now, what --

25        MS. PICCIRILLI:  Objection, your Honor.

1    Q.   What trial were you impaneling a jury for at that time?

2         THE COURT:  What is the objection?  If you have an

3    objection, please say "objection" so I can know that you're --

4         MS. PICCIRILLI:  I said "objection," your Honor.  I

5    apologize.  I'll speak louder, but I did say "objection"

6    twice.

7         This is direct examination and this has -- I've let

8    it go for sometime now, but there's been --

9         THE COURT:  What's the objection?

10        MS. PICCIRILLI:  Leading.  She's on direct

11   examination.  Counsel is testifying.

12        THE COURT:  Okay.  Okay.

13        Members of the jury, a leading question is a question

14   that suggests the answer.  I could ask you, for example, "What

15   time did you get up this morning?"  Not a leading question.

16   Or I could ask the question as, "Now, you got the up at 7

17   o'clock this morning, didn't you?"  That would be a leading

18   question.

19        In general, when counsel call the witness to the

20   stand and conduct what we call direct examination, the purpose

21   of that is to have the witness tell the story, and on

22   cross-examination the object is very different.  It is now to

23   test the story that the witness has told on direct

24   examination.

25        So, for direct examination purposes, in general, we

do not allow leading questions because it becomes testimony of
the lawyer more than of the witness.  On cross-examination you
will hear many leading questions.  I don't know whether they
really do a whole lot of good, but those are the rules.

There are, however, exceptions to all rules,
including that there are exceptions to all rules.  And so, at
the moment we will proceed and counsel will tame the leading
questions.

MR. CHURCHILL:  Okay.

THE COURT:  I mean, there's also a certain judgment.
You know, sometimes when it's very important to have the
witness' exactly testimony about something, then you want to
stop leading questions, but not every leading question the
Court is going to stop.  This is not an encouragement to
counsel.

MR. CHURCHILL:  Understood, your Honor.

Q.   So, at the top of Exhibit 14 there's an email from you
to Mr. Haggan.  Do you see that?

A.   I do.

Q.   And can you just read that quickly out loud.

A.   Sure.  My response was, "Hi, Pat.  Thank you for your
email.  I am impaneling a jury today, but will try to stop by
later in the afternoon or tomorrow.  Thanks.  Christina."

Q.   All right.  Now, let me show you what has been marked as
Exhibit 51.  Do you recognize this document?

1    A.   I do.

2    Q.   And directing your attention below, there's an email

3  from you to Mr. Haggan.  Do you see that?

4    A.   I do.

5    Q.   What's the date on that?

6    A.   The date is Friday, May 16th, 2014.

7    Q.   What did Mr. Haggan say in this email to you?

8    A.   Subject says, "Congratulations" with an exclamation

9  point.  In the body states, "Tremendous verdict, Christina.

10  Extremely difficult case.  I heard that your closing was

11  fantastic.  Great job."

12    Q.   And then you respond to him?  We can see that.

13    A.   Yes.

14    Q.   And then what does he say to you in response?

15    A.   His response is, "Again congrats.  I let the DA know and

16  he was very pleased.  Let's meet sometime next week.  Thanks.

17  And have a great weekend."

18    Q.   And did you then meet with him the next week?

19    A.   I don't recall the exact date, but I did have a meeting

20  with him.

21    Q.   So, let me show you what's been marked as Exhibit 15.

22  Do you see this is a meeting notice?

23    A.   I do.

24    Q.   Does this refresh your memory about when you met with

25  Mr. Haggan?

1    A.   Yes.  I did not meet with him the next week.

2    Q.   Okay.  So when did you meet with him?

3    A.   I think that email is May 18th, and I actually met with

4    him on June 3rd.

5    Q.   So, this was the second meeting you had with Mr. Haggan

6    about your salary?

7    A.   Correct.

8    Q.   And what did you say to Mr. Haggan and -- well, first of

9    all, was anybody else present at this meeting?

10   A.   Yes.

11   Q.   Who else was there?

12   A.   ADA or Assistant District Attorney Rilwan Adeduntan was

13   present at the second meeting.

14   Q.   So, what did you say to Mr. Haggan and what did Mr.

15   Haggan say to you about your salary?

16   A.   So, at the second meeting Mr. Haggan said that he had

17   good news and bad news for Rilwan and I.  He said the bad news

18   was that he had told the DA that he believed we both should

19   have more money and get the raise at this point, that the

20   District Attorney had said to him that he can't do that now

21   because there would be 20 other people in line asking for the

22   same thing at that point.

23        The good news was that we would be getting a raise and

24   as of July 1st it would be the number one priority of the

25   District Attorney and Patrick Haggan that Rilwan and I would

1    be receiving raises.

2        He also had said, again, that the District Attorney had

3    -- was pleased with the trials that we had done because ADA

4    Adeduntan had also just tried a few cases or a case with a

5    positive result.  And so, he had passed those words on from

6    the District Attorney.  After, Mr. Haggan said as of July 1st

7    -- he's the one that brought up that specific date.  I then

8    said, If we don't hear from you as of July 1st, can I bug you,

9    can I harass you.  And he said feel free, that we should be

10   hearing from him by July 1st.  If not, then I can feel free --

11   or we could feel free to continue to ask him about that.

12   Q.   What is the significance of July 1st?

13   A.   That's when the fiscal year begins, I believe, and

14   that's -- oh, I'm sorry, I did forget to mention.  He also

15   stated that the good news in conjunction with us being the

16   number one priority is that we were going to be receiving an

17   increase in budget.

18   Q.   So, when July 1st came, what happened?

19   A.   I had not heard anything from Mr. Haggan.

20   Q.   So, I'm showing you Exhibit 16, and the beginning part

21   of Exhibit 16, at the bottom, there's an email from you to Mr.

22   Haggan on July 7th.  Do you see that?

23   A.   I do.

24   Q.   Can you read that, please?

25   A.   Sure.  The email states, "Hi, Pat.  Hope you had a nice

1   holiday weekend.  I know you had told me to give you a

2   reminder, a/k/a bug you, if Rilwan and I had not heard from

3   you after the new fiscal year.  So, I wanted to shoot you an

4   email to check in on the status.  Thanks."  I cc'd Rilwan

5   Adeduntan on that email.

6   Q.   What was Mr. Haggan's response?

7   A.   On July 11th of 2014, Mr. Haggan's response was, "Chris

8   and Rilwan, thank you for the email to follow up, as I

9   instructed you to do.  I apologize for the delayed response,

10  but I was on a work-related trip this week and just got back

11  last night.

12      "Unfortunately, over the past two weeks, the DA and I

13  have not had mutual availability to meet to discuss the salary

14  issue in the new fiscal year.  I do expect, however, to speak

15  to him next week about this and other related personnel

16  issues.  I hope to have an update for you by the end of next

17  week.  Thank you for your continued hard work and patience."

18  Q.   Now, as of this time how long had it been since you

19  first raised your concern about your salary?

20  A.   Over four months.

21  Q.   All right.  If we go to the next email at the bottom,

22  there's one from you to Mr. Haggan on July 22nd.  Do you see

23  that?

24  A.   I actually can't see it on the screen.  It needs to be

25  pulled up a little bit.  Would you like me to read it?

1    Q.   Yes, please.

2    A.   July 22nd.  It states, "Hi, Pat.  Hope you had a nice

3    weekend.  Just checking in on how your meeting went with Dan

4    last week.  Thanks."  And I also cc'd Rilwan on that.

5    Q.   And did you hear back from Mr. Haggan?

6    A.   No.

7    Q.   So, what happened next?

8    A.   I did not hear back from him at all after July 22nd,

9    2014.  So, then in -- on September 8th of 2014, after a month

10   and a half of not hearing back from him, I sent him another

11   email.

12   Q.   And can you read your email?

13   A.   Yes.  It says, "Hi, Pat.  Hope you had a nice weekend.

14   Wanted to check in again about our salary status and meeting

15   you had with the DA in July.  Thanks."  And I also cc'd

16   Rilwan.

17   Q.   And then what was Mr. Haggan's response?

18   A.   He responded and stated, "Sorry for the delayed

19   response.  The DA decided that all raises will be calculated

20   as part of our current review process (new evaluation forms/

21   reviews/et cetera) that we hope to have completed by the end

22   of October.  Feel free to come see me if you have any

23   questions or concerns.  Thanks.  Pat."

24   Q.   And then did you respond to him?

25   A.   I did.  I responded -- he emailed in the evening and I

1    responded the next day, 12:57 p.m. and cc'd Rilwan and wrote,

2    "Hi, Pat.  Thank you for your email.  I would like to come see

3    you to discuss this whenever you are free.  Thanks."

4    Q.  Did you ever hear back from him?

5    A.  No.

6    Q.  Let me show you now a document that was marked as

7    Exhibit 30.  And what is this?

8    A.  This is an exchange between myself and Rilwan Adeduntan

9    that took place on September 10th of 2014.

10   Q.  And so, the part that says, "Wow," who wrote that?

11   A.  I did.

12   Q.  And when you said, "Thought number one priority July

13   1st," what were you referring to there?

14   A.  Because Pat had specifically said to both myself and

15   Rilwan Adeduntan in that meeting on June 3rd, that it was his

16   and the DA's number one priority, that as of July 1st, we

17   would be receiving raises.  So, when I received the email that

18   said now the DA was waiting as part of the self evaluation

19   process, Rilwan had forwarded me a message the next day after

20   we received it, September 10th, and I wrote back saying I

21   guess this isn't going to happen as they promised, because

22   they said we were the number one priority as of July 1st.

23   Q.  All right.  So, let's move now to Friday, September

24   19th.  What did you do in the office that day in terms of

25   work?

1    A.  So, that was a Friday.  I don't know specifically what I

2    did.  I would either have gone to court or been in the grand

3    jury or had preparation meetings with police officers, but I

4    would have been doing normal work on Friday.

5    Q.  And was there anything else you did relevant to your

6    salary that day?

7    A.  Yes.  So -- excuse me.  We had received an email, I

8    think it was September 9th of 2014, around that time, that

9    there was going to be a new process implemented where the

10   assistant district attorneys as well as other staff were going

11   to have to start doing self evaluation processes.

12        So, there's an email, I believe, sent by Dan Conley, I

13   think it was office-wide, indicating that that was going to be

14   something that we were starting and provided a form on that

15   email or subsequent email, actually, I believe, and that we

16   were all to have filled out our self evaluation form by

17   Friday, September 19th, 2014, at which point once we turned

18   those in, then our supervisors would then be taking over our

19   self evaluations.

20   Q.  And prior to this time, had you ever been asked to

21   complete a self evaluation in the DA's Office?

22   A.  No.  And, in fact, I have never had an evaluation

23   whatsoever in the District Attorney's Office in my seven years

24   there.

25   Q.  All right.  Now, on this Friday, was there a party that

1   night?

2   A.   There was.

3   Q.   And what was the occasion of that party?

4   A.   It was a colleague who actually worked in the Gang Unit

5   at the time.  Her name was Christine Walsh.  It was her going-

6   away party.

7   Q.   And where was the party?

8   A.   Her going-away party was held at The Fours, which is a

9   bar that's located by the big North Garden area of Boston.  I

10  think it's on Canal Street, but I might be wrong.

11  Q.   And had you been to going-away parties for the office

12  before?

13  A.   I had been going-away parties for the office before.

14  They were prevalent.

15  Q.   How many had you gone to before?

16  A.   Definitely over ten.

17  Q.   And where are going-away parties typically held?

18  A.   In my experience, the ones that I can think of right

19  now, I've gone to the Fours prior.  I gone to a place that's

20  called Johnny's On The Side.  It's in Boston across the street

21  from the Boston Municipal Court central division area.  I had

22  also been to North Star, which also a bar in that area, but

23  they would be at bars.

24  Q.   Now, did you socialize with people from work?

25  A.   I did.

```
 1    Q.   And based on your observations and experience, was that

 2   common in the DA's Office?

 3             MS. PICCIRILLI:  Objection.

 4             THE COURT:  What's the objection?

 5             MS. PICCIRILLI:  It's the motion in limine in was

 6   ruled on, your Honor.

 7             THE COURT:  Which number motion are you talking

 8   about?

 9             MS. PICCIRILLI:  I believe that was No. 7, your

10   Honor.

11             THE COURT:  Which docket number?

12             MS. PICCIRILLI:  I can tell you that in a minute.

13             THE COURT:  Members of the jury, a motion in limine

14   is a document that lawyers are prone to file before the trial

15   begins that asks the Court to make certain rulings about how

16   the trial should proceed.  Because it's very difficult to make

17   these rulings out of context, I generally don't.  So, now I'm

18   curious which one we're talking about.  There were a lot of

19   them.

20             MS. PICCIRILLI:  I think it's No. 70, your Honor.

21             THE COURT:  7-O?

22             MS. PICCIRILLI:  Yes.

23             THE COURT:  That one was reserved for trial.  Do you

24   want me to rule on it now?

25             MS. PICCIRILLI:  We discussed it today, your Honor.
```

```
1              THE COURT:  I'm sorry?

2              MS. PICCIRILLI:  We discussed it today, your Honor,

3      pretrial.

4              THE COURT:  I don't think that's what we're talking

5      about at the moment.  We're not going to get into a lot of the

6      stuff that's here, but the evidence that she's given will

7      stand.

8              MS. PICCIRILLI:  Thank you.

9      Q.   All right.  Now, in addition to going-way parties, were

10     there other office events that you attended outside of the

11     office?

12     A.   Yes.

13     Q.   What other types of --

14             MS. PICCIRILLI:  Objection, your Honor.

15             THE COURT:  No.  She may have some evidence as to

16     these matters.

17             MS. PICCIRILLI:  Thank you.

18     A.   So, a lot of people in the DA's Office would celebrate

19     at different events, including promotions or transfers within

20     court or if someone got a positive result on a jury verdict,

21     things like that, then there would be members of the District

22     Attorney's Office that would meet.  Additionally, the District

23     Attorney's Office members, some of them would also celebrate

24     birthdays and things like that together as well.

25     Q.   And were there also office functions outside of the
```

1    office?

2     A.   Yes, there were office functions, including there was a

3    holiday party that the District Attorney's Office threw every

4    year that was known to the assistant district attorneys as

5    being mandatory, and that would be at the -- in early December

6    of each year.  So that was something that was done every

7    single year that I was there.

8     Q.   Now, at holiday --

9              THE COURT:  Are you finished with the parties?

10             MR. CHURCHILL:  No, your Honor, but I can --

11             THE COURT:  Well, I think we'll finish with the

12   parties and finish with the trial this morning.

13             We will now suspend until tomorrow morning at 9:00,

14   members of the jury.  Ms. Urso will explain to you about the

15   drill getting into the building.  Wear your badges, please.

16   It helps the court security officers to get you through

17   quickly and, as I said earlier, if one of you is missing, we

18   can't start.  So, please try to be punctual, and we will carry

19   on tomorrow morning at 9:00.  In the meantime, please leave

20   your notebooks on your chair and try not to think much about

21   this case this afternoon.

22             COURTROOM DEPUTY CLERK URSO:  All rise, please.

23             THE COURT:  And if there were to be any news reports

24   about the trial, don't read them.  You need to decide the case

25   based on what you hear in the courtroom, not on what the

1    reporter thinks the evidence was.

2            COURTROOM DEPUTY CLERK URSO:  You can leave your

3    notebooks on your chair, please.  Thank you.

4            (Jury excused.)

5            THE COURT:  Court is in recess until 2:00, this case

6    until 9:00 tomorrow morning.

7            (Adjourned, 1:01 p.m.)

8

9

10

11                    C E R T I F I C A T E

12            I, Catherine A. Handel, Official Court Reporter of the

13   United States District Court, do hereby certify that the

14   foregoing transcript, from Page 1 to Page 82, constitutes to the

15   best of my skill and ability a true and accurate transcription of

16   my stenotype notes taken in the matter of Civil Action No.

17   15-10628-RWZ, Christina Corda versus Suffolk County District

18   Attorney's Office.

19

20
     May 27, 2016          /s/Catherine A. Handel
21   Date                  Catherine A. RPR-CM, CRR

22

23

24

25